# Exhibit "M"

*Blank Rome**GSR** Draft 9/**11**21/23*

# LEASE BETWEEN

## 92 THIRD STREET LLC,
### as Landlord

### and

### [_____],
### as Tenant

PREMISES:

Portions of the cellar, first (1st) floor and second (2nd) floor
in the building located at
68-92 Third Street
Brooklyn, New York

# TABLE OF CONTENTS

**LEASE**

Article                                                              Page No.

1. COMMENCEMENT OF TERM: ......................................................................... 1
2. OCCUPANCY: ................................................................................................... 1
3. RENT: ................................................................................................................. 3
4. DEFINITIONS: ................................................................................................... 4
5. ADJUSTMENTS OF RENT: .............................................................................. 5
6. LATE PAYMENT CHARGE: ............................................................................. 8
7. ALTERATIONS: ................................................................................................. 8
8. REPAIRS; SERVICES PROVIDED BY LANDLORD: .................................... 11
9. WINDOW CLEANING: .................................................................................... 15
10. REQUIREMENTS OF LAW, FIRE INSURANCE, FLOOR LOAD: ............... 15
11. SUBORDINATION: .......................................................................................... 16
12. PROPERTY LOSS, DAMAGE, REIMBURSEMENT, INDEMNITY: ............. 17
13. DESTRUCTION, FIRE AND OTHER CASUALTY: ....................................... 18
14. EMINENT DOMAIN: ....................................................................................... 20
15. ASSIGNMENT, SUBLETTING, ETC.: ............................................................ 21
16. ELECTRIC CURRENT: .................................................................................... 26
17. ACCESS TO PREMISES: ................................................................................. 26
18. VAULT, VAULT SPACE, AREA: .................................................................... 27
19. BANKRUPTCY: ............................................................................................... 27
20. DEFAULT: ........................................................................................................ 28
21. REMEDIES OF LANDLORD AND WAIVER OF REDEMPTION: ............... 28
22. FEES AND EXPENSES: ................................................................................... 30
23. NO REPRESENTATIONS BY LANDLORD: .................................................. 30
24. END OF TERM: ................................................................................................ 31
25. QUIET ENJOYMENT: ..................................................................................... 31
26. CONDOMINIUM: ............................................................................................ 31
27. NO WAIVER: .................................................................................................... 33
28. WAIVER OF TRIAL BY JURY: ...................................................................... 33
29. INABILITY TO PERFORM: ............................................................................ 34
30. CAPTIONS: ....................................................................................................... 34
31. ADJACENT EXCAVATION — SHORING: .................................................... 34
32. RULES AND REGULATIONS: ....................................................................... 34
33. SECURITY: ....................................................................................................... 35
34. SUCCESSORS AND ASSIGNS: ...................................................................... 37
35. INSURANCE: .................................................................................................... 37
36. BROKERAGE: .................................................................................................. 39
37. ESTOPPEL CERTIFICATE: ............................................................................ 40
38. HOLDING OVER: ............................................................................................ 40
39. NOTICES: ......................................................................................................... 41
40. CERTAIN RIGHTS RESERVED TO LANDLORD: ....................................... 42
41. HAZARDOUS MATERIALS: .......................................................................... 42
42. LANDLORD'S WORK: ..................................................................................... 43
43. TENANT'S MEMBERS .................................................................................... 43
44. EMISSIONS: ..................................................................................................... 45
45. TENANT'S OPERATING OBLIGATIONS: .................................................... 47

46.     ABATEMENT PROGRAMS: ...................................................................................... 48

47.     ZONING LOT MERGER AGREEMENT: ................................................................... 49

48.     MISCELLANEOUS: ................................................................................................... 49

AGREEMENT OF LEASE, made as of this ___ day of September, 2023, between 92 THIRD STREET LLC, a New York limited liability company, having its principal place of business at c/o Samson Management LLC, 118-35 Queens Boulevard, Suite 1710, Forest Hills, New York 11375 ("**Landlord**"), and [TENANT TO PROVIDE NAME OF ENTITY]_____, a [_____] limited liability company, having an address at [_____] ("**Tenant**").

<u>WITNESSETH</u>:

Landlord hereby leases to Tenant and Tenant hereby hires from Landlord certain space consisting of portions of the cellar, first (1st) floor and second (2nd) floor, substantially as shown on the floor plans annexed hereto as <u>Exhibit A</u> and made a part hereof (the "**Premises**") in the building known as 68-92 Third Street, Brooklyn, New York (the "**Building**"; the Building, together with the land on which it is located (the "**Land**") and all other improvements thereon being called the "**Property**"), on the terms and conditions hereinafter set forth.

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives, successors and assigns, hereby covenant as follows:

**COMMENCEMENT OF TERM:**

1.    (A)    ==The term of this Lease (the "**Term**" or "**term**") shall commence on September ~~15,~~____, 2023[1] (the "**Commencement Date**"),== and shall end on the date (the "**Expiration Date**") which is the last day of the month preceding the month in which occurs the tenth (10th) anniversary of the Commencement Date (as hereinafter defined) or until such term shall sooner cease and terminate as herein provided.

(B)    Landlord and Tenant hereby acknowledge that ~~Coworkers~~Coworkrs 3rd Street LLC ("~~Coworkers~~Coworkrs") is currently in occupancy of the Premises pursuant to a terminated lease between Landlord and ~~Coworkers~~Coworkrs 3rd Street LLC, dated as of October 6, 2014 (as the same may have been or may be amended and/or assigned, the "**Existing Terminated Lease**").  Tenant hereby represents and warrants to Landlord that, on or before the Commencement Date, Tenant will acquire title to all of the furniture, fixtures and equipment of ~~Coworkers~~Coworkrs (the "~~Coworkers~~**Coworkrs FF&E**") that is currently located in the Premises .  Simultaneously with the execution and delivery of this Lease, Landlord, Tenant, and ~~Coworkers~~Coworkrs shall enter into that certain **[Tri-Party Agreement]** whereby, among other things, (i) Tenant shall acquire title to the ~~Coworkers FF&E, and (ii)~~ **[Coworkers will assign all of its right, title and interest in and to its [membership agreements] with respect to the Premises and Tenant shall accept such assignment].  [NTD:  TENANT TO ADVISE IF ASSIGNMENT OF MEMBERSHIP AGREEMENTS WILL BE HANDLED IN TRI-PARTY OR PURSUANT TO A SEPARATE AGREEMENT]**Coworkrs FF&E, and (ii) Landlord will release Coworkrs and all Guarantors for the Existing Terminated Lease from any and all liability and other obligations due and owing from Coworkrs and/or the Guarantors arising out of, under or pursuant to the Existing Terminated Lease and all guarantees executed in connection therewith.  For the avoidance of doubt, Landlord and Tenant acknowledge and agree that the Premises does not include the portion of the Premises currently occupied by Coworkers pursuant to that certain License Agreement, dated as of March 2,

---

[1] ~~NTD:  9/15/23 Commencement Date will not be changed, regardless of when Lease is executed.~~  NTD:  To be discussed.

2023, between Landlord, as licensor, and Coworkers, as licensee, with respect to a portion of the second (2nd) floor of the Building more particularly described in the License Agreement.

(C)    Tenant has examined the Premises and agrees to accept possession of the Premises (and the Coworkers FF&E as well as any existing equipment located in or exclusively serving the Premises) in the "as is" condition and state of repair which shall exist on the Commencement Date, with the existing Coworkers members in occupancy of the Premises; it being understood and agreed that the Premises will not be delivered in vacant, broom clean condition, free of tenancies and occupancies. Tenant further agrees that Landlord shall have no obligation to perform any work or make any installations in order to prepare the Premises for Tenant's occupancy.

**OCCUPANCY:**

2.    (A)    Tenant agrees to use, occupy, operate and maintain the Premises solely for general, executive and administrative office purposes, including shared office space, conference rooms, internal lounges, café facilities (for Tenant's Members' (as hereinafter defined) use), break rooms, event space, recreational areas, reception areas, and other common space on a long or short term basis where full service suite services consistent with Tenant's normal business offerings and any other uses agreed to, in writing, by Landlord in its sole and absolute discretion (collectively, the "**Permitted Use**") and for no other purpose whatsoever without Landlord's consent, which may be granted or denied in Landlord's sole and absolute discretion. Without limiting the foregoing, in no event shall the Premises or any part thereof be used for any of the following for so long as the Tenant named herein, [_____], shall be the Tenant and for so long as the Premises shall be used for the Permitted Use (it being understood and agreed that in the event that the Tenant named herein shall no longer be the Tenant or if the Premises shall no longer be used for the Permitted Use, the list below shall be deemed deleted and shall be replaced with the list attached hereto as Schedule 1):

(i)    the conduct of a retail bank, trust company, savings bank, savings and loan association or any branches of any of the foregoing or a loan company business;

(ii)    offices or agencies of a foreign government or political subdivisions thereof;

(iii)    offices of any governmental bureau or agency of the United States or any state or political subdivision thereof;

(iv)    schools or other training or educational uses (other than those which are strictly ancillary to Tenant's business, such as training of Tenant's personnel);

(v)    any manufacturing purpose;

(vi)    broadcasting centers and television stations;

(vii)    any sex-related obscene, immoral or pornographic use;

(viii)    massage parlors, adult book stores, adult theaters, peep shows, establishments offering topless and/or bottomless entertainment and/or sex-related activities or offices for same;

(ix)    betting parlors, gambling casinos, arcades or gambling-type establishments;

(x)      a night club, discotheque, or similar establishment;

(xi)      housing accommodations or for lodging or sleeping purposes; and/or

(xii)      any other use or purpose which, involves the receiving of uninvited members of the general public for the purpose of the dispensing of any services provided by Tenant. (e.g., a retail store).

(B)      Tenant will not make or permit to be made any use of the Premises which would violate this Lease or which is forbidden by Legal Requirements (as hereinafter defined) or which may be dangerous to life, limb, or property, or which may invalidate or increase the premium cost of any policy of insurance carried on the Property or concerning its operation, or which will suffer or permit the Premises or any part thereof to be used in any manner, or anything to be brought into or kept therein, which, in the reasonable judgment of Landlord, shall in any way impair or tend to impair the character, reputation or appearance of the Property as a high quality retail/office building, or which will impair or interfere or tend to impair or interfere with any of the services performed by Landlord for the Property. Landlord hereby acknowledges that the use of the Premises for the Permitted Use shall not cause Tenant to be in violation of the provisions of the preceding sentence. In any event, Landlord makes no representation as to the condition of the Premises, except as otherwise expressly provided in this Lease, and Tenant agrees to accept the same subject to violations whether or not of record. Tenant will not at any time use or occupy the Premises, or permit same to be used or occupied in violation of the certificate of occupancy for the Building provided that the current certificate of occupancy permits the Premises to be used for general, executive and administrative office purposes. Landlord agrees that it will not amend the current certificate of occupancy or take any other action to preclude or make illegal or impermissible the use of the Premises for the Permitted Use and/or for general, executive and administrative offices purposes.

(C)      Tenant shall also be permitted non-exclusive use together with Landlord and other occupants of the Building to the roof area identified on Exhibit [__] annexed hereto. Such use shall be subject to all reasonable rules and regulations as shall be determined by Landlord. **[NTD: CLIENT TO CONFIRM IF ANY CHARGES ARE ASSOCIATED WITH USE OF THE ROOF AREA]**

**RENT:**

3.      (A)      Tenant shall pay Minimum Rent (as hereinafter defined) at an annual rental rate as hereinafter provided. The Minimum Rent and all other sums of money as shall become due and payable by Tenant under this Lease (hereinafter called "**additional rent**" or "**Additional Rent**") which shall be paid by Tenant in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment. The Minimum Rent shall be due and payable in equal monthly installments in advance on the first day of each month during the Term, at the office of Landlord or such other place as Landlord may designate in writing (at least thirty (30) days in advance of such payment becoming due), without any set off or deduction whatsoever (other than as otherwise expressly herein set forth), except that Tenant shall pay the first monthly installment of Minimum Rent on the execution hereof. The Minimum Rent and Additional Rent are collectively referred to herein as the "**rent**".

(B)      Tenant shall pay minimum annual rent (the "**Minimum Rent**"), at an annual rate, as follows:

| Lease Year | Annual Rent |
|:---:|:---:|
| 1 | $1,523,812.00 |
| 2 | $1,561,907.30 |
| 3 | $1,600,954.98 |
| 4 | $1,640,978.86 |
| 5 | $1,682,003.33 |
| 6 | $1,858,507.41 |
| 7 | $1,904,970.10 |
| 8 | $1,952,594.35 |
| 9 | $2,001,409.21 |
| 10 | $2,051,444.44 |

(C)     Provided Tenant is not in default hereunder beyond the expiration of any applicable notice, grace and/or cure period, the Minimum Rent only payable by Tenant shall be abated in part in an amount equal to (i) $126,984.33 per month for a period of eight (8) months beginning on the Commencement Date (the "**First Abatement Period**"), and (ii) $130,158.94 per month for a period of two (2) months beginning on the first anniversary of the Commencement Date (the "**Second Abatement Period**").  The first day immediately following the last day of the First Abatement Period is referred to herein as the "**Rent Commencement Date**".  Notwithstanding the foregoing, Tenant shall continue to be obligated during the First Abatement Period and the Second Abatement Period to pay any and all Additional Rent and other charges payable by Tenant hereunder in accordance with the terms of this Lease.  If, at any time prior to the fifth (5th) anniversary of the Rent Commencement Date, Tenant shall default hereunder beyond the expiration of any applicable notice and/or cure period and as a result thereof this Lease is terminated or, in the case of a Bankruptcy Event (as hereinafter defined), this Lease shall be rejected, the unamortized portion of the Minimum Rent so abated pursuant to the provisions of this Section 3(C) shall immediately be due and payable; it being understood that such abated Minimum Rent, for purposes of this Section 3(C) shall be amortized on a straight line basis over the period commencing on the Rent Commencement Date and ending on the stated Expiration Date.  If, upon the fifth (5th) anniversary of the Rent Commencement Date, Tenant is not in default hereunder, Tenant shall be relieved of its obligation to pay such abated Minimum Rent.

(D)     At the request of Landlord, upon not less than thirty (30) days' prior notice, Minimum Rent and Additional Rent payable under Article 5 hereof shall be payable when due by wire transfer of funds to an account designated in writing from time to time by Landlord.

(E)     If the payment of Minimum Rent hereunder shall commence on any day other than the first day of a calendar month, the Minimum Rent for such calendar month shall be prorated on a per diem basis, and any excess amount paid on the execution of this Lease shall be credited to the Minimum Rent for the next calendar month.

**DEFINITIONS:**

4.     The following definitions shall have the meanings set forth below:

(A)     The term "office", or "offices", wherever used in this Lease, shall not be construed to mean premises used as a store or stores, for the sale or display, at any time, of goods,

wares or merchandise, of any kind or as a restaurant, shop, booth or for other similar purposes or for manufacturing.  The term "Landlord" as used in this Lease means only the owner, or the mortgagee in possession, for the time being of the Land and Building (or the owner of a lease of the Building or of the Land and Building) so that in the event of a sale or lease of the Building, or of the Land and Building, the said Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder arising on or after the date of such sale or lease, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, at any such sale, or the said lessee of the Building, or of the Land and Building, that the purchaser or the lessee of the Building has assumed and agreed to carry out any and all covenants and obligations of Landlord, hereunder.  The words "re-enter" and "re-entry" as used in this Lease are not restricted to their technical legal meaning.  The phrases "Landlord shall not have liability to Tenant", "the same shall be without liability to Landlord" or "without incurring any liability to Tenant therefor" or phrases of similar import shall mean that Tenant is not entitled to terminate this Lease, or to claim actual or constructive eviction, whether partial or total, or, except as otherwise expressly set forth herein, to receive any abatement or diminution of rent, or to be relieved in any manner of any of its other obligations hereunder, or to be compensated for loss or injury suffered or to enforce any other right or kind of liability whatsoever against Landlord under or with respect to this Lease or with respect to Tenant's use of occupancy of the Premises or any part thereof. The term "business days" as used in this Lease shall exclude Saturdays, Sundays and all days designated as holidays.  The terms "hereby", "hereof", "hereto", "herein", "hereunder" and any similar terms shall refer to this Lease, and "hereafter" shall mean after, and "heretofore" shall mean before, the date of this Lease.  Words of the masculine, feminine or neuter gender shall mean and include the correlative words of the other genders and words importing the singular number shall mean and include the plural number and vice versa.

(B)    "**Lease Year**" means (i) with respect to the first Lease Year, the twelve (12) month period beginning on the Commencement Date to and including the last day of the calendar month in which the day immediately preceding the first anniversary of the Commencement Date shall occur, and (ii) for each subsequent Lease Year, each twelve (12) month period thereafter during the Term, except that the last Lease Year may be a partial Lease Year expiring on the Expiration Date.

(C)    "**Legal Requirements**" shall mean all laws, codes, statutes and ordinances and the orders, directives and requirements of all governmental entities whether now or hereafter in force.

(D)    "**Interest Rate**" shall mean the annual interest rate that is six percent (6%) per annum above the then published prime interest rate upon unsecured loans charged by JP Morgan Chase Bank, NA (or any successor thereto) on loans of 90 days ("**Prime Rate**").

**ADJUSTMENTS OF RENT:**

5.    (A)    Definitions as used herein:

(i)    "**Taxes**" shall mean (1) the amount finally determined, of all real estate taxes or other taxes imposed in substitution thereof, assessments (including for any business improvement districts), and other governmental impositions and charges of every kind whatsoever, which shall be levied, assessed or imposed, or become liens upon the Property or any part thereof or interest therein, and (2) all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Landlord in contesting the assessment of the Property for real estate tax purposes or in otherwise contesting the amount of any of the real estate taxes or other governmental

charges described above.  If, due to a change in the method of taxation, a new or additional tax, however designated, shall be levied against Landlord, and/or the Property, in addition to or in substitution, in whole or in part, for any tax which would otherwise constitute "Taxes", or in lieu of additional Taxes, such tax or imposition shall be deemed for the purposes hereof to be included within the term "Taxes".  "Taxes" shall not include (i) any corporation, unincorporated business or franchise taxes, (iii) any succession, gains, recording, income, franchise, transfer, inheritance, capital stock, excise, excess profits, occupancy or rent, gift, estate, foreign ownership or control, payroll or stamp tax of Landlord, (ii) realty transfer taxes or real property transfer gains taxes (if any) imposed in connection with the sale of or the lease of all or substantially all of the Land or the Building, (iii) mortgage recording taxes, ~~or~~ (iv) any penalties or late charges imposed against Landlord with respect to real estate taxes, assessments and the like (except to the extent caused by Tenant's late payment of a Tax Payment~~).~~) or (v) any Taxes associated with and/or resulting from an increased assessed value of the Building, and/or any increase in the Taxes due to a Property Assessed Clean Energy, or similar type of loan or financing.

(ii)    "**Tax Base**" shall mean the Taxes for the Tax Year commencing on July 1, 2023 and ending upon June 30, 2024 (without regard or giving effect to any abatement, exemption  or credit, including, without limitation, any such abatements, exemptions  or credits under ICAP (as hereinafter defined)).

(iii)    "**Tenant's Tax Proportionate Share**" shall mean 46.66**%.**

(iv)    "**Tax Year**" shall mean each period of twelve (12) months, commencing on the first day of July, in which occurs any part of the Term or such other period as may hereafter be adopted as the fiscal year for real estate tax purposes of The City of New York (without regard or giving effect to any abatement, exemption  or credit, including, without limitation, any such abatements, exemptions  or credits under ICAP).

(v)    "**Landlord's Tax Statement**" shall mean an annual statement setting forth the amount payable by Tenant for a specified Tax Year pursuant to this Article 5.

(B)    PAYMENTS - TAX ESCALATIONS.

(i)    If Taxes payable in any Tax Year shall exceed the Tax Base, Tenant shall pay as additional rent a sum (hereinafter referred to as "**Tenant's Tax Payment**") equal to Tenant's Tax Proportionate Share of the amount by which the Taxes for such Tax Year exceed the Tax Base.  Landlord currently receives an abatement of Taxes for the Real Property pursuant to the New York City Industrial & Commercial Abatement Program ("**ICAP**"). Tenant acknowledges that it is not entitled to any share of the abatement of Taxes attributable to Landlord's participation in ICAP and in furtherance thereof, waives any claim in respect thereof, whether currently existing or that could exist in the future (in connection with future improvements performed at the Building) by reason of ICAP or a similar program. For the purpose hereof, "**Taxes**" shall be determined without taking into consideration any abatement, exemption and/or deferral resulting from ICAP and Tenant acknowledges that the benefit of any credits, refunds, exemptions  or abatements in Taxes for the Building attributable to Landlord's or Tenant's participation in ICAP or any similar program, whether prior to, on or after the date hereof, shall accrue solely to the benefit of Landlord, and such benefits shall not be subtracted from Tenant's Tax Payment.

(ii)     Tenant's Tax Payment shall be payable on the first (1st) day of each month during any each Tax Year in an amount equal to 1/12th of Landlord's estimate of Tenant's Tax Payment for such Tax Year -and shall be paid within twenty (20) days following rendition of a an invoice therefor.  If there shall be any increase in Taxes for any Tax Year, prior to or during such Tax Year, Landlord may deliver to Tenant a revised Landlord's Tax Statement, and Tenant's Tax Payment for such Tax Year shall be appropriately adjusted.  In the event of any increase in Taxes, Tenant shall, within thirty (30) days of rendition of such revised Landlord's Tax Statement, pay to Landlord the amount of any underpayment of Tenant's Tax Payment with respect to such Tax Year.  At any time after, during or prior to the end of each Tax Year, Landlord shall cause the actual amount of Tenant's Tax Payment to be computed and a "**Final Tax Statement**" to be given to Tenant.  If such Final Tax Statement shall show a deficiency, Tenant shall pay such amount to Landlord within thirty (30) days; if it shall show that Tenant has made an overpayment, Landlord shall pay to Tenant the amount of such overpayment within thirty (30) days after the delivery of such Final Tax Statement.   Landlord shall deliver a copy of the tax bill for the applicable Tax Year to Tenant together with the Final Tax Statement (provided that Landlord shall also deliver the tax bill for the Tax Base along with the delivery of the tax bill for the Tax Year immediately succeeding the Tax Base).

(iii)     The Final Tax Statements furnished to Tenant shall constitute a final determination as between Landlord and Tenant of the Taxes for the periods represented thereby, unless the Taxes for any such period are subsequently reduced by tax certiorari proceedings or otherwise (in which event the Final Tax Statement for such adjusted Taxes shall be conclusive and binding).  If the Commencement Date is not the first day of a Tax Year or if the date of expiration or termination of this Lease, whether or not same is the Expiration Date or another date prior or subsequent thereto, is not the last day of a Tax Year, then Tenant's Tax Payment shall be prorated based upon the number of days of the applicable Tax Year within the term of this Lease.  With respect to the year in which the term of this Lease expires or terminates, such pro rata portion shall become immediately due and payable by Tenant to Landlord, if it has not theretofore already been paid, and Landlord, as soon as reasonably practicable, shall cause the annual statements of the Taxes for that Tax Year to be prepared and furnished to Tenant.  Landlord and Tenant thereupon shall make appropriate adjustments of all amounts then owing.

(iv)     If the Taxes for the Tax Base or any other Tax Year are reduced as a result of a certiorari proceeding or otherwise, the Taxes as so reduced shall for all purposes be deemed to be the Taxes for such Tax Year and Landlord shall give notice thereof to Tenant and appropriate adjustments and payments shall be made, subject to the provisions of the following paragraph.

(v)     Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the Property.  If Landlord shall receive a refund or credit of Taxes for any Tax Year (after Landlord's payment of any actual out-of-pocket legal or other fees or expenses incurred to obtain such reduction).  Landlord shall either pay to Tenant, or, at Landlord's election, credit against the next due payments under this Section 5(B) an amount equal to Tenant's Tax Proportionate Share of such net amount, but such amount shall not exceed Tenant's Tax Payment paid for such Tax Year.  Provided Tenant is not then in default beyond the expiration of any applicable notice and/or cure period, any credit or refund due Tenant at the expiration or sooner termination of the Term of this Lease shall be paid to Tenant within thirty (30) days after the expiration or sooner termination of this Lease.  Nothing herein shall obligate Landlord to file any application or institute any proceeding seeking a reduction in Taxes or assessed valuation.

(C)    In the event that the date of the expiration or other termination of this Lease shall be a day other than the last day of a Tax Year, then, in such event, in applying the provisions of this Article with respect to any Tax Year, appropriate pro rata adjustments in the escalation due hereunder shall be made to reflect the occurrence of such event on a basis consistent with the principles underlying the provisions of this Article taking into consideration that the expiration date of this Lease occurred during a partial lease year; and all such payments due on account thereof shall be made within thirty (30) days of the expiration or other termination of this Lease.

(D)    In no event shall the Minimum Rent ever be reduced by operation of this Article 5.  Landlord's shall render a Landlord's Tax Statement with respect to any Tax Year within the later of two (2) years after (i) the end of each applicable Tax Year or (ii) the final determination of any application or proceeding seeking a reduction in Taxes or assessed valuation assessment, failing which Landlord will be deemed to have waived its right to collect any additional rent due to an increase in the Taxes for such Tax Year.

(E)    If, at the time Landlord is required to give Tenant a credit or refund under this Article, Tenant is then in default under this Lease beyond the expiration of any applicable notice and/or cure period, Landlord may offset the amount of such credit or refund payable to Tenant against amounts properly due and owing by Tenant to Landlord.

(F)    Each of Landlord's Tax Statements and Final Tax Statement shall be conclusive and binding upon Tenant unless (i) pending the determination of such dispute by agreement or otherwise, Tenant shall pay additional rent in accordance with the applicable Landlord's Tax Statement without prejudice to Tenant's position, and (ii) within sixty (60) days after receipt of such Landlord's Tax Statement and/or Final Tax Statement, Tenant shall notify Landlord in writing that it disputes the correctness thereof, which notice shall specify the particular respects in which the disputed Statement is inaccurate to the extent known.

(G)    Landlord's and Tenant's obligations under this Article shall survive the expiration or earlier termination of the term of this Lease; provided however that Tenant shall not be liable for any Tenant's Tax Payment that is not first billed to Tenant within two (2) years following the expiration or sooner termination of this Lease.

**LATE PAYMENT CHARGE:**

6.    (A)    If Tenant shall fail to make any payment of Minimum Rent or Additional Rent after the same is due and payable, Tenant shall pay a late payment charge of $.03 for each $1.00 which remains unpaid to compensate Landlord for additional expenses in processing such late payment.  In addition, if Tenant fails to pay any Minimum Rent or Additional Rent when due, Tenant shall pay interest thereon from the date due until the date paid at an annual rate equal to the Prime Rate *plus* five percent (5%) per annum but not in excess of the maximum amount permitted by law to be charged to Tenant, and such interest shall be deemed to be Additional Rent hereunder. Notwithstanding the foregoing, Tenant shall have a five (5) business day grace period before any late charges and/or interest is imposed.

(B)    If any check of Tenant shall be returned for insufficient funds, there shall be an additional charge to Tenant of $150.00.

**ALTERATIONS:**

7.      (A)      Tenant shall not make any alterations or improvements ("**Alterations**") in or to the Premises without Landlord's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed for changes which are non-structural and which will not adversely affect (i) the Building's systems or structure or (ii) any other tenant's use of its premises.  Any permitted Alterations must be performed by reputable contractors or mechanics as Landlord shall approve (which approval shall not be unreasonably withheld, conditioned, or delayed); it being agreed, however, that Tenant must use Landlord's designated contractor for any Alterations relating to fire safety system of the Building or structural changes.  Tenant agrees that all Alterations shall be performed by Tenant in accordance with all applicable Legal Requirements and Landlord's reasonable construction requirements  then in effect for the Building, except that if there are any conflicting provisions of this Lease and the construction rules and regulations, the provisions of this Lease shall prevail.  Tenant agrees to use a reputable engineer and architect licensed in the State of New York approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed) for the preparation of all construction documents and drawings pertaining to any Alterations and to file all plans with and obtain all required permits from appropriate governmental authorities.  Notwithstanding the foregoing, Landlord's designated engineer shall review any construction documents or drawings prepared by or on behalf of Tenant in connection with any Alteration that affects the Building's systems or structure.  Tenant's architect shall file all required architectural drawings and obtain all necessary permits at Tenant's cost.  Upon receipt thereof, Tenant shall promptly submit to Landlord, copies of all approved plans, permits, applications, final approvals and sign-offs.

(B)      All fixtures and all paneling, partitions, railings and like installations, installed in, and affixed to the Premises at any time, either by Tenant or by Landlord on Tenant's behalf, shall, upon installation, become the property of Landlord and, subject to the provisions of Section 7(E) below, shall remain upon and be surrendered with the Premises.  At Landlord's election pursuant to Section 7(E), all future Alterations, including any Alterations existing as of made after the Commencement Date, shall be removed from the Premises by Tenant prior to the expiration of this Lease, at Tenant's sole cost and expense.  For the sake of clarity, Landlord acknowledges that Tenant shall not be required to remove any Alterations existing as of the Commencement Date.  Nothing in this Article shall be construed to give Landlord title to or to prevent Tenant's removal of trade fixtures, moveable furniture and equipment, but upon removal of any such items from the Premises, Tenant shall promptly and at its expense, repair and restore the Premises to the condition existing prior to installation and repair any damage caused by such removal.  All property permitted or required to be removed by Tenant at the end of the term remaining in the Premises after Tenant's removal shall be deemed abandoned and may, at the election of Landlord, either be retained as Landlord's property or may be removed from the Premises by Landlord at Tenant's expense.

(C)      Tenant, at its expense, before making any Alterations, shall obtain all approvals required by any governmental bodies and (upon completion) certificates of final approval thereof and shall deliver promptly duplicates of all such approvals to Landlord.  If any mechanic's lien is filed against the Building for work claimed to have been performed by or on behalf of Tenant or for materials claimed to have been furnished to Tenant, it shall be discharged by Tenant within thirty (30) days after Tenant receives notice thereof, at Tenant's expense, by filing the bond required by law or payment or otherwise.  If Tenant fails to so discharge such lien, then Landlord shall have the right to discharge same (by filing the bond required by law or by payment in full of the mechanic's lien or otherwise) and Landlord's actual out-of-pocket costs and expenses in obtaining such discharge shall be repaid in full by Tenant to Landlord as additional rent upon demand.

(D)     Notwithstanding anything to the contrary contained in this Article 7, Landlord's consent shall not be required with respect to (i) decorative alterations such as painting, wall coverings and floor coverings ("**Decorative Alterations**") or (ii) non-structural alterations by Tenant which (a) shall be located wholly within the Premises, (b) shall not affect the structural integrity of the Building or the operation of the systems of the Building or affect any other tenant, (c) are not visible from outside of the Premises, and (d) do not cost more than $25,000 for any single project, provided, in each instance that (1) such alterations shall otherwise be performed in accordance with this Lease, (2) Tenant gives Landlord at least ten (10) days' prior notice of such work and, for informational purposes, the plans and specifications therefor but only to the extent the same would be customarily prepared or be required to be prepared in order to obtain any necessary permits, (3) such item(s) shall be performed in a good and workerlike manner and (4) Tenant is not in default or default under this Lease.

(E)     Notwithstanding the foregoing or anything to the contrary contained in this Lease, Tenant shall remove in accordance with the requirements of this Lease, at or prior to the Expiration Date, all future Alterations, including any (i.e., Alterations existing as of made after the Commencement Date;), unless, not later than ninety (90) days prior to the Expiration Date, Landlord gives Tenant notice that all or a portion of such future Alterations may remain in the Premises. Landlord acknowledges and agrees that Tenant shall have no obligations to remove any or all of the Alterations existing as of the Commencement Date.  Tenant shall, from time to time during the Term, remove any computer, telephone and other cabling and wiring installed by Tenant that is not then being used or designated for future use by Tenant.  In connection with any future Alterations performed by Tenant, at the time Tenant requests Landlord's consent to any Alterations, Tenant may simultaneously specifically request Landlord's waiver of Tenant's obligation to restore any Alterations shown on the plans submitted by Tenant to Landlord, and Landlord shall identify those particular proposed Alterations shown on such plans which need to be removed at the end of the term, in which case Tenant shall remove the same at Tenant's expense.

(F)     Tenant agrees that with respect to the performance of any Alterations in the Premises, Tenant shall pay to Landlord, as additional rent hereunder, within twenty (20) days of being billed therefor, Landlord's reasonable out-of-pocket expenses including, without limitation, the fees of any architect, engineer or expeditor employed or hired by Landlord, costs of field supervision and coordination incurred by Landlord.

(G)     (1)     Before proceeding with any Alteration estimated to cost in excess of $350500,000.00  (other than Decorative Alterations), Tenant shall furnish to Landlord one of the following (as selected by Landlord): (a) a cash deposit, or (b) an irrevocable, unconditional, negotiable letter of credit, issued by and drawn on a bank or trust company which is a member of the Clearing House Association in a form reasonably satisfactory to Landlord; each in an amount equal to one hundred fifteen  percent (115%) of the estimated cost of the Alteration.

(ii)     Upon (a) the completion of the Alteration in accordance with the terms of this Article and (b) the submission to Landlord of proof evidencing the payment in full for said Alteration including, but not limited to, delivery of Waivers of Mechanic Liens (in the form set forth below), the security deposited under Section 7(G)(i) with Landlord (or the balance of the proceeds thereof, if Tenant has furnished cash or a letter of credit and if Landlord has drawn on the same) shall be returned to Tenant.

(iii)     Upon Tenant's failure to properly perform, complete and fully pay for the said Alteration, as reasonably determined by Landlord, and Tenant's failure to cure the

same within thirty (30) days after Landlord's written notice to Tenant of such failure (or ,  Landlord shall be entitled to draw on the security deposited under this Section 7(G)(i) and Article 33 to the extent it deems necessary to complete any incomplete Alteration or otherwise hazardous condition, to effect any necessary restoration and/or protection of the Premises or the Property and to apply such funds to the payment or satisfaction of any costs, damages or expenses directly in connection with the foregoing and/or Tenant's obligations under this Article and this Lease relating to Alterations and repairs, including the satisfaction of any mechanic's lien.  Notwithstanding the foregoing, if Tenant cannot cure the default noted by Landlord hereunder within thirty (30) days, then, such thirty (30) day period shall be tolled and continued provided, and on condition that Tenant commences such cure within the thirty (30) day period and thereafter continues its good faith efforts to diligently pursue curing the default.

(H)    Tenant agrees that Tenant will not at any time during the term hereof, use any contractors and/or labor and/or materials if the use of such contractors and/or labor and/or materials actually creates any material and ongoing difficulty with other contractors and/or labor engaged by Tenant or Landlord or others in the performance of any work at the Building or any part thereof.  If Tenant employs, or permits the employment of, any contractor, mechanic or laborer in the Premises which materially interferes or causes any ongoing conflict with other contractors, mechanics or laborers engaged in the maintenance, repair, management or operation of the Building, Tenant shall cause all contractors, mechanics or laborers causing such interference or conflict to leave the Building as promptly as reasonably possible and shall take such other action as may be reasonably necessary to resolve such conflict.

(I)    Before commencing any work or delivering material to the Building, each such contractor shall deliver certificates evidencing insurance as may be reasonably required by Landlord to Landlord and naming Landlord as an additional insured party under the policy.

(J)    No approval of any plans or specifications by Landlord or consent by Landlord allowing Tenant to make any Alterations shall in any way be deemed to be an agreement by Landlord that the contemplated improvements comply with Legal Requirements or insurance requirements nor shall it be deemed to be a waiver by Landlord of the compliance by Tenant with this Lease.

(K)    Provided Tenant is not in default hereunder beyond the expiration of any applicable notice and/or cure period, Landlord shall promptly after Tenant's request, at no out of pocket cost, expense or liability to Landlord, cooperate with and assist Tenant in all reasonable respects in attempting to procure all approvals that may be required for the performance of any approved Alterations to be performed by Tenant provided that any such applications and other documents comply in all respects with all Legal Requirements and this Lease.

(L)    Tenant acknowledges and agrees that the performance, procurement, construction and/or installation of any work, materials, fixtures and/or equipment required for the use and occupancy by Tenant of, and the conduct of Tenant's business in, the Premises, shall be the sole responsibility, cost and expense of Tenant.

(M)    Tenant, at its expense and in accordance with Legal Requirements, may install one (1) or more signs reasonably approved by Landlord identifying Tenant in a location(s) reasonably designated by Landlord on or adjacent to the exterior doors of the Premises.  Tenant at its expense shall maintain such sign(s) and remove such sign(s) (and repair any damage caused by the removal thereof) prior to the expiration or sooner termination or cancellation of this Lease.   Tenant shall not exhibit, inscribe, paint or affix any sign, banner, decal, placard, decoration, lettering or any

advertising or promotional materials or matter of any kind or description, including, without limitation, any banner, flag, awning, canopy, pennant, exterior advertisements, picture or image or notices or lettering on glass ("**Signage**") on any portion of the Building or the outside of the Premises without the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld, conditioned or delayed solely if such Signage complies with the terms of this Lease, Legal Requirements, and is professionally prepared and consistent with the operation of a first-class retail establishment.  A plan of all Signage proposed to be exhibited, inscribed, painted or affixed to the Premises shall be prepared by Tenant in conformity with the terms of this Lease, Legal Requirements, which shall be professionally prepared and shall be submitted to Landlord for Landlord's consent.  If the proposed Signage is acceptable to Landlord, in the exercise of its reasonable discretion, Landlord shall approve such Signage by notice to Tenant.  Landlord hereby confirms that Tenant may replace all existing Coworks' Signage with similar Signage, without the prior consent of Landlord, except as to the manner in which all new Signage shall be affixed to the Building if such manner differs from the existing manner.  All Signage reasonably approved by Landlord shall thereafter be diligently installed and maintained by Tenant  (and the same shall be treated as an Alteration under the terms of this Lease and subject to the applicable provisions thereof with respect thereto) in good condition and repair and in compliance with the provisions of this Lease and all Legal Requirements at Tenant's sole cost and expense, including, without limitation, the periodic cleaning and replacement of the sameany damaged Signage, as reasonably required (or as reasonably requested by Landlord).  Tenant shall obtain and pay for all permits and licenses required by Legal Requirements relating to any Signage, and shall deliver copies of all such permits and licenses to Landlord prior to installation of the Signage to which such permits and licenses relate. Landlord shall reasonably cooperate with Tenant, at no out-of-pocket cost to Landlord, in connection with Tenant's application to procure all such permits and licenses required by Tenant's Signage, including (if required) signing any permit applications promptly after Landlord's receipt and review of same.  Tenant shall indemnify, defend and hold harmless Landlord for any actual Losses directly arising out of or related to Landlord's signing of any applications or other filings related to such permits or licenses.  Upon installation of any Signage, such Signage shall not be removed, changed or otherwise modified in any way without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed solely if such replacement or modified Signage complies with the provisions of this Lease, Legal Requirements, and is professionally prepared.  The removal, change or modification of any Signage, theretofore installed shall be performed solely by Landlord at Tenant's sole cost and expense.  **[NTD:  TENANT TO ADVISE OF PROPOSED LOCATION AND LANDLORD CAN RESPOND.  ALSO, TO THE EXTENT THAT TENANT HAS A PROPOSED RENDERING, LANDLORD CAN REVIEW NOW]**

(N)     All Alterations must be done in strict compliance with the ICAP for as long as the Building qualifies for ICAP benefits.  In furtherance of the foregoing, Tenant and Tenant's contractors shall cooperate in filing documents required by the Department of Finance and the Department of Business Services of the City of New York in the connection with the ICAP exemption.

**REPAIRS; SERVICES PROVIDED BY LANDLORD:**

8.     (A)     Repairs; Interruptions.

(i)     Except as required to be made by Tenant herein, Landlord shall make all repairs and replacements, structural and otherwise, necessary or desirable in order to keep in good order and repair all structural portions of the Building, the roof, foundation, footings, exterior walls, load bearing columns, floor slabs and Building systems serving the common areas of the Building and the sprinklers, subject to Section 8(G), as well as any other repairs necessitated by Landlord's gross

negligence or willful misconduct.  Tenant agrees to notify Landlord of the necessity of repairs of which Tenant may have knowledge, for which Landlord may be responsible.  In performing any such repairs Landlord agrees to use commercially reasonable efforts to (a) perform the same with due diligence and continuity and (b) minimize interference with Tenant's use and occupancy of the Premises; provided that in no event shall Landlord be required to utilize overtime or premium pay labor or incur any extraordinary costs in connection therewith unless Tenant shall request that Landlord perform the same on an overtime or premium pay basis and Tenant shall agree to reimburse Landlord for the same, in which event Tenant shall pay to Landlord an amount equal to all reasonable costs and expenses incurred by Landlord to perform such work or repairs on an overtime basis, as additional rent within twenty (20) days after demand.

(ii)     Tenant shall, throughout the term of this Lease, take good care of the Premises and the fixtures and appurtenances therein, and all electrical, plumbing, HVAC systems (or portions thereof) exclusively located within or exclusively serving the Premises) and at Tenant's sole cost and expense, make all repairs and replacements thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear, obsolescence and damage from the elements, fire or other casualty, excepted.  The term "appurtenances" in this Article 8 shall include (a) all horizontal portions of the systems and facilities of the Building within or exclusively serving the Premises, including, without limitation, ductwork, VAV boxes and light fixtures and (b) all Alterations made by or on behalf of Tenant or any person claiming through Tenant.

(iii)    Notwithstanding anything to the contrary contained herein, all damage to the Premises or to any other part of the Building, whether requiring structural or non-structural repairs, caused by or resulting from (a) the negligence or willful misconduct of Tenant or Tenant's employees, invitees, agents or licensees, (b) as a result of any future Alterations, and/or (c) the moving by Tenant of Tenant's fixtures, furniture or equipment shall be repaired promptly by Tenant at its sole cost and expense, to the reasonable satisfaction of Landlord. All repairs by Tenant hereunder shall be of quality or class equal to the original work or construction.  If Tenant fails after thirty (30) days' written notice to proceed with due diligence to make repairs required to be made by Tenant, the same may be made by Landlord at the expense of Tenant and the expense thereof actually incurred by Landlord shall be collectible as additional rent within thirty (30) days after Landlord's written demand.  Except as specifically provided in Article 13 or as otherwise expressly provided in this Lease, there shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others making or failing to make any repairs or Alterations.  The provisions of this Article 8 with respect to the making of repairs shall not apply in the case of fire or other casualty which are dealt with in Article 13 hereof.

(iv)    Landlord reserves the right upon reasonable prior notice to stop or reduce service of any of the elevator, plumbing, HVAC systems, sanitary, sprinkler, water, power or other Building systems or cleaning or other services, if any, when necessary by reason of accident or for repairs, alterations, replacements or improvements reasonably necessary or desirable to the Building, the Premises, or Building for as long as may be reasonably required by reason thereof or by reason of Force Majeure Events.  Landlord shall use reasonable efforts to minimize the duration of such stoppage or reduction of service, without in any event being obligated to employ overtime labor or to incur any extraordinary costs in connection therewith unless Tenant shall request that Landlord perform the same on an overtime or premium basis and Tenant shall agree to reimburse Landlord for the same, in which event Tenant shall pay to Landlord an amount equal to all reasonable costs and expenses incurred by Landlord to perform such work or repairs on an overtime basis as additional rent within twenty (20) days after demand.

(v)    Notwithstanding anything to the contrary set forth herein, if, as a result of: (i) Landlord's performance of, or failure to perform, its repair and maintenance obligations or other duties and obligations under this Lease or (ii) a utility failure or interruption of utility service solely or caused solely by Landlord or its agents, employees or contractors (each, an "**Abatement Event**"), Tenant cannot fully operate in the Premises, or a portion thereof, for more than five (5) consecutive business days, and, in fact, materially ceases operating therein, or a portion thereof, then provided Tenant is not in default hereunder beyond the expiration of any applicable notice and cure period and provided further that such failure by Landlord is not due to or arising out of acts or omissions of Tenant or Tenant's agents or Force Majeure,  Minimum Rent for such portion of the Premises shall proportionately abate (based on the affected portion of the Premises)  beginning on the sixth (6th) consecutive business day until to the day which is the first to occur of (i) the date Landlord advises Tenant that the interruption has ceased (provided such interruption has actually ceased), or (ii) when Tenant or any other persons occupying the Premises by, through or under Tenant, or any of its or their employees, servants, agents, contractors, licensees or invitees occupies the affected portion of the Premises for the conduct of its or their business; provided, however, that in no event shall Tenant be entitled to abate Minimum Annual Rent pursuant to this Section unless Tenant has notified Landlord in writing of the Abatement Event (the "**Abatement Event Notice**") and Landlord has failed to remedy such Abatement Event within 72twelve (12) hours after receipt of the Abatement Event Notice.

This Section shall not apply in the event the Premises are damaged in whole or in part as a result and in such event the casualty provisions of this Lease shall govern.

**(B)**    HVAC. Notwithstanding anything to the contrary contained in the Lease Tenant shall be responsible for all utility charges related to Tenant's use of the HVAC system serving the Premises and Landlord shall have no obligation to furnish or pay for any heat and/or air conditioning to the Premises. Tenant shall be responsible for all repairs, maintenance (including, without limitation, regular cleanings and filter replacements) and/or replacement of all or any part of the HVAC system serving the Premises. Tenant agrees that it shall, at Tenant's sole cost and expense, obtain and keep in full force and effect a comprehensive maintenance and repair contract shall include preventive maintenance and parts replacements whether ordinary or extraordinary in nature (the "**Service Contract**") for the HVAC system with a company reasonably approved by Landlord. Such Service Contract, and any renewal or amendments thereto, must be submitted to Landlord for its prior approval which shall not be unreasonably withheld, conditioned or delayed. Not less than thirty (30) days prior to the expiration of the Service Contract, evidence of the renewal of such Service Contract, together with evidence of the payment of premiums for the renewal period or a new Service Contract, as the case may be, shall be delivered to the Landlord. On Tenant's default in obtaining or delivering the Service Contract or failure to pay the charges therefor, Landlord may secure or pay the charges for the Service Contract and charge the Tenant as Additional Rent therefor. Any repairs and replacements required to be made to the HVAC system that are not covered by the Service Contract, shall be carried out by Tenant at Tenant's sole cost and expense, except to the extent that the same are necessitated by Landlord's negligence or willful misconduct in which event the same shall be carried out by Landlord at Landlord's sole cost and expense. The HVAC system installed in the Premises, is and shall be deemed property of Landlord, and shall be surrendered in working order upon any expiration or earlier termination of this Lease. normal wear and tear excepted.  Notwithstanding anything to the contrary contained herein, Tenant shall not be required to replace the HVAC system during the final five (5) years of the term of this Lease and, during such time period, Landlord shall be obligated to replace the HVAC system, with a comparable system, at Landlord's sole cost and expense.

(C)    <u>Utilities</u>.  Tenant acknowledges and agrees that no utilities or other services have been included in the Minimum Rent and that Landlord shall have no obligation to furnish or supply gas, electricity, heat, air conditioning, ventilation, sewer or any other utility or service to or for the Premises.

(D)    <u>Water.</u>  The Minimum Rent herein provided includes water for ordinary lavatory, cleaning and pantry purposes, but if Tenant uses or consumes water for any other purposes or in unusual quantities (of which fact Landlord shall be the sole but reasonable judge), Landlord may install a water sub-meter at Tenant's expense, which Tenant shall thereafter maintain at Tenant's expense in good working order and repair, to register such water consumption, and Tenant shall pay for water consumed as shown on said sub-meter, together with Landlord's reasonable actual out-of-pocket third party administrative costs incurred in reading same, as Additional Rent as and when bills are rendered.

(E)    <u>Cleaning and Waste Removal</u>.  Tenant shall, at its sole cost and expense, (i) keep the Premises neat, clean and free of all debris and (ii) promptly bag and remove all garbage, rubbish and waste arising out of or in connection with the conduct of its business at the Premises to the Building's designated disposal area under such conditions and at such times as reasonably approved by Landlord and in such manner so as to avoid any obnoxious or offensive smells or odors therefrom or otherwise unreasonably interfering with the comfort and quiet enjoyment of the other occupants of the Building or pedestrians.  Tenant shall, at its sole cost and expense, contract with a professional insured janitorial service provider reasonably approved by Landlord to provide janitorial services to the Premises five (5) days per week.  Tenant shall, at its sole cost and expense, engage a carting company, reasonably approved by Landlord for the removal and disposal of Tenant's rubbish and trash.   The disposal of garbage, rubbish and waste shall be made subject to and in accordance with the rules and regulations from time to time promulgated by Landlord, and Tenant shall not permit accumulations of garbage, rubbish or waste except at locations designated by Landlord.  Tenant shall not permit the discharge of odors or humidity into any other portions of the Building or adjacent areas.  If any governmental agency or quasi governmental agency, board or other body having jurisdiction over the Building or the Premises has issued a summons or other notice of violation of any health or safety laws or regulations, Tenant shall immediately cease and desist from the activity which gave rise to such summons or other notice of violation and shall promptly correct any such condition.

(F)    <u>Elevator</u>.  Landlord shall provide elevator service by elevators serving the floor on which the Premises are situated seven (7) days a week, twenty-four (24) hours a day, subject to Force Majeure.

(G)    <u>Sprinkler System</u>.  If there now is or shall be installed in the Building a "sprinkler system", and such system or any of its appliances shall be damaged or injured or not in proper working order by reason of any negligence or willful misconduct of Tenant, Tenant's agents, servants, employees, licensees or visitors, Tenant shall forthwith restore the same to good working condition at its own expense; and if the New York Board of Fire Underwriters or the New York Fire Insurance Rating Organization or any bureau, department or official of the state or city government, shall require or recommend that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied by reason of Tenant's business, or the location of the partitions, trade fixtures, or other contents of the Premises, Tenant shall, at Tenant's expense, promptly make and supply such changes, modifications, alterations, additional sprinkler heads or other equipment.  For the avoidance of doubt, Tenant shall be responsible for all installations, modifications or alterations to such sprinkler system within the Premises (i) necessary on account of Alterations made by or on behalf of Tenant, (ii) required by reason of the negligence or willful misconduct of Tenant or Tenant's Member, agents, contractors or invitees or on account of a default by Tenant hereunder or (iii) required on account of the

particular use or particular manner of use by Tenant of the Premises (other than mere use for office purposes).  Anything elsewhere in this Lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the New York Fire Insurance Rating Organization or any bureau, department or official of the federal, state or city government require or recommend the installation of a sprinkler system or the location of partitions, trade fixtures, or other contents of the Premises, Tenant shall, at Tenant's expense, promptly make such sprinkler system installations or other alterations as required whether the work involved shall be structural or non-structural in nature

**WINDOW CLEANING:**

9.    Tenant will not clean, nor require, permit, suffer or allow any window in the Premises to be cleaned, from the outside in violation of Section 202 of the Labor Law or any other applicable Legal Requirements or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction.

**REQUIREMENTS OF LAW, FIRE INSURANCE, FLOOR LOAD:**

10.    Tenant, at Tenant's sole cost and expense, shall promptly comply with all Legal Requirements and ~~all~~any orders, ~~recommendations~~rules and regulations of ~~the Insurance Services Office, Inc.~~any governmental or ~~any similar body~~quasi-governmental agency or authority which shall ~~impose any duty upon Landlord or Tenant with respect to~~have jurisdiction over the Premises, or, with respect to the Building, if arising out of Tenant's particular use or manner of use (as opposed to general office Use) of the Premises.  Nothing herein shall require Tenant to make structural repairs or alterations under this Article 10 unless (i) the use of the Premises or method of operation therein violated any such Legal Requirements or orders, recommendations or regulations with respect thereto or (ii) the same relate or are otherwise necessary as a result of any Alterations. Tenant may, after securing Landlord to Landlord's reasonable satisfaction against all damages, interest, penalties and expenses, including, but not limited to, reasonable attorneys' fees and disbursements, by cash deposit or by surety bond in an amount and in a company reasonably satisfactory to Landlord, contest any such Legal Requirements, recommendations or regulations provided same is done with all reasonable promptness and provided such appeal shall not subject Landlord to any civil liability, prosecution for a criminal offense.  Tenant shall not do or permit any act or thing to be done in or to the Premises which is contrary to Legal Requirements, or which shall invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Landlord with respect to the Premises or the Building, nor shall Tenant keep anything in the Premises except as now or hereafter permitted by the ~~Insurance Services Office, Inc.~~any governmental or ~~and~~quasi-governmental agency or authority ~~having~~which shall have jurisdiction over the __Premises and/or the __ Building, and then only in such manner so as not to increase the rate for fire insurance applicable to the Building.  Tenant shall pay all actual and reasonable costs, expenses, fines, penalties, or damages, which may be imposed upon Landlord by reason of Tenant's failure to comply with the provisions of this Article and if by reason of such failure the fire insurance rate shall, at the beginning of this Lease or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Landlord, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Landlord which shall have been charged because of such failure by Tenant, and shall make such reimbursement upon the first day of the month following such outlay by Landlord.  In any action or proceeding wherein Landlord and Tenant are parties a schedule or "make-up" of rate for the Building or the Premises issued by any body making fire insurance rates applicable to the Premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate then applicable to the Premises.  Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which it was

designed to carry and which is allowed by law. Landlord reserves the right in its reasonable discretion to prescribe the weight and position of all safes, business machines and mechanical equipment. Such installation shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient, in Landlord's reasonable judgment, to absorb and prevent unreasonable vibration, noise and annoyance. Notwithstanding the foregoing, the mere use of the Premises for the Permitted Use and/or office purposes shall not cause Tenant to be in violation of any of the provisions of this Article.

## SUBORDINATION:

11.    The rights of Tenant under this Lease shall be and are subject and subordinate at all times to all ground leases, and/or underlying leases, if any, now or hereafter in force against the Property, and to each and every mortgage that may now or hereafter be placed by Landlord on its interest in the Property, and to all modifications, consolidations, replacements and extensions thereof. This Article is self-operative and no further instrument of subordination shall be required. In confirmation of such subordination Tenant shall promptly execute such further instruments as may be reasonably requested by Landlord. Tenant hereby irrevocably appoints Landlord as attorney in fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instrument or instruments that Tenant fails to sign within ten (10) days of Landlord's demand. In the event of the enforcement by such mortgagee or lessor of the remedies provided for by the mortgage or lease, if such mortgagee or lessor or any successors or assigns of such mortgagee or lessor shall succeed to the interest of Landlord under this Lease, whether through possessory or foreclosure action or a deed in lieu of foreclosure or otherwise, and this Lease shall not be terminated or affected by such foreclosure or any such proceedings, Tenant, at the election of such mortgagee or lessor or its successors or assigns, shall attorn to and recognize such mortgagee or lessor (or its successors or assigns) as its landlord upon the terms contained in this Lease to the same extent and in the same manner as if this Lease was a direct lease between such mortgagee or lessor (or its successors or assigns) and Tenant, except that such mortgagee or lessor (or its successors or assigns), whether or not it shall have succeeded to the interest of Landlord under this Lease, shall not (i) have any liability for refusal or failure to perform or complete any work required to be performed by Landlord under this Lease to prepare the Premises for occupancy in accordance with the provisions of this Lease or otherwise, (ii) be liable for any act, omission or default of any prior landlord under this Lease except for a default continuing after any such succession, (iii) be subject to any offsets, claims or defenses which shall have theretofore accrued to Tenant against any prior landlord under this Lease, (iv) be bound by any rent or additional rent which Tenant might have paid to any prior landlord for more than one (1) month in advance, (v) be liable for the return of any security deposit unless such security shall actually be received by such superior mortgagee or superior lessor (or its successor or assigns) and/or (vi) be bound by any cancellation, abridgement, surrender, modification or amendment of this Lease, without the prior written consent of such mortgagee or lessor (or its successors or assigns). Upon request by such party, Tenant shall execute and deliver an instrument or instruments confirming such attornment.

(B)    Landlord shall use commercially reasonable efforts to obtain for the benefit of Tenant from any current or future superior lessor and/or future mortgagee which hereafter affects the Land a recognition agreement or a subordination, non-disturbance agreement, as applicable (in either case, hereinafter referred to as a "**SNDA**"), on such superior lessor's or mortgagee's, as the case may be, standard form of SNDA. Notwithstanding the previous sentence, in no event shall Landlord be required to request a SNDA from any superior mortgagee or superior lessor if Tenant shall then be in default hereunder beyond applicable notice and/or cure periods. Landlord shall have no liability to Tenant if Tenant does not execute the standard form of SNDA provided by any superior mortgagee or superior lessor or if any mortgagee or superior lessor refuses to execute and/or deliver

an SNDA to Tenant (in which event this Lease shall not be subject and subordinate to any such future mortgage or superior underlying or ground lease) or, if executed and delivered, such mortgagee or superior lessor does not abide by the terms thereof.  In connection with any SNDA, Tenant must promptly provide to the superior lessor or the mortgagee, as the case may be, all such information as the superior lessor or the future mortgagee, as the case may be, may reasonably require, including, but not limited to, any reasonably requested financial statements of Tenant.  In no event shall Landlord be required to (i) pay any consideration to any mortgagee or ground lessor, or (ii) alter any of the monetary terms of the mortgage, the ground lease or this Lease, or (iii) commence any action against any ground lessor or mortgagee in order to obtain a SNDA.

**PROPERTY LOSS, DAMAGE, REIMBURSEMENT, INDEMNITY:**

12.    (A)    Neither Landlord nor Landlord's agents, members, officers, directors, shareholders, partners or principals (disclosed or undisclosed) shall be liable to Tenant or Tenant's agents, employees, contractors, invitees or licensees (collectively, "**Tenant Party**") or any other occupant of the Premises for any damage to property of Tenant or of others entrusted to employees of the Building, nor for any injury to Tenant or to any other person or for any damage to, or theft or other loss of, any of Tenant's property or of the property of any other person resulting from any cause of whatsoever nature, unless due to the gross negligence or willful acts of Landlord or Landlord's agents or Landlord's breach of any of its obligations under this Lease; provided, however, that even if due to any such gross negligence or willful acts of Landlord or Landlord's agents, Tenant waives, to the fullest extent permitted by law, any claim for consequential damages in connection therewith; nor shall Landlord or its agents be liable for any such damage caused by other tenants or persons in, upon or about the Building or caused by operations in construction of any private, public or quasi public work.  If at any time any windows of the Premises are temporarily closed, darkened or bricked up (or permanently closed, darkened or bricked up, if required by law) for any reason whatsoever including, but not limited to Landlord's own acts, Landlord shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement or diminution of rent nor shall the same release Tenant from its obligations hereunder nor constitute an eviction.

**(B)**    Except to the extent caused by Landlord's gross negligence or willful misconduct, Tenant shall indemnify and save harmless Landlord and the Building manager against and from all actual liabilities, obligations, damages, penalties, claims, costs and expenses including reasonable attorneys' fees and disbursements, paid, suffered or incurred in connection with or arising from (i) any breach by Tenant or any Tenant Party of any obligation of this Lease on Tenant's part to be performed, or (ii) the negligence or willful acts of Tenant or any Tenant Party or any other person or entity claiming through Tenant, or (iii) the use or occupancy of the Premises by Tenant, Tenant Party or any person or entity claiming through Tenant, or (iv) any acts, omissions or negligence of Tenant, Tenant Party or any such person or entity, or the contractors, agents, employees, invitees or licensees of Tenant or any such person or entity, in or about the Premises or the Property.  Tenant shall pay to Landlord as Additional Rent, within thirty (30) days following rendition by Landlord to Tenant of bills or statements therefor, sums equal to all losses, costs, liabilities, claims, damages, fines, penalties and expenses referred to in this Section.  Tenant's liability under this Lease extends to the acts and omissions of any Tenant Party and any subtenant.  In case any action or proceeding is brought against Landlord by reason of any such claim, Tenant, upon notice from Landlord, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Landlord in writing, such approval not to be unreasonably withheld, conditioned or delayed and such approval to be deemed given if such counsel is selected by Tenant's insurance carrier.  In connection with such indemnity, (a) Landlord shall promptly notify Tenant of the relevant claim or action, (b) Landlord

shall reasonably cooperate with Tenant in Tenant's defense of such claim or action, provided that Landlord shall not incur any expense thereby (but Tenant shall not be required to pay for any separate counsel retained by Landlord but rather only the aforementioned counsel approved or deemed approved by Landlord as noted above), (c) prior to Landlord's settlement of any such claim or action, Landlord shall request Tenant's consent thereto, such consent not to be unreasonably withheld, conditioned or delayed and (d) if Tenant shall request that Landlord settle such claim or action, and Tenant shall deliver to Landlord the necessary funds to do so (together with all other amounts due or payable to Landlord in connection with this indemnity), Landlord shall accede to such request in any case where the only relief being sought by the claimant or plaintiff in any proposed settlement is monetary damages and Landlord and parties related to Landlord are absolutely and unconditionally released in connection therewith.

      (C)     Tenant shall look only to Landlord's estate and interest in the Property (and the net unused insurance or condemnation proceeds from any casualty or condemnation thereof as well as the rental proceeds received from and after the date of Landlord's default) for the satisfaction of Tenant's remedies or for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default by or liability of Landlord under this Lease, and no other property or assets of Landlord and no property of any officer, member, employee, director, shareholder, partner or principal of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder or Tenant's use or occupancy of the Premises.

      (D)(D)  Under no circumstances shall either party to this Lease be liable to the other party for punitive, special and/or consequential damages arising from or in connection with this Lease and/or Tenant's use and occupation of the Premises, except that with respect to a holdover Landlord shall be entitled to seek consequential damages from Tenant as provided for herein.

      (E)     Landlord shall indemnify and save harmless Tenant and its respective directors, officers, principals, shareholders, agents and employees against and from all liabilities, obligations, damages, penalties, claims, costs and expenses including reasonable attorneys' fees and disbursements, paid, suffered or incurred in connection with or arising from any occurrence in the Building resulting from (i) any gross negligence or willful misconduct of Landlord, its agents, employees, contractors or invitees, and (iii) any breach or default by Landlord in the performance of its obligations under this Lease on Landlord's part to be performed, unless such claim shall arise as a result of the willful act or negligence of Tenant, its agents, servants, employees or invitees or except as otherwise provided in this Lease.

      (F)     Under no circumstance shall the officers, members, agents, employees, directors, principals or direct or indirect shareholders of Tenant have any liability arising from, under, or in connection with this Lease.

      (FG)     The provisions of this Article shall survive the expiration or sooner termination of this Lease.

## DESTRUCTION, FIRE AND OTHER CASUALTY:

      13.     (A)     If the Building or the Premises shall be partially or totally damaged or destroyed by fire or other cause, then, whether or not the damage or destruction shall have resulted from the fault or neglect of Tenant, or its employees, agents or visitors (and if this Lease shall not have been terminated as in this Article hereinafter provided), Landlord shall repair the damage and

restore and rebuild the Building, at its expense, with reasonable dispatch after notice to it of the damage or destruction ("**Landlord's Restoration Work**") which Landlord's Restoration Work shall include delivering the Premises to Tenant in a "white box" condition with the Building systems delivered to the point of connection to the Premises; provided, however, that Landlord shall not be required (i) to repair or replace any of Tenant's property, (ii) to restore any Alterations (including, but not limited to, any Specialty Alterations) installed by or on behalf of Tenant, or (iii) to expend therefor an amount in excess of the proceeds of insurance recovered with respect to the damage.

(B)    If the Building or the Premises shall be partially damaged or partially destroyed by fire or other casualty, the rents payable hereunder shall be abated to the extent that the Premises shall have been rendered untenantable and for the period from the date of such damage or destruction to the date the date upon which Landlord shall substantially complete Landlord's Restoration Work.  If the Premises or a major part thereof shall be totally (which shall be deemed to include substantially totally) damaged or destroyed or rendered completely (which shall be deemed to include substantially completely) untenantable on account of fire or other cause, the rents shall abate as of the date of the damage or destruction and until Landlord shall substantially complete Landlord's Restoration Work, provided, however, that if Tenant reoccupies a portion of the Premises during the period the restoration work is taking place and prior to the date that the same are made completely tenantable, rents allocable to such portion shall be payable by Tenant from the date of such occupancy.

(C)    If the Building and/or the Premises are damaged by fire or other casualty such that, in Landlord's reasonable estimate, the Premises cannot be restored within three hundred sixty-five (365) days from the date of the casualty, Landlord shall give notice of such estimate to Tenant within one hundred twenty (120) days from the date of the casualty.  In such event, Tenant shall have sixty (60) days from the date of such notice to elect to terminate this Lease by giving written notice to Landlord, and such termination shall be effective as of the date of Tenant's notice.  If Tenant does not elect to terminate this Lease at such time but the Premises are not at least seventy-five percent (75%) restored within one and one- half (1.5) years from the date of such casualty then Tenant shall again have the right to terminate this Lease upon written notice to Landlord at any time prior to the date that Landlord has substantially completed such restoration and notified Tenant in writing thereof. If the Building or the Premises shall be totally damaged or destroyed by fire or other cause, or if the Building shall be so damaged or destroyed by fire or other cause (whether or not the Premises are damaged or destroyed) (i) such that 25% or more of the Building is rendered untenantable, or (ii) the general Building systems are rendered inoperable and, in Landlord's reasonable estimate, cannot be repaired within three hundred sixty-five (365) days from the date of the damage, or (iii) if the Building or the Premises shall be totally damaged or destroyed by fire or other cause within the last two (2) years of the Term, Landlord may terminate this Lease as of the date of the casualty by giving Tenant notice to such effect within one hundred twenty (120) days after the date of the casualty. If Landlord does not elect to so terminate this Lease, Landlord shall undertake the repair of the damage and restoration and rebuilding of the Building and/or Landlord's Restoration Work with respect to the Premises with reasonable promptness, subject to reasonable delays for insurance adjustment and/or Unavoidable Delay. "**Unavoidable Delay**" shall mean any strikes, labor troubles or accident, or by any cause whatsoever beyond Landlord's reasonable control, including legal requirements, governmental preemption in connection with a national emergency, shortages, or unavailability of labor, fuel, steam, water, electricity or materials, Tenant Delay, delays caused by other tenants or other occupants of the Building, acts of God, enemy action, civil commotion, fire or other casualty.

(D)      No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or of the Building pursuant to this Article.

(E)      Each party agrees to include in each of its policies insuring against loss, damage or destruction by fire, a waiver of the insurer's right of subrogation against the other party in connection with any loss or damage covered by any such policy or permission to release third parties from liability resulting from such casualties.  If such waiver or permission shall not be, or shall cease to be, obtainable without additional charge or at all, the insured party shall promptly so notify the other party.  In any case in which such waiver or permission shall cease to be obtainable without additional charge, if the other party shall so elect and shall pay the insurer's additional charge therefor, such waiver or permission shall be included in the policy.

(F)      Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty.  Notwithstanding the foregoing, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and, except as herein provided, to the extent that such insurance is in force and collectible and to the extent permitted by law, Landlord and Tenant each hereby releases and waives all right of recovery against the other or any one claiming through or under each of them by way of subrogation or otherwise.  The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance and also, provided that such a policy can be obtained without additional premiums.

(G)      Tenant acknowledges that Landlord will not carry insurance on Tenant's furniture, furnishings and other personal property or any Alterations installed by or on behalf of Tenant and agrees that Landlord will not be obligated to insure or repair any damage thereto or replace the same and unless this Lease is terminated as provided in this Article 13, Tenant shall promptly repair, restore and/or replace the same regardless if the insurance proceeds therefor are sufficient for the same.

(H)      Notwithstanding any of the foregoing provisions of this Article, if and to the extent by reason of some wrongful act on the part of Tenant or any of its employees, agents, contractors, subcontractors, licensees or concessionaires after the occurrence of a casualty which wrongful act is not cured prior to the expiration of any applicable notice and/or cure period, either (i) Landlord shall be unable to collect all of the insurance proceeds (including rent insurance proceeds) applicable to damage or destruction of the Premises or the Building by fire or other casualty or (ii) the Premises or the Building shall be damaged or destroyed or rendered completely or partially untenantable on account of fire or other casualty, then, without prejudice to any other remedy which may be available against Tenant, (a) the abatement of rent provided for in this Article shall not be effective to the extent of the uncollected insurance proceeds and (b) Landlord shall have no obligation to make any repairs whatsoever to the portions of the Premises required to be repaired by Landlord hereunder.

(I)      This Article shall be considered an express agreement governing any casualty or damage to or destruction of the Building or any part thereof by fire or other casualty, and Section 227 of the Real Property Law of the State of New York providing for such a contingency in the absence or such express agreement, and any other law of like import now or hereafter enacted, shall have no application in such case.

**EMINENT DOMAIN:**

14.    If the whole or any material part of the Premises shall be acquired or condemned by eminent domain for any public or quasi public use or purpose, then and in that event, the term of this Lease shall cease and terminate from the date of title vesting in such proceeding and Tenant shall have no claim for the value of any unexpired term of this Lease.  Tenant acknowledges that Landlord shall be entitled to receive the entire compensation or award therefor.  Notwithstanding the foregoing, Tenant may make a separate claim in any eminent domain proceeding (affecting all or any portion of the Premises) solely for the then value of Tenant's property and/or for any moving expenses incurred by Tenant in connection therewith, provided that such award shall not result in a reduction of the award made to Landlord in connection therewith.  If only a non-material part of the Premises shall be acquired or condemned by eminent domain as aforesaid and Tenant can continue to use the Premises for the Permitted Use, then this Lease shall not be terminated, and this Lease and the term of this Lease shall continue in full force and effect, provided, however, that from and after the date of the vesting of title, the Minimum Rent and Additional Rent shall be equitably reduced to include only that portion of the Premises that was not acquired or condemned by eminent domain.

**ASSIGNMENT, SUBLETTING, ETC.:**

15.    (A)    If Tenant's interest in this Lease is assigned, whether or not in violation of the provisions of this Lease, Landlord may, after default by Tenant under this Lease beyond any applicable notice and/or cure periods,  collect rent from the assignee; if the Premises are sublet to, or occupied by, or used by, any person other than Tenant, whether or not in violation of this Lease, Landlord, after default by Tenant under this Lease and expiration of Tenant's time, if any, to cure such default, may collect rent from the subtenant, user or occupant.  In either case, Landlord shall apply the net amount collected to the rents reserved in this Lease, but neither any such assignment, subletting, occupancy, nor use, nor any such collection or application shall be deemed a waiver of any terms, covenant or condition of this Lease or the acceptance by Landlord of such assignee, subtenant, occupant or user as a tenant.  The consent by Landlord to any assignment, subletting, occupancy or use shall not relieve Tenant from its obligation to obtain the express prior written consent of Landlord to any further assignment, subletting, occupancy or use (which shall likewise be governed by the same standard under this Lease).  The listing of any name other than Tenant's on any door of the Premises, or on any directory, or on any elevator in the Building, or otherwise, shall not operate to vest in the party so named, any right or interest in this Lease or in the Premises, or be deemed to constitute, or serve as a substitute for, any prior written consent of Landlord required under this Article, and it is understood that any such listing shall constitute a privilege extended by Landlord which shall be revocable at Landlord's will by notice to Tenant.  Tenant agrees to pay to Landlord any reasonable counsel fees incurred by Landlord in connection with any proposed assignment of Tenant's interest in this Lease or any proposed subletting of the Premises or any part thereof. Tenant shall not be entitled to propose or consummate any assignment or sublet under this Article if it is then in default under this Lease beyond the expiration of all applicable notice and cure periods, unless the assignment or subletting will permit Tenant to cure the default, in full, contemporaneously with the effectiveness of such assignment or subletting.  Neither any assignment of Tenant's interest in this Lease nor any subletting, occupancy or use of the Premises by any person other than Tenant, nor any collection of rent by Landlord from any person other than Tenant as provided in this Paragraph A, nor any application of any such rent as aforementioned as provided in this Paragraph A, shall in any circumstances relieve Tenant of Tenant's obligations fully to observe and perform the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed.  ~~In the event Tenant shall assign this Lease as permitted hereunder (regardless of whether Landlord's consent is required), Tenant shall remain liable for performance of each and every term of this Lease to be performed by Tenant hereunder during the Term and in accordance with the terms and provisions of this Lease; provided, however, Tenant shall not be~~

bound by any extensions or renewals not currently contemplated in this Lease or other amendments or modifications to this Lease made by and between the assignee and Landlord without such Tenant's prior written approval (which Tenant may withhold in its sole and absolute discretion).

B.    If Tenant shall desire to assign this Lease or to sublet the Premises to any third party including but not limited to a subsidiary, successor, affiliate or related entity to Tenant, Tenant shall submit to Landlord a written request for Landlord's consent to such assignment or subletting, which request shall be accompanied by the following information: (i) the name and address of the proposed assignee or subtenant; (ii) a duplicate original or photocopy of the assignment agreement or sublease to be executed by such assignee or sublessee; (iii) the nature and character of the business of the proposed assignee or subtenant and its proposed use of the Premises which use shall be in conformity with the use provision provided in this Lease; and (iv) banking, financial and credit information with respect to the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the financial responsibility of the proposed assignee or subtenant. In the event of an assignment of this Lease or a subletting of the entire portion of a single floor of the Premises occupied by Tenant, Landlord shall then have the following options, to be exercised by notice (**"Exercise Notice"**) given to Tenant within thirty (30) days after receipt of Tenant's request for consent:

1.    Landlord may require Tenant to surrender the Premises to Landlord and to accept a termination of this Lease as of a date (the **"Termination Date"**) to be designated by Landlord in the Exercise Notice, which date shall not be less than thirty (30) days nor more than ninety (90) days following the date of Landlord's Exercise Notice; or

2.    Landlord may require Tenant to assign this Lease to Landlord without merger of Landlord's estates effective as of the day preceding the proposed assignment or sublease.

3.    If Landlord shall elect to require Tenant to surrender the Premises and accept a termination of this Lease, then this Lease shall expire on the Termination Date as if that date had been originally fixed as the Expiration Date. Regardless of which option Landlord exercises under this Paragraph B, whether to terminate this Lease or to take an assignment thereof, Landlord shall be free to, and shall have no liability to Tenant if Landlord shall, Lease the Premises to Tenant's prospective assignee or subtenant.

Notwithstanding anything to the contrary set forth above, in the case of a proposed subletting of the entire portion of a single floor of the Premises, then the Landlord shall only be entitled to terminate the Lease with respect to such floor, and the Lease shall remain in full force and effect with respect to the floor that is not being sublet.

C.    In the event Landlord shall exercise either of such options, Tenant shall have the one-time right during the term of this Lease, provided that Tenant is not then in default under this Lease beyond any applicable notice and/or grace period, to rescind its request to enter into a proposed assignment or subletting, which right must be exercised by written notice given to Landlord not later than thirty (30) days after the delivery of Landlord's notice of termination, time being of the essence. If Tenant does not timely exercise such right to rescind, such right shall be deemed irrevocably waived. If Landlord shall not exercise either of its options under Paragraph B above within the time period therein provided or if Tenant has requested Landlord's consent to sublet the entire portion of a single floor of the Premises occupied by Tenant, and Tenant does not timely exercise its one-time right to rescind, then Landlord shall not unreasonably withhold, condition or delay consent to the proposed assignment or subletting of the entire or a portion of Premises, as the case may be, provided that Tenant is not then in

default under this Lease beyond any applicable notice and/or cure periods and further provided that the following further conditions shall be fulfilled:

1.    There shall not be more than three (3) sublettings of the Premises, or any portion thereof, at any one time, and such subletting shall not be for a period less than the lesser of either (x) twelve (12) months; or (y) the amount of time between the effective date of the subletting and the day before the Expiration Date;

2.    The subletting or assignment shall be to a tenant whose occupancy will be in keeping with the dignity and character of the then use and occupancy of the Building and whose occupancy will not be more objectionable or more hazardous than that of Tenant herein or impose any additional cost or burden whatsoever upon Landlord in the operation of the Building;

3.    No space shall be advertised or openly promoted to the general public (but may be listed with brokers)  at a lower rental rate than that being charged by Landlord at the time for similar space in the Building; provided however that nothing contained herein shall prohibit Tenant from privately listing the Premises with one or more brokers.

4.    The proposed sublessee or assignee shall not be an occupant of any premises in the Building (it being further agreed that, in the case of a proposed extension of an existing sublease, the sublessee shall not then be an occupant of any other premises in the Building), unless Landlord has no space available for lease in the Building; or a party who dealt with Landlord or Landlord's agent (directly or through a broker) with respect to space in the Building during the six (6) months immediately preceding Tenant's request for Landlord's consent;

5.    Tenant shall reimburse Landlord within ten (10) days following written demand for the reasonable and actual costs that may be incurred in connection with any assignment or sublease, including, without limitation, the reasonable costs of making investigations as to the acceptability of the proposed assignee or subtenant, and legal costs incurred in connection with the granting of any requested consent; and

6.    In case of a subletting, it shall be expressly subject and subordinate to all of the obligations of Tenant under this Lease and the further condition and restriction that the sublease shall not be assigned, encumbered or otherwise transferred or the subleased Premises further sublet by the sublessee in whole or in part, or any part thereof suffered or permitted by the sublessee to be used or occupied by others, without the prior written consent of Landlord in each instance.

7.    Any sublease must provide that the same is subject and subordinate to all of the terms and conditions of this Lease and the sublease must provide that in the event of cancellation or termination of this Lease for any reason whatsoever or of the surrender of this Lease whether voluntary, involuntary or by operation of law, prior to the expiration date of such sublease, including extensions and renewals granted thereunder, the proposed subtenant agrees to make full and complete attornment to Landlord for the balance of the term of the sublease, at the option of Landlord at any time during the proposed  subtenant's occupancy of the Premises, which attornment shall be evidenced by an agreement in which Landlord agrees not to disturb the proposed subtenant's occupancy of the demised space in accordance with the sublease, in form and substance satisfactory to Landlord, which the proposed subtenant agrees to execute and deliver at any time within fifteen (15) days after written request of Landlord, its successors and assigns, and the proposed subtenant waives the provisions of any law

now or hereafter in effect which may give the proposed subtenant any right of election to terminate the sublease or to surrender possession of the Premises in the event any proceeding is brought by Landlord to terminate this Lease.

        8.      The subtenant must be a United States citizen or citizens or a corporation or other entity which is qualified to do business in the State of New York and organized and existing under the laws of one of the States of the United States, and such subtenant must carry on a business that is otherwise a permitted use under this Lease.

        9.      No subletting shall be for a term ending later than one day prior to the Expiration Date.

Notwithstanding the foregoing, Landlord may require an additional security deposit in an amount equal to six (6) months of the then payable Minimum Rent as a condition to Landlord's consent to any such proposed assignment of this Lease or subletting of the Premises, provided, however, that if Tenant is not in default beyond any notice and cure periods under this Lease for the first twelve (12) months of the sublease, then Landlord shall return four (4) months of the then payable Minimum Rent from the additional security deposit to Tenant.

        D.      No permitted or consented to assignment or subletting shall be effective or valid for any purpose whatsoever unless and until a counterpart of the assignment or a counterpart or reproduced copy of the sublease shall have been first delivered to the Landlord, and, in the event of an assignment, the Tenant shall deliver to Landlord a written agreement executed and acknowledged by the Tenant and such assignee in recordable form wherein such assignee shall assume jointly and severally with Tenant the due performance of this Lease on Tenant's part to be performed to the full end of the term of this Lease notwithstanding any other or further assignment.

        E.      Any transfer by operation of law or otherwise, of Tenant's interest in this Lease or of a forty-nine (49%) percent or greater interest in Tenant (whether stock, partnership interest, membership interest, or otherwise) shall be deemed an assignment of this Lease for purposes of this Article except that (i) the transfer of the outstanding capital stock of any corporate tenant shall be deemed not to include the sale of such stock by persons or parties through the "over-the-counter market" or through any recognized stock exchange, other than those deemed "insiders" within the meaning of the Securities Exchange Act of 1934, as amended; and (ii) the transfer of any stock or membership interest for estate planning or income tax purposes shall not be deemed to be an assignment of this Lease provided that Tenant promptly after any such transfer shall deliver a notice to Landlord advising it of such transfer and to who such transfer was made.

        F.      Neither any assignment of Tenant's interest in this Lease nor any subletting, occupancy or use of the Premises or any part thereof by any person other than Tenant, nor any collection of rent by Landlord from any person other than Tenant, nor any application of any such rent shall, in any circumstances, relieve Tenant of its obligations fully to observe and perform the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed.

        G.      Notwithstanding anything to the contrary contained herein, if Landlord shall consent to any assignment or subletting and Tenant shall either (i) receive any consideration from its assignee (other than a successor corporation) in connection with the assignment of this Lease, Tenant shall pay over to Landlord a sum equal to fifty percent (50%) of such consideration (excluding any sums

designated by the assignee as paid for the purchase of Tenant's property in the Premises, that do not exceed the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns, or if Tenant does not file such returns, on the same basis as carried on Tenant's books) less any brokerage commissions and attorneys' fees and disbursements reasonably incurred by Tenant for such assignment or (ii) sublet the Premises or any portion thereof to anyone for rents, additional charges or other consideration (excluding sums designated by the subtenant as paid for the purchase of Tenant's property in the Premises, that do not exceed the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns or, if Tenant does not file such returns, on the same basis as carried on Tenant's books) which for any period shall exceed the rents payable for the subleased space under this Lease for the same period allocable on a per square foot basis, Tenant shall pay Landlord, as Additional Rent, a sum equal to fifty percent (50%) of such excess less brokerage commissions and attorneys' fees and disbursements, including without limitation alteration or demising costs,  reasonably incurred by Tenant for such subletting.  All sums payable to Landlord pursuant to subdivision (i) of this Paragraph G shall be paid on the effective date of such assignment and all sums payable to Landlord pursuant to subdivision (ii) of this Paragraph G shall be paid within ten (10) days following the date or dates such sums are received by Tenant from the subtenant.

~~H.     Intentionally omitted.~~

H.     If Landlord exercises either of its options under Paragraph B hereof, and the assignment or subletting would have permitted Tenant to cure any existing default, in full, contemporaneously with the effectiveness of such assignment or subletting, then Tenant shall not be required to cure such default as a condition to Landlord accepting an assignment of this Lease and/or the termination of this Lease.

I.     Intentionally deleted.

J.     If Tenant (i) requests in writing Landlord's consent to an assignment or sublease in accordance with the notice requirements set forth in this Lease, (ii) Tenant includes with such request a note in bold uppercase letters that "**LANDLORD'S FAILURE TO EITHER CONSENT TO THE ENCLOSED CONSENT REQUEST OR NOTIFY TENANT OF LANDLORD'S REASONS FOR WITHHOLDING SUCH CONSENT WITHIN ~~THIRTY (30)~~TEN (10) BUSINESS DAYS AFTER LANDLORD RECEIVES THIS REQUEST SHALL ENTITLE TENANT TO PROVIDE A SECOND NOTICE TO LANDLORD.  IF LANDLORD DOES NOT EITHER CONSENT TO THE ENCLOSED CONSENT REQUEST OR NOTIFY TENANT OF LANDLORD'S REASON(S) FOR WITHHOLDING SUCH CONSENT WITHIN FIVE (5) BUSINESS DAYS AFTER THE DATE THAT LANDLORD RECEIVES THAT SECOND NOTICE, LANDLORD'S CONSENT TO THE ENCLOSED CONSENT REQUEST SHALL BE DEEMED UNCONDITIONALLY GIVEN.",** and (iii) if Landlord fails to either consent to the consent request or notify Tenant of Landlord's reason(s) for withholding such consent within ~~thirty (30)~~ten (10) business days after Tenant's delivery of such request, Tenant may send a second written notice to Landlord again requesting Landlord's consent to the same proposed assignment or sublease.  If (a) Tenant sends such second written notice to Landlord in accordance with the notice requirements set forth in this Lease, (b) Tenant has satisfied all of the requirements of this Article 15, (c) Tenant includes with such second notice a note in bold uppercase letters that "**THIS IS YOUR SECOND AND FINAL NOTICE.  IF YOU FAIL TO EITHER CONSENT TO THE ENCLOSED CONSENT REQUEST OR NOTIFY TENANT OF LANDLORD'S REASON(S) FOR WITHHOLDING SUCH CONSENT WITHIN FIVE (5) BUSINESS DAYS**

**AFTER YOU RECEIVE THIS REQUEST, YOUR CONSENT TO THE ENCLOSED REQUEST SHALL BE DEEMED <u>UNCONDITIONALLY</u> GIVEN.**" and (d) at the time of such second notice, if Landlord fails to either consent to the consent request or notify Tenant of Landlord's reason(s) for withholding such consent within five (5) business days after Tenant's delivery of such second notice, and Tenant is not, at the end of such five (5) business day period in default under this Lease beyond the expiration of any applicable notice, grace, and/or cure periods, then, as Tenant's sole and exclusive remedy, Landlord's consent to the proposed assignment or subletting shall be deemed <u>unconditionally</u> given.

K.     If any lien is filed against the Premises or the Building for brokerage services claimed to have been performed for Tenant, whether or not actually performed, the same shall be discharged by Tenant within thirty (30) days after Tenant is notified of the same, at Tenant's expense, by filing the bond required by law, or otherwise, and paying any other necessary sums, and Tenant agrees to indemnify the Landlord Parties and hold them harmless from and against any and all losses or liability resulting from such lien for brokerage services rendered.

L.     Notwithstanding anything to contrary above or elsewhere in this Lease, the provisions of paragraph B shall not apply to an assignment of this Lease, or sublease of all or part of the Premises to the parent of Tenant or to a wholly-owned subsidiary of Tenant or of said parent of Tenant, but Tenant shall notify Landlord of any such assignment or sublease prior to the effective date thereof.

M.     Notwithstanding anything to contrary above or elsewhere in this Lease, the provisions of paragraph B shall not apply to an assignment of this Lease, or sublease of all or part of the Premises to any corporation or other entity (a) to which all or substantially all of the stock or assets of Tenant are transferred;  (b) into which Tenant may be merged or consolidated, provided that the net worth of the resulting or surviving corporation or entity, as the case may be, is at least equal to the net worth of Tenant on the date immediately prior to such merger or consolidation, and Landlord is furnished with financial statements confirming such net worth; or (c) which would otherwise be subject to the terms and provisions of this Article 15 pursuant to subsection (F) hereof, except that such transfer is in connection with the sale of Tenant's business in  an arms'-length transaction to a bona fide third party purchaser for value, but Tenant shall notify Landlord of any assignment or sublease identified in this subsection prior to the effective date thereof.

**ELECTRIC CURRENT:**

16.

(A)     All electricity consumed in the Premises will be metered by separate meters maintained by Tenant, at Tenant's own cost and expense, and Tenant shall pay for all electricity consumed in the Premises.  Payment for electricity consumed at the Premises shall be made by Tenant directly to the public utility supplying same unless otherwise instructed by Landlord. Tenant hereby agrees to pay and discharge all charges, claims and liens incurred during the term of this Lease by reason of the maintenance of equipment incidental to the consumption of all electricity at the Premises.

(B)     Tenant's use of electric current in the Premises shall not at any time exceed the capacity (provided in the preceding paragraph) of any of the electrical conductors and equipment in or otherwise serving the Premises. Tenant shall not make or perform of permit the making

of, any alterations to wiring, installations or other electrical facilities in or serving the Premises without the prior consent of Landlord in each instance. Should Landlord grant any such consent, all additional risers or other equipment required therefore shall be installed by Landlord and the cost thereof shall be paid by Tenant upon Landlord's demand; any such Work performed by Landlord shall be of workmanlike quality and the cost thereof shall be comparable to costs payable for similar type installations performed by owners of property similar to the Building.

(C)     Except to the extent caused by Landlord's gross negligence or willful misconduct, Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric energy furnished to the Premises by reason of any requirement act or omission of the public utility company servicing the Building with electricity or for any other reason whatsoever.

(D)     If any tax (other than a Federal, State or City Income Tax) is imposed upon Landlord's receipt from the sale or resale of electricity to Tenant by any Federal, State or Municipal Authority, Tenant covenants and agrees that where permitted by law, Tenant's pro rata share of such taxes shall be passed on to and included in the bill of, and paid by Tenant to Landlord.

**ACCESS TO PREMISES:**

17.     Landlord or Landlord's agents shall have the right to enter the Premises in any emergency at any time, and, at other reasonable times, upon reasonable ~~prior notice to Tenant~~, (being no less than 24 hours advance written notice), and, if Tenant elects, only while accompanied by a representative of Tenant (to the extent that Tenant makes such representative available), to examine the same and to make such repairs, replacements and improvements as Landlord may reasonably deem necessary or desirable to any portion of the Building or which Landlord may elect to perform following Tenant's failure for more than thirty (30) days after written notice from Landlord to make repairs or perform any work which Tenant is obligated to perform  or to comply with Legal Requirements.  Landlord shall repair, at Landlord's expense, any damage caused during the course of such work and/or entry into the Premises, and shall restore the Premises as nearly as reasonably practicable to the condition existing prior to such installation but in no event shall Landlord be obligated to employ overtime labor or to incur any extraordinary expenses in connection therewith.  Tenant shall permit Landlord to erect, use and maintain ducts, pipes and conduits in and through the Premises and to erect new pipes and conduits therein; provided, however, that (i) to the extent reasonably possible, any such ducts, pipes or conduits where there is no drop ceiling shall either be concealed behind, beneath or within walls, columns, ceilings or floors located in the Premises, or completely furred, (ii) the installation, when completed, shall not reduce the usable area of the Premises beyond a *de minimis* amount and (iii) Landlord shall repair any damage caused by such installations.  Landlord may, during the progress of any work in the Premises, take materials and equipment into the Premises without the same constituting an eviction.  Landlord shall have the right to enter the Premises with reasonable frequency, at reasonable hours, upon reasonable prior notice to Tenant, and, if Tenants elects, only while accompanied by a representative of Tenant (to the extent Tenant makes such representative available), to show prospective purchasers or mortgagees, and during the last year of the Term, to showing prospective tenants.  If Tenant is not present to open and permit an entry into the Premises, Landlord or Landlord's agents may enter whenever necessary ~~or permissible~~ by master key or forcibly (in the event of any emergency) and provided reasonable care is exercised to safeguard Tenant's property, such entry shall not render Landlord or its agents liable therefor, except that Landlord shall promptly repair any damage.  Landlord shall have the right at any time, without constituting an eviction to change the arrangement, design and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets, or other public parts of the Building and to change the name or number by which the Building may be known, provided that

any such change does not diminish Tenant's means of access to, and/or use and enjoyment of the Premises beyond a *de minimis* extent.  In connection with any access under this Article, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises; provided that Landlord shall not be required to utilize overtime or premium pay labor or incur any extraordinary costs in connection therewith unless Tenant shall request that Landlord perform the same on an overtime or premium pay basis and Tenant shall agree to reimburse Landlord for the same as additional rent hereunder.

## VAULT, VAULT SPACE, AREA:

18.    No vaults, vault space or area, not within the property line of the Building is leased hereunder.  Landlord makes no representation as to the location of the property line of the Building.  All vaults and vault space and all such areas not within the property line of the Building, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, Landlord shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction.  Any tax, fee or charge of municipal authorities for such vault or area shall be paid by Tenant.

## BANKRUPTCY:

19.    2)    Neither Tenant's interest in this Lease, nor any estate hereby created in Tenant nor any interest herein or therein, shall pass to any debtor-in-possession, trustee, or receiver or assignee for the benefit of creditors or otherwise by operation of law except as may specifically be provided pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "**Bankruptcy Code**").  If this Lease is assigned pursuant to the Bankruptcy Code, any and all consideration for such assignment shall be paid to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code.  Any and all monies and other consideration due under the preceding sentence shall be held in trust for the benefit of Landlord and be promptly paid to or turned over to Landlord.

(B)    Anything elsewhere in this Lease to the contrary notwithstanding, this Lease may be cancelled by Landlord by the sending of a notice to Tenant within a reasonable time after the happening of any one or more of the following events (each, a "**Bankruptcy Event**"): (i) the commencement of a case in bankruptcy or under the laws of any state naming Tenant or any Guarantor as the debtor; which case shall not have been dismissed within ninety (90) days after the institution thereof, or (ii) the making by Tenant of an assignment or any other arrangement for the benefit of creditors under any state statute.  If this Lease shall be assigned in accordance with its terms, the provisions of this Article 19 shall be applicable only to the party then owning Tenant's interest in this Lease.

(C)    It is stipulated and agreed that in the event of the termination of this Lease pursuant to Section 19(B) hereof, Landlord shall forthwith be entitled to recover from Tenant as and for liquidated damages an amount computed as provided in Section 21(B) hereof.  Nothing herein contained shall limit or prejudice the right of Landlord to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time.

## DEFAULT:

20.    (A)    This Lease is subject to the limitation that if (i) Tenant shall default in the payment of the Minimum Rent reserved herein or any item of Additional Rent or any part of either for more than ~~five (5)~~ seven (7) business days after notice from Landlord of such default; (ii) Tenant defaults in fulfilling any of the covenants of this Lease, other than the covenants for the payment of Minimum Rent or Additional Rent or other enumerated defaults in this Section 20(A), then, in any one or more of such events, upon Landlord serving a written thirty (30) days' notice upon Tenant specifying the nature of said default, and upon the expiration of said thirty (30) days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of such a nature that the same cannot be completely cured or remedied within said thirty (30) day period, and if Tenant shall not have diligently commenced curing such default within said thirty (30) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default; (iii) Guarantor shall default beyond any applicable notice and/or cure period under the Guaranty; (iv) the Premises are abandoned for more than ninety (90) days other than as a result of a casualty and/or Force Majeure Event; (v) any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the Premises shall be taken or occupied by someone other than Tenant without Landlord's express consent; (vi) intentionally omitted and/or (vii) Tenant shall fail to deliver or replace any security deposit required to be delivered hereunder within the applicable time periods set forth herein, then in any of said events Landlord may give to Tenant notice of intention to terminate this Lease to end the Term and the estate hereby granted at the expiration of five (5) business days from the date of the giving of such notice, and, in the event such notice is given, this Lease and the Term and estate hereby granted (whether or not the Term shall have commenced) shall terminate upon the expiration of said five (5) business days with the same effect as if that day were the Expiration Date, but Tenant shall remain liable for damages as hereinafter provided in this Article 20.

(B)    Nothing in Section 20(A) shall be deemed to require Landlord to give any further notice in addition to the notices, if any, required under such Section prior to the commencement of a summary proceeding for nonpayment of rent or a plenary action for the recovery of rent on account of any default in the payment of the same; it being intended that such notices are for the sole purpose of creating a conditional limitation hereunder pursuant to which this Lease shall terminate, and if Tenant thereafter remains in possession or occupancy, it shall become a holdover tenant.

**REMEDIES OF LANDLORD AND WAIVER OF REDEMPTION:**

21.    (A)    In case of any such default beyond the expiration of any applicable notice, grace and/or cure period, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (i) the rent shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, together with such expenses as Landlord may incur for attorneys' fees and disbursements, brokerage, and/or putting the Premises in good order, or for preparing the same for re-rental; (ii) Landlord may (but without any obligation to do so) re-let the Premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms, which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the term and may grant concessions or free rent, and/or (iii) Tenant shall also pay Landlord as liquidated damages, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the lease or leases of the Premises for each month of the period which would otherwise have constituted the balance of the Term of this Lease.  The failure of Landlord to re-let the Premises or any part or parts thereof shall not release or affect Tenant's liability for damages.  In computing such liquidated damages there shall be added to the said deficiency such actual and necessary expenses as Landlord may incur in connection with re-

letting, such as reasonable attorneys' fees and disbursements, brokerage, advertising and for keeping the Premises in good order or for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this Lease and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar proceeding. Landlord, in putting the Premises in good order or preparing the same for re-rental may, at Landlord's option, make such repairs and/or decorations in the Premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of re-letting the Premises. Landlord shall not be liable for failure to re-let the Premises, or in the event that the Premises are re-let, for failure to collect the rent thereof under such re-letting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rent collected over the sums payable by Tenant. Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Landlord obtaining possession of the Premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease, or otherwise.

(B)    In the event this Lease is terminated pursuant to the provisions of Article 20 herein, then in addition to the remedies Landlord may have pursuant to Section 21(A) herein, Landlord may elect, at its option, to recover from Tenant, all damages it may incur by reason of such breach, including the cost of recovering the Premises and reasonable attorneys' fees and expenses and shall be entitled to recover as and for liquidated damages, and not as a penalty, an amount equal to the difference between (1) the Minimum Rent, Additional Rent and charges equivalent to rent payable hereunder for the remainder of the stated Term and (2) the reasonable rental value of the Premises for the remainder of the stated term, both discounted at the rate of four percent (4%) per annum to present worth, all of which shall be immediately due and payable by Tenant. In determining the rental value of the Premises for such period, the rental realized by any reletting, if such reletting be accomplished by Landlord within a reasonable period of time after the termination of this Lease, shall be deemed prima facie to be the rental value. Landlord shall not be liable in any way whatsoever for its failure or refusal to relet the Premises or any part thereof, or if the Premises are so relet, for its failure to collect the rent under such reletting, and no refusal or failure to relet or failure to collect rent shall affect Tenant's liability for damages or otherwise hereunder. Nothing herein contained shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages by reason of such termination an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amounts referred to herein.

(C)    Tenant, on its own behalf and on behalf of all persons claiming by, through or under Tenant, including all creditors, does, to the fullest extent permitted by law, hereby expressly waive any and all rights which Tenant and all such persons might otherwise have to (i) the service of any notice of intention to re-enter or to institute legal proceedings to that end (except for any notices expressly provided for in this Lease, including, without limitation, this Article 21), (ii) redeem the Premises or any interest therein, (iii) re-enter or repossess the Premises, or (iv) restore the operation of this Lease, after Tenant shall have been dispossessed by a judgment or by a warrant of any court or judge, or after any re-entry by Landlord, or after any termination of this Lease, whether such dispossess, re-entry by Landlord or termination shall be by operation of law or pursuant to the provisions of this Lease. (B)    Intentionally omitted.

(C)      Intentionally omitted.

(D)      In the event of any breach or threatened breach by Tenant or Landlord hereunder or by any person or entity claiming through Tenant or Landlord, as the case may be, of any term, covenant or condition of this Lease, the other party shall have the right to seek to enjoin such breach or threatened breach or, subject to the limitations contained herein, to invoke any other right or remedy allowed by law or in equity.

(E)      Each right and remedy provided for in this Lease shall be cumulative and shall be in addition to every other right provided for in this Lease or now or hereafter existing at law or in equity (including, without limitation, the equitable remedies of specific performance and injunctive relief), by statute or otherwise, and the exercise or beginning of the exercise by a party of any one or more of such rights shall not preclude the simultaneous or later exercise by such party of any or all other rights provided for in this Lease or now or hereafter existing at law or in equity, by statute or otherwise.

(F)      The provisions of this Article 21 shall survive the expiration or earlier termination of this Lease.

**FEES AND EXPENSES:**

22.      If Tenant shall default under this Lease which shall continue after the expiration of any applicable notice and/or cure period, then, unless otherwise provided elsewhere in this Lease, Landlord may immediately or at any time thereafter and without notice perform the obligation of Tenant thereunder, and if Landlord, in connection therewith makes any reasonable expenditures or incurs any reasonable obligations for the payment of money, including but not limited to reasonable attorneys' fees and disbursements, in instituting, prosecuting or defending any action or proceeding, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Landlord within thirty (30) days of rendition of any bill or statement to Tenant therefor, and if the Term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Landlord as damages.

**NO REPRESENTATIONS BY LANDLORD:**

23.      Neither Landlord nor Landlord's agents have made any representations or promises with respect to the physical condition of the Building, the Land or the Premises, the rents, leases, expenses of operation or any other matter or thing related to the Premises except as herein expressly set forth.  Tenant has inspected the Building and the Premises and is thoroughly acquainted with their condition, and agrees to take the same "as is", and acknowledges that the taking of possession of the Premises on the Commencement Date by Tenant shall be conclusive evidence that the Premises and the Building were in good and satisfactory condition at the time such possession was so taken.  All understandings and agreements heretofore made between the parties hereto are merged in this Lease, which alone fully and completely expresses the agreement between Landlord and Tenant.  **[NTD:  LANDLORD TO CONFIRM THAT BUILDING FIRE ALARM SYSTEM IS OPERATIONAL]**

**END OF TERM:**

24.      Upon the expiration or earlier termination of the term of this Lease, Tenant shall quit and surrender to Landlord the Premises, broom clean, vacant, in good order and condition, ordinary wear and tear and damage by fire or other casualty excepted, and Tenant shall perform any restoration obligation imposed upon Tenant pursuant to the terms hereof, including, without limitation, Article 7 and remove all of its personal property.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this Lease.of the term of this Lease

**QUIET ENJOYMENT:**

25.      So long as this Lease is in full force and effect, Landlord covenants that Tenant shall peaceably and quietly enjoy the Premises hereby demised, subject, nevertheless, to the terms and conditions of this Lease including, but not limited to, Article 32 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**CONDOMINIUM:**

**26.**

(A)      Tenant acknowledges that the Property may be subjected to condominium form of ownership prior to the end of the term of this Lease.  Tenant agrees that if, at any time during the term, the Property shall be subjected to condominium form of ownership, then, this Lease and rights of Tenant hereunder are and shall be subject and subordinate in all respects to any condominium declaration (the "**Declaration**"), bylaws and any other documents (together with the Declaration, collectively, the "**Condominium Documents**"; the condominium association and/or the board thereof, hereafter, the "**Condominium**") which shall be recorded in order to convert the Property to a condominium form of ownership in accordance with the provisions of Article 9-B of the Real Property Law of the State of New York or any successor thereto, provided that such Condominium Documents do not materially and adversely increase the obligations of Tenant hereunder, diminish the rights of Tenant hereunder, or cause a change in Tenant's financial obligations hereunder. If any such Declaration is to be recorded, Tenant, upon request of Landlord, shall enter into an amendment of this Lease in such respects as shall be necessary to conform to such condominiumization (provided that Tenant's rights and obligations hereunder shall not be materially modified and there are no materially adverse change in Tenant's financial obligations including, without limitation, appropriate adjustments to Tenant's Tax Proportionate Share and the Base Taxes, subject to Paragraph F below.

(B)      Subject to the other provisions of this Article, Tenant agrees that it shall comply with the rules and regulations of the Condominium as well as Landlord's rules and regulations provided that all such rules and regulations are applied to Tenant in a non-discriminatory, uniform manner with all other tenants in the Building.  Tenant's use of the Demised Premises shall comply in all respects with the provisions of the Condominium Documents; provided that the Condominium Documents do not materially and adversely increase the obligations of Tenant hereunder, diminish the rights of Tenant hereunder, or cause a change in Tenant's financial obligations hereunder.

(C)    Notwithstanding anything to the contrary contained herein, if at any time during the term, Landlord shall receive notice from the Condominium, unit owners of the Condominium or occupants of the Building or other persons that any use or manner of use or the operation of the Demised Premises or part thereof (other than Tenant's use as set forth in Article 2) by Tenant or other person claiming by, through or under Tenant, violates any provision of the Condominium Documents or results in a breach of any duty or obligation which Landlord may have or owe to the Condominium, any unit owner of the Condominium or other occupant of the Building or other person, then Tenant hereby agrees to indemnify, defend and hold Landlord, its successors and assigns, harmless from and against any cost, loss or expense (including reasonable attorneys fees) suffered or incurred by Landlord, its successor or assigns, in connection with any such claim and any action or proceeding thereon, such indemnification obligation to survive the expiration or other termination of this Lease.

(D)    If at any time, pursuant to law or the provisions of the Condominium Documents, the Building shall cease to be a condominium, unless any condition exists pursuant to which this Lease may otherwise be terminated, then, this Lease shall continue in full force and effect between Tenant and the new owner of the Building, except that this Lease shall be deemed modified to delete provisions relating to the Condominium which are no longer relevant.  At the request of Landlord, Tenant will execute a modification of this Lease confirming such changes at that time.

(E)    With regard to any items of repair, maintenance, restoration, services or other obligations of Landlord under this Lease which under the Condominium Documents is the duty or responsibility of the Condominium, the board of managers, or the owner of any other unit in the Condominium (each of the foregoing being a **"Responsible Party"**)  Landlord shall have no liability to Tenant for the performance (or the failure to perform) such work or obligations, and Tenant shall first look directly to the Responsible Party whose obligation is involved for such work or obligations therefor and for any damages therefrom, except that Landlord shall use commercially reasonable efforts to cause such Responsible Party to perform such work or other obligations. Without limiting the foregoing, the failure of any Responsible Party to perform any of its obligations shall not be the grounds for any termination of this Lease by Tenant on the basis of a claim for constructive eviction against Landlord.

(F)    Tenant acknowledges that Landlord retains the right, at any time during the term, and from time to time, to split the Building into two (2) or more separate condominium units. In any such event, Tenant agrees as follows:  (i) Tenant will give such consents if any, as may be required to effectuate any such further condominiumization within the Building; (ii) Tenant agrees that it will promptly cooperate and comply with all reasonable requests made by Landlord in furtherance of any such further condominiumization, which may include, without limitation, executing such documents as may necessary in connection with the further condominiumization and consenting to any modifications of this Lease as may be reasonably requested by Landlord in connection therewith, provided the same do not increase the obligations of Tenant under this Lease or have an adverse impact upon the rights of Tenant or increase any of Landlord's rights or diminish any of Landlord's obligations under this Lease and Tenant agrees that its failure to so cooperate on a timely basis shall, at Landlord's option, constitute a default by Tenant under this Lease entitling Landlord to exercise all remedies hereunder after notice and the expiration of the grace period applicable to non-monetary defaults; and (iii) Tenant agrees that from after any such conversion of the Building to two (2) or more condominium units, the word "Landlord" as used herein shall refer

to the owner of the unit or units of the Condominium which comprise the Demised Premises and such other definitional charges as may be appropriate shall be made.  From and after such further condominiumization, if any, the computation of Tenant's Proportionate Share shall be appropriately adjusted to reflect the relative size of the Demised Premises to the tax lot constituting the condominium unit(s) containing the Demised Premises, and any other escalation or other changes payable on the basis of a percentage of square footage of the Building shall be appropriately adjusted, if necessary, to accurately reflect Tenant's percentage thereof.  Without limiting the generality of the foregoing, from and after such condominiumization, Base Year Taxes shall be determined by multiplying the Base Year Taxes times a fraction, the numerator of which is the amount of Real Estate Taxes initially payable by the Condominium containing the Demised Premises when the Condominium has been established and the denominator of which is the total amount of real estate taxes payable by all Condominiums in the Building when such Condominiums have been established.

## NO WAIVER:

27.     The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this Lease or of any of the Rules or Regulations shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation.  The receipt by Landlord, or the payment by Tenant, of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver and no provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver be in writing signed by the party to be charged.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.  No act or thing done by Landlord or Landlord's agents during the term hereby demised shall be deemed an acceptance of a surrender of the Premises and no agreement to accept such surrender shall be valid unless in writing signed by Landlord.  No employee of Landlord or Landlord's agent shall have any power to accept the keys of the Premises prior to the termination of this Lease and the delivery of keys to any such agent or employee shall not operate as a termination of this Lease or a surrender of the Premises.

## WAIVER OF TRIAL BY JURY:

28.     It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding (except for personal injury or property damage) on any matters whatsoever arising out of or connected with this Lease, the relationship of Landlord and Tenant and Tenant's use of or occupancy of the Premises.  It is further agreed that if Landlord commences any summary proceeding for possession of the Premises, Tenant will not interpose any counterclaim in any such proceeding (except a compulsory or mandatory counterclaims that would be waived if not raised in such proceeding).

## INABILITY TO PERFORM:

29.     This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no way be affected,

impaired or excused because Landlord is unable to perform any of its obligations under this Lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed from so doing by reason of strike or labor troubles or any cause whatsoever beyond Landlord's control including, but not limited to governmental regulation, governmental restriction (including governmental preemption in connection with a national emergency or a governmental warning, advisory, travel restrictions, or similar actions or pronouncements of governmental authorities), a mandated shutdown of work by applicable governmental authorities due to a public health emergency (including epidemics, pandemic (including, without limitation, the COVID-19 pandemic), famine, disease, plague, quarantine, and other health risk such as those declared or recognized by the Centers for Disease Control, the World Health Organization, national governments or other similar bodies), governmental preemption in the connection with a national emergency, strike, labor dispute not occasioned by a breach of contract by Landlord, riot, inability to obtain labor or materials, acts of God, war, fire, bioterrorism, terrorist acts or other casualty and other like circumstances (collectively, "**Force Majeure Event(s)**").   Likewise, the obligation of Landlord to perform all of its covenants and agreements hereunder shall in no way be affected, impaired or excused because Tenant is unable to perform any of its obligations under this Lease due to Force Majeure Events. For the avoidance of doubt, under no circumstances shall the inability to obtain money or the non-payment of money be deemed to be (or to have caused) a Force Majeure Event.~~CAPTIONS:~~

**CAPTIONS:**

30.     The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the intent of any provision hereof.

**ADJACENT EXCAVATION — SHORING:**

31.     If an excavation shall be made upon land adjacent to the Building, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the Building from injury or damage and to support the same by proper foundations. Landlord has no written notice of any planned or proposed excavation upon any land adjacent.

**RULES AND REGULATIONS:**

32.     Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe and comply with the Buildings Rules and Regulations attached hereto as Exhibit B and such other and further reasonable Rules and Regulations as Landlord or Landlord's agents may from time to time adopt upon reasonable notice to Tenant.  To the extent any inconsistencies arise between this Lease and the Rules and Regulations, as amended, the terms of this Lease shall govern and take precedence over the Rules and Regulations.  Notice of any additional rules or regulations shall be given in such manner as Landlord may elect but in any event in writing at least thirty (30) days in advance of their becoming effective.  Landlord shall not have any duty or obligation to enforce the Rules and Regulations against any other tenant and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.  The Rules and Regulations will not be promulgated or enforced against Tenant in a discriminatory manner and shall not by their nature discriminate against Tenant, and no amendment, modification or addition to the Rules and Regulations shall impose any additional financial burden on Tenant; reduce Tenant's rights hereunder; or reduce Landlord's obligations hereunder, in each case except to a de minimis extent.

**SECURITY:**

**33.** (A)    As a condition to the entering into of this Lease, simultaneously herewith Tenant shall deliver to Landlord a security deposit in the amount of $175,000.00 (the "**Security Deposit**") in the form of a Letter of Credit (as hereinafter defined) as security for the full and punctual performance by Tenant of all of the terms of this Lease.  Notwithstanding the foregoing, Tenant may provide Landlord with cash security pursuant to the terms of this Lease provided that within sixty (60) days of the date hereof (~~TIME BEING OF THE ESSENCE and failure~~provided that such sixty (60) day period shall be extended if Tenant establishes to ~~do so being a material default hereunder~~Landlord's satisfaction that Tenant has applied for the required Letter of Credit but that same has not been delivered due to reasons beyond Tenant's control) Tenant replaces such cash security with a Letter of Credit in the form required by the terms of this Lease; it being agreed that Landlord's holding of such cash security shall not be deemed a waiver of Tenant's obligation to maintain the security in the form of a Letter of Credit.  In the event Tenant defaults beyond the expiration of all applicable notice, grace and cure periods in the performance of any of the terms of this Lease, including the payment of rent, or in the event of a Bankruptcy Event, Landlord may use, apply or retain the whole or any part of the Security Deposit to the extent required for the payment of any rent or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms of this Lease, including any damages or deficiency in the re-letting of the Premises, whether accruing before or after summary proceedings or other re-entry by Landlord.  In the case of every such use, application or retention, Tenant shall, within thirty (30) days after Landlord's written demand, pay to Landlord the sum so used, applied or retained which shall be added to the Security Deposit so that the same shall be replenished such that, the security deposit hereunder is not less than $175,000.00.  If Tenant shall fully comply with all of the terms of this Lease, the Letter of Credit, shall be returned to Tenant within five (5) business days after the termination of this Lease and delivery of exclusive possession of the Premises to Landlord in the manner required hereunder.

(B)    Tenant acknowledges that it is a material inducement to Landlord to enter into this Lease that the Security Deposit be maintained in the form of a Letter of Credit and that Tenant's failure to provide and maintain any such Letter of Credit throughout the Term shall constitute a material default under this Lease, and Tenant further acknowledges that notwithstanding anything else in this Lease, Tenant shall not be permitted to provide cash security (other than any deposit under Article 7 hereof, which may be in the form of cash).  Any letter of credit on account of the Security Deposit shall be a clean, irrevocable and unconditional Letter of Credit (the "**Letter of Credit**") issued by and drawn upon any commercial bank which is a member of The Clearing House Association (hereinafter referred to as the "Issuing Bank") with offices for banking purposes in the City of New York and having a net worth of not less than Ten Billion and 00/100 ($10,000,000,000.00) Dollars, which Letter of Credit may be drawn upon in New York City, shall have a term of not less than one year, be in the form substantially similar to the form attached hereto as Exhibit B, be for the account of Landlord and be in the amount of the Security Deposit.  Each Letter of Credit shall provide that:

(i)    The Issuing Bank shall pay to Landlord or its duly authorized representative an amount up to the face amount of the Letter of Credit upon presentation of the Letter of Credit, a sight draft in the amount to be drawn and a signed statement;

(ii)    The Letter of Credit shall be deemed to be automatically renewed, without amendment, for consecutive periods of one year each during the term of this Lease (and shall remain in effect for not less than three (3) months following the Expiration Date), unless the Issuing

Bank sends notice (hereinafter referred to as the "**Non-Renewal Notice**") to Landlord by certified or registered mail, return receipt requested, not less than sixty (60) days next preceding the then expiration date of the Letter of Credit, that it elects not to have such Letter of Credit renewed;

        (iii)    If Landlord receives a Non-Renewal Notice and Tenant fails to provide a replacement Letter of Credit which meets the requirements of this Lease not fewer than forty-five (45) days prior to the expiration of the Letter of Credit, such failure shall constitute a material default under this Lease and Landlord shall have the right, exercisable by a sight draft, to draw upon and receive the monies represented by the Letter of Credit (which moneys shall be held by Landlord as a cash deposit, without interest, pending the replacement of such Letter of Credit); however, Landlord's holding of such cash security shall not be deemed a waiver of Tenant's default of its obligation to maintain the security in the form of a Letter of Credit);

        (C)    Tenant further agrees that Landlord is hereby authorized and shall have the right, exercisable by sight draft:

        (a)    if a Bankruptcy Event occurs, to receive monies represented by the Letter of Credit; and/or

        (b)    if a voluntary termination of this Lease occurs, to receive monies represented by the Letter of Credit in order to satisfy any fees and payments owed by Tenant in connection with such termination, including without limitation, accrued but unpaid rents and/or other charges payable pursuant to this Lease; and/or

        (c)    In the event of a sale or lease of Landlord's interest in the land and the Building, Landlord shall transfer (at no expense to Landlord) the Security Deposit deposited hereunder to the vendee or lessee, and upon such transfer, Landlord shall be released by Tenant from all liability for the return of the Security Deposit.  In such event, Tenant agrees to look solely to the new landlord for the return of the Security Deposit.  It is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new landlord.

        (D)    Notwithstanding anything to the contrary contained herein, Tenant acknowledges that Tenant is obligated to provide Landlord with Replacement Security (as hereinafter defined) within thirty (30) business days of written notice from Landlord if any of the following events (each, a "**Triggering Event**") occurs:  (1) the Issuing Bank of the Letter of Credit is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation or any successor or similar entity; (2) the Issuing Bank of the Letter of Credit fails to meet the Minimum Rating Requirement (as hereinafter defined); or (3) the net worth of the Issuing Bank of the Letter of Credit is less than Ten Billion and 00/100 Dollars ($10,000,000,000.00).  Within thirty (30) business days of Landlord's written notice to Tenant of a Triggering Event, Tenant shall replace the Letter of Credit with either a letter of credit issued by an Eligible Issuer or other security (the "Replacement Security") acceptable to Landlord in its sole and absolute discretion.  If Tenant fails to provide the Replacement Security as aforesaid, then, notwithstanding anything in this Lease to the contrary, (1) such failure shall constitute a default under this Lease for which there shall be no notice or grace or cure periods being applicable thereto other than the aforesaid thirty (30) business day period, and (2) Landlord may immediately draw upon the Letter of Credit in whole or in part, and the proceeds thereof shall be held or applied, as applicable, pursuant to the terms of this Lease.  Tenant shall have the right to direct Landlord to draw upon the Letter of Credit prior to the expiration of such thirty (30) business day period.  Notwithstanding anything to the contrary contained in this Lease, in the event that Landlord shall so draw upon the Letter of Credit and shall receive the proceeds thereof, Tenant's default shall

be deemed to be cured and Landlord shall hold such funds pursuant to the terms of this Lease.  In addition, following any such draw by Landlord, Tenant may obtain a replacement Letter of Credit from an Eligible Issuer, and upon issuing of same to Landlord, Landlord shall return to Tenant all such funds unapplied and drawn by Landlord in accordance with this Lease.

(E)     The term "**Eligible Issuer**" means any depository institution that is a member of the Clearing House Association, with offices for banking purposes in the City of New York and having a net worth calculated in accordance with generally accepted accounting principles, consistently applied, of not less than Ten Billion Dollars ($10,000,000,000), the long term unsecured debt obligations of which are rated at least "A-" by Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies ("S&P"), or, if an S&P rating is unavailable, "A-" by Fitch IBCA, Inc. ("Fitch") or "Aa3" by Moody's Investors Service, Inc. ("Moody's") (such rating requirements, collectively, the "Minimum Rating Requirement").

(F)     Tenant covenants that it will not assign or encumber the Security Deposit, and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, or attempted encumbrance.

(G)     Tenant shall pay Landlord's reasonable attorneys' fees and disbursements in connection with the renewal, replacement, substitution or amendment of the Letter of Credit or the drawing thereon by Landlord.

**SUCCESSORS AND ASSIGNS:**

34.     This Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors, and permitted assigns.

**INSURANCE:**

**35.**

(A)     Tenant shall obtain and keep in full force and effect during the term of this Lease, at its own cost and expense, the following policies of insurance:

(i)     comprehensive commercial general liability insurance for all activity conducted on the Premises including, but not limited to, coverage for independent contractors, products and completed operations liability and contractual liability, with a limit in an amount not less than FIVE MILLION AND 00/100 ($5,000,000.00) DOLLARS combined single limit for personal injury, bodily injury and property damage liability in any one occurrence (which may be in the form of a primary policy plus an "excess" or "umbrella" policy);

(ii)     property insurance providing coverage on a "special cause of loss" a/k/a "all-risk" policy form basis for all personal property of the Premises, including, but not limited to improvement and betterments, inventory, equipment, furnishings, furniture and trade fixtures installed therein by Tenant, with a limit in an amount not less than the full "replacement cost" thereof with a deductible of not more One Thousand and 00/100 ($1,000.00) Dollars;

(iii)     Statutory benefits of the Workers' Compensation Laws in the State of New York, including Employers Liability (Coverage B) with limits not less than $1,000,000; and

     (iv)  such other insurance and in such reasonable amounts as may, from time to time, be reasonably required by Landlord or any fee owners or lessors under any ground or underlying Leases, or the holder or holders of any mortgages to which this Lease is or shall be subordinate.

(B) Said insurance shall: (i) be written in form reasonably satisfactory to Landlord by one or more good and solvent insurance companies of recognized standing admitted to do business in the State of New York, rated by A.M. Best Co., Inc., or any successor thereto (or if there be none, an organization having a national reputation) as having a "Best's Rating" of at least "A" (Excellent) and a financial size of at least "Class IX"; (ii) be written without the inclusion of any defense costs within the limit of liability and without aggregation of other premises with the Premises; (iii) under no circumstances be considered anything other than primary insurance; (iv) name Landlord, Landlord's managing agents (presently Samson Management LLC, Goldstein Advisors LLC, Goldstein Properties LLC, Goldstein Properties II LLC and Goldstein Manager LLC), and any fee owners, mortgages, or lessors under any ground or underlying Leases, and such others as Landlord shall designate from time to time as having an interest in the Building, as insureds on a primary, non-contributory basis/loss payees as applicable, and shall insure against any and all claims for bodily injury (including death), personal injury, or property damage occurring in, upon, adjacent to, or connected with the Premises or any part thereof. Tenant shall pay all premiums and charges therefor; (v) include coverage for acts of terrorism as identified in the Terrorism Risk Insurance Act or any similar or succeeding legislation or published insurance guidelines or policies; and (vi) contain a provision that no act or omission of Tenant shall affect or limit the obligation of the insurer to pay the amount of any loss sustained.

(C) Acord Form 25-S (Certificate of Insurance) and an Acord Form 28 (Evidence of Commercial Property Insurance), each in form and substance reasonably satisfactory to Landlord, shall be delivered to Landlord together with any endorsements thereto on the Commencement Date and delivered to Landlord at least thirty (30) days prior to the expiration of any expiring policy.  Such insurance policies or certificates shall contain a provision that no act or omission of Tenant will affect or limit the obligation of the insurance company to pay the amount of any loss sustained and that the insurance afforded thereunder shall not be cancelled or coverage thereunder reduced except upon thirty (30) days' prior written notice to Landlord.  Any certificate delivered to Landlord shall also specifically reflect coverage of Tenant's aforementioned indemnification obligation. Upon Landlord's request, Tenant shall provide Landlord with duplicate original insurance policies.

(D) Tenant shall not violate or permit to be violated any of the conditions or provisions of any such policies, and Tenant shall so perform and satisfy the requirements of the companies writing such policies so that, at all times, companies of good standing, satisfactory to Landlord or any mortgagees designated by Landlord, shall be willing to write and/or continue such insurance.

(E) Tenant and Landlord shall reasonably cooperate in connection with the collection of any insurance monies that may be due in the event of loss, and Tenant shall execute and deliver to Landlord such proofs of loss and other instruments which may be reasonably required for the purpose of obtaining the recovery of any such insurance monies.

(F) In the event of Tenant's failure to comply with the provisions of this Article, Landlord may, but shall not be obligated to, cause the same to be done for Tenant's account and the cost thereof shall be deemed payable to Landlord by Tenant on demand as Additional Rent without set-off or deduction. Supplementing the foregoing, but not in limitation thereof, Landlord may recover from Tenant, and Tenant agrees to pay, any and all reasonable damages which Landlord may sustain by reason of Tenant's

failure to obtain and keep in force any insurance which Tenant is required to obtain and keep in force under this Article and this Lease (it being understood and agreed by Tenant that the damages of Landlord shall not be limited to the amount of the premiums thereon).

(G)     Tenant agrees to use its best efforts to include in each of its policies insuring against loss, damage or destruction by fire, a waiver of the insurer's right of subrogation against Landlord in connection with any loss or damage covered by any such policy or permission to release third parties from liability resulting from such casualties.  If such waiver or permission shall not be obtainable without additional charge, Tenant shall promptly so notify Landlord, whereupon, if Landlord shall so elect and shall pay the insurer's additional charge therefor, such waiver or permission shall be included in the policy.  The provisions of this Article shall also apply to each permitted assignee, if any, and each permitted subtenant, if any, at any time occupying the Premises, or any part thereof.

(H)     Tenant hereby releases Landlord, its partners, members, managers, agents and employees with respect to any claim (excluding claims for gross negligence and willful misconduct or breach of Landlord's obligations under this Lease) which Tenant might otherwise have against Landlord, its partners, members, managers, agents or employees for loss, damage or destruction with respect to Tenant's property (including rental value or business interruption) occurring during the term of this Lease.

(I)     Tenant understands and agrees that Landlord will not be obligated to carry insurance of any kind on any personal property in the Premises (regardless of whether such property shall be owned by Tenant and including, but not limited to, Tenant's goods, supplies, furnishings, furniture, fixtures, equipment, improvements, betterments, installations or appurtenances).   Any employee or agent of the Building to whom property shall be entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property and neither Landlord nor its employees or agents shall be liable for any damage to such property nor for the loss of or damage to any property of Tenant by theft or otherwise.

(J)     Landlord hereby agrees to at Landlord's sole cost and expense maintain in full force and effect throughout the term of this Lease insurance in the forms and amounts required by Landlord's commercial mortgage lender, or, if there is no such loan on the Building, in such forms and amounts as may be determined by  Landlord in its reasonable discretion.

**BROKERAGE:**

36.     Tenant and Landlord represent and warrant that neither party has had any dealings or communications with any broker or agent in connection with this Lease and Tenant and Landlord covenant and agree to hold harmless and indemnify the other party and its officers, directors, employees and members from and against any and all cost, expense (including reasonable attorneys' fees and disbursements) and liability arising out of any inaccuracy or alleged inaccuracy of the above representation.  Tenant's and Landlord's liability under this Article extends to the acts and omissions of any employees, officers, directors, shareholders, members, and representatives of each respective party.  In case any action or proceeding is brought against Landlord by any broker or agent claiming to have dealt with Tenant in connection with this Lease, Tenant, upon notice from Landlord, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Landlord in writing, which approval shall not be unreasonably withheld, <u>conditioned,</u> delayed or conditioned. The provisions of this Article 36 shall survive the expiration or sooner termination of this Lease.  In case any action or proceeding is brought against Tenant by any broker or agent claiming to have been retained by Landlord in connection with this Lease, Landlord, upon notice from Tenant, will, at

Landlord's expense, resist or defend such action or proceeding by counsel approved by Tenant in writing, which approval shall not be unreasonably withheld, ~~delayed or~~ conditioned or delayed.  The provisions of this Article 36 shall survive the expiration or sooner termination of this Lease.

**ESTOPPEL CERTIFICATE:**

       37.     Tenant shall at any time and from time to time, but no more than twice every calendar year, upon not less than fifteen (15) days' prior notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing setting forth the Commencement Date, the Expiration Date and the Minimum Rent and certifying (i) that this Lease is unmodified and in full force and effect (or if there has been any modification, that the same is in full force and effect as modified and stating the modification), (ii) the dates to which the Minimum Rent and Additional Rent have been paid in advance, if any, (iii) whether or not to the knowledge of Tenant, without any independent investigation, Landlord is in default in performance of any of its obligations under this Lease and, if so, specifying each such default of which Tenant may have knowledge, (iv) whether there exist any known offsets or defenses against enforcement of any of the terms of this Lease upon the part of Tenant to be performed, and, if so, specifying the same, and (v) such further information as Landlord may reasonably request.  Any such statement shall be binding upon Tenant and may be relied upon by Landlord and by any prospective purchaser of the Real Property and/or the Building or any part thereof or of the interest of Landlord in any part thereof, by any mortgagee or prospective mortgagee thereof, by any lessor or prospective lessor thereof, by any lessee or prospective lessee thereof, or by any prospective assignee of any mortgage thereof.

       ==Landlord shall at any time and from time to time upon not less than fifteen (15) days' prior notice from Tenant, execute, acknowledge and deliver to Tenant a statement in writing setting forth the Commencement Date, the Expiration Date and the Minimum Rent and certifying (i) that this Lease is unmodified and in full force and effect (or if there has been any modification, that the same is in full force and effect as modified and stating the modification), (ii) the dates to which the Minimum Rent and Additional Rent have been paid in advance, if any, (iii) whether or not to the knowledge of Landlord, Tenant is in default in performance of any of its obligations under this Lease and, if so, specifying each such default of which Landlord may have knowledge,  and (iv) such further information as Tenant may reasonably request.  Any such statement shall be binding upon Landlord and may be relied upon by Tenant and by any third party with whom Tenant is dealing.==

**HOLDING OVER:**

       38.    3)    Tenant hereby indemnifies and agrees to hold Landlord harmless from and against any loss, cost, liability, claim, damage and expense (including reasonable attorneys' fees and disbursements) resulting from delay by Tenant in surrendering the Premises for more than ~~thirty (30~~forty-five (45) days following the expiration or termination of this Lease as provided in Article 24, including any claims made by any succeeding tenant or prospective tenant founded upon such delay.

       (B)    In the event of any holding over by Tenant, Tenant shall pay as holdover use and occupancy for each month (or portion thereof) of the holdover tenancy an amount equal to (i) one and one-half (2~~1~~.5) times the Minimum Rent and Additional Rent payable during the last month of the Term for the first thirty (30) days of any such holdover, (ii) two (2) times the Minimum Rent and Additional Rent payable during the last month of the Term for the next thirty (30) days of any such holdover, and thereafter, (iii) two and one-half (2.5) times the Minimum Rent and

Additional Rent payable during the last month of the Term,  subject to all of the other terms of this Lease insofar as the same are applicable to such holdover tenancy.  The acceptance of any such use and occupancy payment paid by Tenant pursuant to this Section shall in no event preclude Landlord from commencing and prosecuting a holdover or summary eviction proceeding and the provisions of this Section shall be deemed be an "agreement expressly providing otherwise" within the meaning of Section 232-c of the Real Property Law of the State of New York and any successor or similar law of like import.  Nothing contained in this Section shall (i) imply any right of Tenant to remain in the Premises after the termination of this lease without the execution of a new lease, (ii) imply any obligation of Landlord to grant a new lease or (iii) be construed to limit any right or remedy that Landlord has against Tenant as a holdover tenant or trespasser.

**NOTICES:**

39.    Every notice, demand and other communication (collectively, "**notices**") which is given under this Lease or by law must be in writing and shall be sent either by (A) reputable overnight courier or (B) hand delivery (against confirmation of delivery), and shall be addressed:

(i)    if to Tenant, addressed to Tenant at the Property, or at such other place as Tenant may from time to time designate by notice to Landlord and with a simultaneous copy delivered in the same manner to:

601 West 26th Street
Suite 1250
New York, New York 10001
Attn:  Mark Karasick

-    and –

Gerstein Strauss & Rinaldi LLP
57 West 38th Street, 9th Floor
New York, NY 10018
Attn: Eric S. Horowitz, Esq.
Email: ehorowitz@gsrlaw.com

(ii)    if to Landlord, to

92 Third Street LLC
c/o Samson Management LLC
118-35 Queens Boulevard, Suite 1710,
Forest Hills, New York 11375
Attention:  Mr. Brian McCarthy
Email: brian@samsonmanagement.com

and

92 Third Street LLC
c/o Samson Management LLC
118-35 Queens Boulevard, Suite 1710,
Forest Hills, New York 11375
Attention:  Mr. David Kershner
Email: david@samsonmanagement.com

and the same shall be deemed delivered (A) the first business day following delivery to an overnight courier or (B) when delivered by hand.  A copy of any notice to Landlord shall be sent in like manner to Landlord's counsel, Blank Rome LLP, 1271 Avenue of the Americas, New York, New York 10020, Attention: Mara Levin, Esq.  A copy of any default or termination notice to Tenant shall be sent in like manner to Tenant's counsel:   Gerstein Strauss & Rinaldi LLP, 57 West 38th Street, 9th Floor, New York, NY 10018, Attn: Eric S. Horowitz, Esq.  A notice given by counsel for Landlord or Tenant shall be deemed a valid notice if addressed and sent in accordance with the provisions of this Article.  Either party may designate, by similar notice to the other party, any other address for such purposes.   Notwithstanding the foregoing, either party hereto may give the other party facsimile or orale-mail notice of the need of emergency repairs.  Notices requesting after hours services may be given by delivery to the Building Manager or any other person in the Building designated by Landlord to receive such notices.  Landlord's Tax Statements and all other rent bills may be delivered by Landlord via ordinary United States mail.

**CERTAIN RIGHTS RESERVED TO LANDLORD:**

40.    Landlord reserves the following rights:

(A)    To name the Property.

(B)    To install, affix and maintain all signs, awnings, scaffolding, sidewalk bridges and canopies on the exterior of the Building.

(C)    To have pass keys to the Premises.

(D)    Subject to Section 40(E) below, to close the Building for all days observed by the State or Federal Government as legal holidays and those designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to heating service.

(E)    Subject to the Rules and Regulations, Force Majeure Events and Landlord's commercially reasonable security measures, Tenant shall have access to the Premises 24 hours per day, 7 days per week, 365(6) days per year.  Notwithstanding the foregoing but subject to the provisions of Article 13 and Article 14, Landlord shall have no liability to Tenant, nor shall Tenant be entitled to terminate this Lease, to claim an actual or constructive eviction in whole or in part, or be entitled to any abatement or diminution of rent payable by Tenant under this Lease or to any relief from any of its obligations under this Lease if by reason of strike or labor trouble or any other similar cause beyond the reasonable control of Landlord there is (i) a lack of access to the Building or the Premises (which shall include without limitation the lack of access to the Building or the Premises when it or they are structurally sound but inaccessible due to evacuation of the surrounding area or damage to nearby structures or public areas); (ii) reduced air quality or other contaminants in the Building that would adversely affect the Building or its occupants; (iii) disruption of mail and

deliveries to the Building or the Premises; (iv) disruption of telephone and/or other communications services to the Building or the Premises; or (v) disruption of any other services to the Premises or any of the Building systems if Tenant is otherwise unable to use and/or occupy the Premises for the conduct of its business.

**HAZARDOUS MATERIALS:**

      41.    (A)    Tenant hereby covenants that it shall not install, cause or permit any Hazardous Materials to be placed or stored in or about the Premises in violation of any applicable environmental or other Legal Requirements; provided, that nothing herein shall prevent Tenant's use of such reasonable and legally permissible amounts of Hazardous Materials customarily used in the ordinary course of operation of Tenant's business in the Premises, including, without limitation, cleaning products provided that the same are used and stored in compliance with applicable Legal Requirements. Tenant shall indemnify and hold Landlord harmless from and against any claims, demands, losses, liabilities, penalties and damages arising out of, or in any way connected with the installation, placement, storage or release of Hazardous Materials used or installed upon the Premises in violation of the terms of this Lease. If Tenant, or its employees, contractors or agents install, use, store or place Hazardous Materials in the Premises, Tenant shall be obligated to remove and dispose of said Hazardous Materials in compliance with all Legal Requirements. This covenant shall survive the expiration or earlier termination of this Lease.

      (B)    As used herein, the term "Hazardous Materials" (i) means any substance or material that is included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," or "solid waste" in any Environmental Law and mildew, fungus, mold, bacteria and/or other organic spore material, and (ii) "**Environmental Laws**" means Legal Requirements relating to pollution or the protection of the environment.

      (C)    Landlord hereby covenants that it shall not knowingly install, cause or permit any Hazardous Materials to be placed or stored in or about the Premises or the Building in violation of any applicable environmental or other legal requirement.

      (D)    Tenant shall surrender the Premises to Landlord upon the expiration or earlier termination of this Lease free of Hazardous Materials and in a condition which complies with all Environmental Laws and any additional requirements of Landlord that are reasonably necessary to protect the value of the Premises and the Building. Tenant's obligations and liabilities pursuant to this 41(D) shall be in addition to any other surrender requirements in this Lease and shall survive the expiration or earlier termination of this Lease.

      ==(E)    Landlord shall indemnify and hold Tenant harmless from and against any claims, demands, losses, liabilities, penalties and damages arising out of, or in any way connected with the installation, placement, storage or release of Hazardous Materials used or installed anywhere at or within the Building or the land on which it is situated by Landlord in violation of any Legal Requirements.==

**LANDLORD'S WORK:**

      42.    Landlord shall have no obligation to furnish a work allowance or perform any work or provide any services in or to the Premises in order to prepare the same for occupancy by Tenant,

other than Landlord's Work.  Except as otherwise expressly provided herein, Landlord has not made and does not make any representations or warranties with respect to the Premises.

**TENANT'S MEMBERS**

> 43.

> (A)   Notwithstanding anything herein to the contrary, Tenant may, without prior notice to Landlord and/or Landlord's consent and without being subject to Landlord's recapture or profit sharing rights, permit clients of Tenant (which may include, but not be limited to the existing clients of Coworkers who are currently in occupancy of the Premises) to occupy the Premises for co-working and shared office space purposes in accordance with the terms of this Lease (individually, a "**Tenant Member**" and collectively, "**Tenant's Members**") to use all or a portion of the Premises, provided that (i) such arrangement will terminate automatically upon a default by Tenant occurring and continuing beyond any applicable notice and cure period under this Lease; (ii) any Tenant Member shall use the Premises in conformity with all applicable provisions of this Lease, including, without limitation, Article 2 hereof; and (iii) in no event shall the use of any portion of the Premises by a Tenant Member create or be deemed to create any right, title or interest in or to the Premises for such Tenant Member.  Any such use of all or any portion of the Premises by such Tenant Member shall not relieve Tenant of any of its obligations or liabilities under this Lease.  Landlord shall have no liability or obligation to such Tenant Member as a tenant.

> (B)   Prior to the use or occupancy of the Premises or any portion thereof by any Tenant Member, such Tenant Member shall enter into a license agreement in the form then utilized by Tenant ~~and its affiliates in a majority of its location in comparable buildings in New York City~~ (a "**Membership Agreement**").

> (C)   Tenant hereby acknowledges and agrees that each Membership Agreement shall be subject and subordinate in all respects to the terms and conditions of this Lease and any and all matters to which this Lease is subject and subordinate, including, without limitation, any Superior Mortgage or Superior Lease.

> (D)   Tenant shall cause each Tenant Member to comply with the Rules and Regulations annexed hereto and all Legal Requirements applicable to such Tenant Member's use and occupancy of the Premises and the Building to the same extent Tenant is obligated to so comply hereunder, and Tenant shall not permit or suffer any Tenant Member to take any action or fail to take any action which would constitute a default hereunder. For the avoidance of doubt, any breach or violation of any provision of this Lease by any Tenant Member (whether by act or omission) shall be deemed to be and shall constitute a default by Tenant in fulfilling such provision and, in such event, Landlord shall have all of the rights, powers and remedies provided herein or at law or in equity or by statute or otherwise with respect to default (subject however to the Tenant notice  and cure periods set forth in this Lease).

> (E)   In no event shall any Membership Agreement be for a term extending beyond the term of this Lease. Tenant acknowledges and agrees that each Membership Agreement shall terminate immediately and be of no further force and effect upon the expiration or earlier termination of this Lease, whether by reason of termination following a default by Tenant hereunder, exercise of any termination option expressly herein provided, or otherwise.

(F)      In no event shall any Membership Agreement grant (or be deemed or construed in any way to grant) to the Tenant Member thereunder a leasehold, subleasehold or other real property estate or interest in the Premises or the Building or any portion thereof, it being expressly acknowledged and agreed that each such Membership Agreement shall merely grant to the Tenant Member thereunder a license to enter upon and use the space licensed thereunder in accordance with the terms and conditions thereof.

**(G)**      All Membership Agreements shall be entered into for a good faith business purpose, and not solely for the purposes of engaging in a transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate any of the provisions of Article 15 of this Lease.

(H)      Tenant hereby represents, warrants and covenants to Landlord that Tenant has established and will maintain adequate procedures to screen potential and existing Members to ensure that such Members do not constitute any one or more of the following (any one or more of the following being a **"Prohibited Licensee"**): (1) a person or entity whose involvement or presence in the Premises could create a potential security threat; (2) a governmental authority or other entity or person who would otherwise be subject to sovereign immunity; (3) any user not permitted pursuant to Article 2 of this Lease; or (4) a person on the List or any Embargoed Person (as such terms are hereinafter defined).  Tenant shall not enter into a Membership Agreement with, or permit the use or occupancy of any portion of the Premises by, a Prohibited Licensee.

(I)      Upon Landlord's request from time to time during the Term (but no more frequently than two (2) times per year or in the event of a security breach or threatened security breach), Tenant shall promptly furnish to Landlord a current list of those Tenant Members then entitled to occupy the Premises. Landlord will (and will cause Landlord's employees, subcontractors and agents) to use such list of Tenant Members solely to comply with its security protocols in ensuring the identity of the individuals regularly accessing the Building and comply with all aspects of the Lease.

(J)      Tenant shall and hereby does indemnify Landlord against any liability resulting from any claims for a commission or similar compensation that may be made against Landlord by any brokers, or other persons claiming to have dealt with Tenant or any Tenant Member in connection with any Membership Agreement. This indemnity shall include indemnity from and against any and all liability, fines, suits, demands, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in or in connection with any such claim. The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

## TENANT COMPETITOR:

43.      For purposes hereof, the term: (i) "**Restricted Business**" means the design, development, marketing, operating and/or managing of a shared working environment (including, without limitation, flexible workplace center and executive/shared office suites) and (ii) "**Tenant Competitor**" shall mean any person, entity, business or enterprise that engages in the Restricted Business in the Building as its primary business.  So long as such provisions do not violate so-called antitrust laws or other laws governing unfair trade practices, and provided that Tenant is not in default under the terms, conditions or covenants of this Lease beyond any applicable notice and cure period, Landlord agrees that it shall not hereafter lease another space in the Building (i) for the operation of a Restricted Business, or (ii) to any Tenant Competitor, or (iii) permit any Tenant

Competitor to install signage, branding, advertising or other similar matters identifying, or otherwise related to, such Tenant Competitor on the interior, or exterior of the Building or any other portion of the Building, or have any naming rights with respect to the Building. The foregoing shall not apply with respect to any portion of the Premises subleased by Tenant. Tenant's rights under this Article [__] are personal to Tenant named in this Lease (and to any successor entity or acquiring entity) and may not be otherwise assigned or transferred in any manner or granted to a subtenant.

**EMISSIONS:** <mark>NTD: STILL SUBJECT TO NEGOTIATION</mark>

**44.**

(A)    The terms defined below shall for the purposes of this Lease have the meanings herein specified:

(i)    "**Base Building Energy Consumption**" means the amount of energy, expressed in kilowatt-hours, for any applicable time period, equal to the amount of all electrical energy used at the Building to operate all non-leasable portions of the Building during such time period, as determined by the applicable meters and/or submeters in the Building.

(ii)    "**Carbon Emissions Law**" means Local Law 97 of the Local Laws of the City of New York for the Year 2019 or any amendment, modification, supplement or replacement thereof.

(iii)    "**CEL Charges**" means (A) all costs, expenses, fines, penalties or other similar charges payable by Landlord under or to comply with the Carbon Emissions Law and attributable to the Building, and (B) amounts paid to purchase renewable energy credits and/or "greenhouse gas offsets" in order to reduce the amounts that would otherwise be payable under clause (A); provided, that CEL Charges shall not include any costs, expenses, fines, penalties or similar charges paid by Landlord (including, without limitation, in connection with any penalties or charges levied upon the Building under the Carbon Emissions Law or otherwise) directly or indirectly arising from, or attributable to any failure of Landlord to duly meet any reporting, improvements, installation and/or any other obligations under the Carbon Emissions Law applicable to the Building.

(iv)    "**Leasable Area Energy Consumption**" means the amount of energy, expressed in kilowatt-hours for any applicable time period, equal to all electrical energy used to power the leasable portions of the Building during such time period, as determined by Tenant's meter or meters and each other meter or meters, as applicable with respect to such leasable portions.

(v)    "**Tenant Energy Consumption**" means the amount of energy, expressed in kilowatt-hours for any applicable time period, equal to all electrical energy used to power the Premises during such time period as determined by Tenant's meter or meters.

(vi)    "**Tenant's CEL Share**" shall be a percentage expressed as a fraction, the numerator of which is the Tenant Energy Consumption for such

period and the denominator of which is the Total Energy Consumption for such period.

(vii)    "**Total Energy Consumption**" means, for any time period, the sum of the Base Building Energy Consumption plus the Leasable Area Energy Consumption, in each case, for such period.

**(B)**    Tenant shall pay to Landlord an amount (such amount, "**Tenant's CEL Payment**") equal to the sum of (i) Tenant's CEL Share of CEL Charges, and (ii) Tenant's Operating Share of CEL Charges attributable to steam consumption in connection with the operation of the base Building HVAC system, in each case, for the applicable period.

(C)    Within 180 days following the assessment or imposition of any CEL Charges, Landlord shall submit to Tenant a statement (each a "**CEL Statement**") prepared by Landlord and certified as true and correct by an officer of the managing agent of Landlord, setting forth in reasonable line item detail a calculation of Tenant's CEL Payment, if any, due to Landlord from Tenant with respect to CEL Charges for such period. Landlord will include reasonable documentation supporting the determination and/or calculation of any Tenant's CEL Payment, including the applicable electrical meter, electrical submeter and steam meter readings for such period that Landlord utilizes to determine such Tenant's CEL Payment. Within thirty (30) days after receipt of a CEL Statement, Tenant shall make payment of the Tenant's CEL Payment; provided, that any such payment may be made under protest by Tenant.

(D)    The CEL Statement furnished to Tenant for any applicable period shall constitute a final determination as between Landlord and Tenant of the Tenant's CEL Payment for the CEL Charges payable for such period.

(E)    In no event shall the Minimum Rent under this Lease be reduced by virtue of this Article 44.

**TENANT'S OPERATING OBLIGATIONS:**

45.    Tenant covenants and agrees that during the term of this Lease:

(A)    If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business in the Premises, or any part thereof (other than a temporary or permanent certificate of occupancy required for office purposes), and if failure to secure such license or permit would in any way affect Landlord, then Tenant, at its sole cost and expense, shall duly procure and thereafter maintain such license or permit and submit the same to inspection by Landlord. Tenant shall at all times comply with the terms and conditions of each such license or permit.

(B)    Tenant shall maintain any sanitary lines in the Premises and shall not misuse plumbing facilities, or dispose of any foreign substance therein.  Tenant shall not permit any food, waste or other foreign substances to be thrown or drawn into the pipes. Tenant shall maintain the plumbing that it its installs in good order, repair and condition, and repair any damage resulting from any violation of this Paragraph. Tenant shall make any repairs to the other plumbing in the Building, if damage results from Tenant's improper use of such plumbing.

(C)    Tenant will retain a licensed professional exterminating  service that will service the Premises on a regular basis throughout the Term so as to keep the Premises free of vermin. Any necessary exterminating work in the Premises shall be done at Tenant's expenses, at such times, in such manner and by such company as Landlord shall require.  Tenant shall furnish Landlord with a copy of said contract within thirty (30) days of Landlord's written request therefor.

(D)    Tenant shall install chemical extinguishing devices approved by the Fire Insurance Rating Organization and shall keep such devices under service as required by such organization. If gas is used in the Premises, Tenant shall install gas cutoff devices (manual and automatic), to the extent same re not currently existing in the Premises

(E)    Tenant will not encumber or obstruct or permit to be encumbered or obstructed any hallway, service elevator, stairway or passageway in the Building.

(F)    Tenant covenants and agrees that throughout the term, it shall not suffer, allow or permit any offensive or obnoxious vibration, noise, odor or other undesirable effect to emanate from the Premises, or any machine or other installation therein, or otherwise suffer, allow or permit any such obnoxious vibration, noise, odor or other undesirable effect to constitute a nuisance or otherwise interfere with the safety, comfort or convenience of Landlord, or other tenants, occupants or customers, agents, or invitees or any others lawfully in or upon the Building and upon Landlord's notice, Tenant shall within thirty (30) days thereof remove or control the same, and if any such condition is not so remedied, then Landlord may, in its discretion, either: (l) cure such condition and add any reasonable cost and expense incurred by Landlord therefor to the next installment of rent due under this Lease, and Tenant shall then pay said amount, as Additional Rent hereunder; or (ii) treat such failure on the part of Tenant to remedy such condition as a material default of this Lease on the part of Tenant hereunder, entitling Landlord to any of its remedies pursuant to the terms of this Lease.

(G)    Tenant shall not subject any fixtures or equipment in or on the Premises that are affixed to the realty, to any mortgage, liens, conditions, sales agreements, security instruments or encumbrances.

(H)    Tenant shall not perform any act or carry on any practice that may damage, mar or deface the Premises or any other part of the Building.

(I)    Tenant shall not permit window cleaning or other exterior maintenance and Janitorial services in and for the Premises to be performed except by such person(s) as shall be approved by Landlord, and except during reasonable hours designated for such purposes by Landlord.

(J)    Tenant shall not install, operate or maintain in the Premises any . electrical equipment which will overload the electrical system therein or any part thereof beyond its reasonable capacity for proper and safe operation; as determined by Landlord, in light of the overall system and requirements therefor in the Building, or which does not bear underwriters' approval.

(K)    There shall be no cooking or food preparation whatsoever in the Premises except for the use of a coffee maker and light food preparation.

**ABATEMENT PROGRAMS:**

46.    Landlord may from time to time apply to various municipal or other relevant authorities for real estate tax exemption benefits or other similar government incentives, including, but not limited to, ICAP, offered by the City of New York (the "**Abatement Programs**").  Tenant agrees to reasonably cooperate with Landlord in completing and filing applications and certificates, and doing such other things, as to facilitate Landlord's obtaining said benefits and incentives provided that the same do not adversely affect Tenant's rights or increase Tenant's obligations hereunder, except to a de minimis extent.  In the event that Landlord is granted a real estate tax abatement under an Abatement Program, Tenant shall not be required to: (i) pay taxes or charges which become due because of the willful neglect or fraud by the Landlord in connection with the Abatement Programs; or (ii) otherwise relieve or indemnify Landlord from any personal liability arising under the Administrative Code of the City of New York §11 265, except where the imposition of such taxes, charges or liability is occasioned by the actions of Tenant in violation of this Lease.  Tenant agrees to report to Landlord the number of workers permanently engaged in employment in the Premises, the nature of each worker's employment and the New York City residency of each worker.  Tenant further agrees to provide access to the Premises by employees and agents of the Department of Finance of the City of New York at all reasonable times at the request of Landlord.  Landlord also agrees to reasonably cooperate with Tenant, at Tenant's sole cost and expense, in connection with any efforts by Tenant to obtain tax and other abatements implemented by the City of New York, provided that the same do not adversely affect Landlord's rights or increase Landlord's obligations hereunder.

**ZONING LOT MERGER AGREEMENT:**

47.    Tenant hereby irrevocably waives any rights that Tenant may have in connection with any zoning lot merger or transfer of development rights with respect to the Building, including, without limitation, any rights that Tenant may have to be a party to, to contest, or to execute any Declaration of Restrictions (as such term is used in Section 12-10 of the Zoning Resolution of The City of New York effective December 15, 1961, as amended) with respect to the Building, which would cause the Demised Premises to be merged with or unmerged from any other zoning lot pursuant to such Zoning Resolution or to any document of a similar nature and purpose. Tenant agrees that this Lease shall be subject and subordinate to any Declaration of Restrictions or any other document of similar nature and purpose now or hereafter affecting the Building; providing that they do not prohibit or restrict Tenant's Permitted Use of the Demised Premise.  In confirmation of such subordination and waiver, Tenant, from time to time, shall execute and deliver promptly any certificate or instrument that Landlord reasonably requests.

**MISCELLANEOUS:**

48.    (A)    If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

(B)     Landlord and Tenant each hereby (a) irrevocably consents and submits to the jurisdiction of any Federal, state, county or municipal court sitting in the State of New York having subject matter jurisdiction in respect to any action or proceeding concerning any matters arising out of or in any way relating to this Lease; (b) irrevocably waives all objections as to venue and any and all rights it may have to seek a change of venue with respect to any such action or proceedings if the same is brought in New York City; and (c) agrees that this Lease and the rights and obligations of the parties shall be governed by and construed, and all actions, proceedings and all controversies and disputes arising under or of or relating to this Lease shall be resolved in accordance with the internal substantive laws of the State of New York applicable to agreements made and to be wholly performed with the State of New York.

(C)     If, in connection with obtaining financing for the Building, a bank, insurance company or other lending institution shall request reasonable modifications to this Lease as a condition to such financing, Tenant will not unreasonably withhold its consent thereto, provided that such modifications do not affect Tenant's rights or obligations hereunder, except to a de minimis extent.

(D)     Wherever it is specifically provided in this Lease that a party's consent is not to be unreasonably withheld, conditioned or delayed, a response to a request for such consent shall also not be unreasonably withheld, conditioned or delayed. Tenant hereby waives any claim against Landlord which it may have based upon any assertion that Landlord has unreasonably withheld, conditioned or unreasonably delayed any consent required hereunder, and Tenant agrees that except as expressly herein set forth, its sole remedies shall be an action or proceeding to enforce any such provision or for specific performance, injunction or declaratory judgment, and to recover Tenant's reasonable attorney's fees in connection therewith. In the event of such a determination, the requested consent shall be deemed to have been granted; however, except as otherwise expressly herein set forth, Landlord shall have no liability to Tenant for its refusal or failure to give such consent. Notwithstanding anything to the contrary provided in this Lease, in the event that a court of law determines that Landlord acted maliciously or in bad faith in not consenting then Tenant shall also be entitled to actual direct damages resulting therefrom. The sole remedies for Landlord's unreasonably withholding, conditioning or delaying of consent shall be as provided in this Section. Notwithstanding anything to the contrary provided in this Lease, in any instance where the consent of a ground lessor and/or a mortgagee is required, Landlord shall not be required to give its consent until and unless such ground lessor and/or mortgagee has given its consent. Landlord agrees to seek such consent if Landlord would otherwise consent in such instance.

(E)     The person(s) executing this Lease on behalf of Tenant and Landlord hereby represent and warrant that they have been duly authorized to execute this Lease for and on behalf of their respective parties.

(F)     The listing of any name other than that of Tenant, whether on the doors of the Premises, on the Building directory, if any, or otherwise, shall not operate to vest any right or interest in this Lease or in the Premises, nor shall it be deemed to be the consent of Landlord to any assignment or transfer of this Lease, to any sublease of the Premises, or to the use or occupancy thereof by others.

(G)     If Tenant is a partnership (or is comprised of two (2) or more persons, individually, or as joint venturers or as copartners of a partnership, which for purposes of this Section shall include a limited liability partnership and a limited liability company) or if Tenant's interest in this Lease shall be assigned to a partnership (or to two (2) or more persons, individually, or as joint

venturers or as copartners or a partnership) (any such partnership and such persons are referred to in this Section as "**Partnership Tenant**"), the following provisions shall apply to such Partnership Tenant: (i) the liability of each of the general partners comprising Partnership Tenant shall be joint and several, and (ii) each of the parties comprising Partnership Tenant hereby consents in advance to, and agrees to be bound by, any modification, termination or surrender of this Lease which may hereafter be made and by any notices, demands, requests or other communications which may hereafter be given, by Partnership Tenant or by any of the parties comprising Partnership Tenant, and (iii) any bills, statements, notices, demands, requests or other communications given or rendered to Partnership Tenant or to any of the parties comprising Partnership Tenant shall be deemed given or rendered to Partnership Tenant and to all such parties and shall be binding upon Partnership Tenant and all parties and (iv) if Partnership Tenant shall admit new general partners, all such new general partners shall, by their admission to Partnership Tenant, be deemed to have assumed performance of all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, and (v) Partnership Tenant shall give prompt notice to Landlord of the admission of any such new general partners, and upon demand of Landlord, shall cause each such new general partner to execute and deliver to Landlord an agreement in form satisfactory to Landlord, wherein each such new general partner shall assume jointly and severally performance of all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed (but neither Landlord's failure to request any such agreement nor the failure of any such new general partner to execute or deliver any such agreement to Landlord shall vitiate the provisions of this Section. This provision is expressly subject to the exculpation provisions of Article 12 of this Lease.

(H)    Intentionally omitted.

(I)    Landlord and Tenant understand, agree, and acknowledge that (i) this Lease has been freely negotiated by both parties and (ii) in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions, there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

(J)    Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (i) the submission by Landlord to Tenant of any drafts of this Lease or any correspondence with respect thereto shall (a) be deemed submission solely for Tenant's consideration and not for acceptance and execution, (b) have no binding force or effect, (c) not constitute an option for the leasing of the Premises or a lease or conveyance of the Premises by Landlord to Tenant and (d) not confer upon Tenant or any other party any title or estate in the Premises, (ii) the terms and conditions of this Lease shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties and all conditions precedent to the effectiveness thereof shall have been fulfilled or waived, and (iii) if this Lease is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Lease on account of any written or parol representations, negotiations, any legal or equitable theory (including, without limitation, part performance, detrimental reliance, promissory estoppel, or undue enrichment) or otherwise.

(K)    In order to induce Landlord to enter into this Lease, simultaneously herewith, Tenant shall cause Mark Karasick and Rachel Cohen Skydell (the "**Guarantors**") to enter into a limited guaranty of payment and performance in the form of Exhibit D annexed hereto (the "**Guaranty**"). Any default by Guarantor under the Guaranty shall be deemed a default hereunder.

(L)      Within ninety (90) days after Landlord's request (to be made no more than once every year), Tenant shall deliver to Landlord the then current Financial statements (the "**Financial Statements**") of Tenant (including interim periods following the end of the last fiscal year for which annual statements are available), prepared or compiled by an independent certified public accountant, including a balance sheet and profit and loss statement for the most recent prior year, all prepared in accordance with generally accepted accounting principles consistently applied.

(M)      Tenant expressly acknowledges and agrees that Tenant shall not cause or permit any work of art or other item that is subject to the Visual Artists Rights Act of 1990 to be installed, constructed, erected or maintained in, on or at the Premises.  Tenant hereby indemnifies Landlord against liability arising out of or in connection with a breach of the foregoing covenant.

(N)      In the event of any dispute between Landlord and Tenant in any way related to this Lease, the non-prevailing party, shall pay to the prevailing party all reasonable attorneys' fees and disbursements without restriction by statute, court rule or otherwise, incurred by the prevailing party in connection with any action or proceeding (including any appeal and the enforcement of any judgment or award, whether or not the dispute is litigated or prosecuted to final judgment (collectively, "**Fees**").  The "prevailing party" shall be determined based upon an assessment of which party's major arguments or positions taken in the action or proceeding could fairly be said to have prevailed (whether by compromise, settlement, abandonment by the other party of its claim or defense, final decision, after any appeals, or otherwise) over the other party's major arguments or positions on major disputed issues.  Any Fees incurred in enforcing a judgment shall be recoverable separately from any other amount included in the judgment and shall survive and not be merged in the judgment.

(O)      Tenant represents and warrants to Landlord that (a) Tenant and each person or entity directly or indirectly owning an interest in Tenant is (1) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control of the Department of the Treasury ("**OFAC**") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "**List**"), and (2) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, (b) none of the funds or other assets of Tenant constitute property of, or are beneficially owned, directly or indirectly, by, any Embargoed Person, (c) no Embargoed Person has any interest of any nature whatsoever in Tenant (whether directly or indirectly), (d) none of the funds of Tenant have been derived from any unlawful activity with the result that the investment in Tenant is prohibited by law or that this Lease is in violation of law, and (e) Tenant has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times. The term "**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Tenant is prohibited by law or Tenant is in violation of law.

(i)      Tenant covenants and agrees (a) to comply with all Legal Requirements relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect, (b) to immediately notify Landlord in writing if any of the representations, warranties or covenants set forth in this Section are no longer true or have been breached or if Tenant has a reasonable basis to believe that they may no longer be true or have been breached, (c) not to use

funds from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) to make any payment due to Landlord under this Lease and (d) at the request of Landlord, to provide such information as may be reasonably requested by Landlord to determine Tenant's compliance with the terms hereof.

(ii)    Tenant hereby acknowledges and agrees that Tenant's inclusion on the List at any time during this Lease Term shall be a material default of this Lease.  Notwithstanding anything to the contrary contained herein, Tenant shall not permit the Premises or any portion thereof to be used or occupied by any person or entity on the List or by any Embargoed Person (on a permanent, temporary or transient basis), and any such use or occupancy of the Premises by any such person or entity shall be a material default of this Lease.

(P)    Landlord represents and warrants to Tenant that (a) Landlord and each person or entity directly or indirectly owning an interest in Landlord is (1) not currently identified on the List, and (2) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, (b) none of the funds or other assets of Landlord constitute property of, or are beneficially owned, directly or indirectly, by, any Embargoed Person, (c) no Embargoed Person has any interest of any nature whatsoever in Landlord (whether directly or indirectly), (d) none of the funds of Landlord have been derived from any unlawful activity with the result that the investment in Landlord is prohibited by law or that this Lease is in violation of law, and (e) Landlord has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times.

(i)    Landlord covenants and agrees (a) to comply with all Legal Requirements relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect, (b) to immediately notify Tenant in writing if any of the representations, warranties or covenants set forth in this Section are no longer true or have been breached or if Landlord has a reasonable basis to believe that they may no longer be true or have been breached, (c) not to use funds from any Prohibited Person to make any payment due to Landlord under this Lease and (d) at the request of Tenant, to provide such information as may be reasonably requested by Tenant to determine Landlord's compliance with the terms hereof.

(ii)    Landlord hereby acknowledges and agrees that Landlord's inclusion on the List at any time during this Lease Term shall be a material default of this Lease.

If any of the provisions of this Lease, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

(Q)    Tenant shall, throughout the term of this Lease, maintain, repair, service and replace when necessary, all doors leading into and out of the Premises and all hardware appurtenant thereto, including, but not limited to, locks, hinges, silencers, door stops, door jams, door closets, latchsets, flashbulbs, door frames, thresholds and door knobs. Landlord shall have no liability or obligation whatsoever regarding the maintenance, repair, service and replacement of the foregoing.

(R)    Tenant covenants and  agrees that, upon request of landlord, it shall, within thirty (30) days from the date of the request, furnish Landlord with an up-to-date copy of any

permit or license required by any authority having jurisdiction therein for Tenant to conduct business at the Premises.  In addition. Tenant further covenants end agrees that upon request of Landlord, it shall, within thirty (30) days from the date of the request, furnish Landlord with a copy of the canceled check, paid bill or any other evidence which supports payment of current tax, assessment or fee, for personal property, fees or other imposition which is imposed upon Tenant, other than the Taxes.

(S)    This Lease may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single agreement.  Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.  Delivery of an executed counterpart of this Lease by facsimile or electronically shall be equally effective as delivery of an original executed counterpart.

[end of agreement; signatures follow on the next page]

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed and sealed this Lease as of the date first above written.

**LANDLORD:**

92 THIRD STREET LLC

By:  Goldstein Advisors, LLC, its manager

By:_____
Name:  David Kershner
Title:  Management Committee Designee

**TENANT:**

[_____]

By: _____
    Name:
    Title:

**EXHIBIT A**

**<u>LEASED PREMISES</u>**

## EXHIBIT B

## RULES AND REGULATIONS

1.        No animals, birds, bicycles or vehicles shall be brought into or kept in the Premises.  The Premises shall not be used for manufacturing or commercial repairing or for sale or display of merchandise or as a lodging place, or for any immoral or illegal purpose, nor shall the Premises be used for a public stenographer or typist; barber or beauty shop; telephone, secretarial or messenger service; employment, travel or tourist agency; school or classroom; commercial document reproduction; or for any business other than specifically provided for in the tenant's Lease.  Tenant shall not cause or permit in the Premises any disturbing noises which may interfere with occupants of this or neighboring building, any cooking or objectionable odors, or any nuisance of any kind, or any inflammable or explosive fluid, chemical or substance.  Canvassing, soliciting and peddling in the building are prohibited, and each tenant shall cooperate so as to prevent the same.

2.        The toilet rooms and other water apparatus shall not be used for any purposes other than those for which they were constructed, and no sweepings, rags, ink, chemicals or other unsuitable substances shall be thrown therein.  Tenant shall not throw anything out of doors, windows or skylights or into hallways, stairways or elevators, nor place food or objects on outside windowsills.  Tenant shall not obstruct or cover the halls, stairways and elevators, or use them for any purpose other than ingress and egress to or from tenant's premises, nor shall skylights, windows, doors and transoms that reflect or admit light into the Building be covered or obstructed in any way.

3.        Tenant shall not place a load upon any floor of the Premises in excess of the load per square foot, which such floor was designed to carry and which is allowed by law.  Landlord reserves the right to prescribe the weight and position of all safes in the Premises.  Business machines and mechanical equipment shall be placed and maintained by Tenant, at Tenant's expense, only with Landlord's consent which shall not be unreasonably withheld, conditioned or delayed and in settings approved by Landlord to control weight, vibration, noise and annoyance.  Smoking or carrying lighted cigars, pipes or cigarettes in the elevators of the Building is prohibited.

4.        Tenant shall not move any heavy or bulky materials into or out of the Building without Landlord's prior written consent which shall not be unreasonably withheld, conditioned or delayed, and then only during such hours and in such manner as Landlord shall approve.  If any material or equipment requires special handling, Tenant shall employ only persons holding a Master Rigger's License to do such work, and all such work shall comply with all Legal Requirements.  Landlord reserves the right to inspect oil freight to be brought into the Building, and to exclude any freight which violates any rule, regulation or other provision of this Lease.

5.        Except as otherwise set forth in the within Lease, no sign, advertisement, notice or thing shall be inscribed, painted or affixed on any part of the building, without the prior written consent of Landlord.  Landlord may remove anything installed in violation of this provision, and Tenant shall pay the cost of such removal. Interior signs on doors and directories shall be inscribed or affixed at Tenant's expense. Landlord shall have the right to approve (which approval shall not be unreasonably withheld,

conditioned or delayed) the color, size, style and location of all signs, advertisements and notices.  No advertising of any kind by Tenant shall refer to the Building unless first approved in writing by Landlord.

6.      At the termination of this Lease, Tenant shall deliver to Landlord all keys for any portion of the Premises or Building.  Before leaving the Premises at any time, Tenant shall close all windows and close and lock all doors.

7.      Landlord will furnish passes to all persons reasonably designed by Tenant.  Tenant shall be responsible for the acts of all persons to whom passes are issued at Tenant's request.

8.      Whenever Tenant shall submit to Landlord any plan, agreement or other document for Landlord's consent or approval, Tenant agrees to pay Landlord as Additional Rent, on demand, an administrative fee equal to the sum of the reasonable out of pocket fees of any third party architect, engineer or attorney employed by Landlord to review said plan, agreement or document.

9.      The use in the Premises of auxiliary heating devices, such as portable electric heaters, heat lamps or other devices whose principal function at the time of operation is to produce space heating, is prohibited.

10.      The sidewalks, entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by Tenant or used for any purpose other than for ingress or egress from the Premises, and for delivery of merchandise and equipment in a prompt and efficient manner using elevators and passageways designated for such delivery by Landlord.  There shall not be used in any space, or in the public hall of the Building, either by Tenant or by jobbers or others in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and sideguards.

11.      Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from the Premises only on the freight elevators and through the service entrances and corridors, and only during hours and in a manner approved by Landlord.  Landlord reserves the right to inspect all freight to be brought into the Building and to exclude from the Building all freight which violates any of these Rules and Regulations or of the Lease.

12.      Landlord shall have the right to prohibit any advertising by Tenant which in Landlord's opinion, tends to impair the reputation of the Building or its desirability as a building for offices, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

13.      In case of any conflict or inconsistency between any provisions of this Lease and any of the rules and regulations as originally or as hereafter adopted, the provisions of this Lease shall control.

14.      No tenant shall invite to the Tenant's premises, or permit the visit of, persons in such numbers or under such conditions as to interfere with the use and enjoyment of

any of the entrances, corridors, elevators and other facilities of the Building by other tenants. Fire exits and stairways are for emergency use only, and they shall not be used for any other purpose by the tenants, their employees, licensees or invitees.  The Landlord reserves the right to control and operate the public portions of the Building and the public facilities, as well as facilities furnished for the common use of the tenants, in such manner as it deems best for the benefit of the tenants generally.

15.      Any person whose presence in the Building at any time shall, in the judgment of the Landlord, be prejudicial to the safety, character, reputation and interests of the Building or of its tenants may be denied access to the Building or may be ejected therefrom.  In case of invasion, riot, public excitement or other commotion, the Landlord may prevent all access to the Building during the continuance of the same, by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building.  The Landlord shall, in no way, be liable to any tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the Tenant's premises or the Building under the provisions of this rule.

## EXHIBIT C

## FORM LETTER OF CREDIT

**BENEFICIARY:**

92 THIRD STREET LLC
c/o Samson Management LLC
118-35 Queens Boulevard, Suite 1710
Forest Hills, New York 11375

ATTENTION: Mr. David Kershner

**APPLICANT:**

_____
_____
_____

MAXIMUM STATED AMOUNT:   US $175,000

GENTLEMEN:

WE HEREBY ESTABLISH THIS IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ IN YOUR FAVOR, FOR AN AGGREGATE AMOUNT NOT TO EXCEED THE AMOUNT INDICATED ABOVE, EXPIRING AT OUR COUNTERS IN NEW YORK WITH OUR CLOSE OF BUSINESS ON _____ OR ANY AUTOMATICALLY EXTENDED EXPIRATION DATE.

THIS LETTER OF CREDIT IS AVAILABLE WITH [NAME OF BANK] AGAINST PRESENTATION OF YOUR DRAFT AT SIGHT DRAWN ON [NAME OF BANK].

IT IS A CONDITION OF THIS IRREVOCABLE LETTER OF CREDIT THAT IT SHALL BE AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ADDITIONAL ONE YEAR PERIODS FROM THE PRESENT OR EACH FUTURE EXPIRATION DATE, UNLESS AT LEAST 60 DAYS PRIOR TO SUCH DATE WE SEND YOU NOTICE IN WRITING BY REGISTERED MAIL OR HAND DELIVERY AT THE ABOVE ADDRESS, THAT WE ELECT NOT TO RENEW THIS LETTER OF CREDIT FOR SUCH ADDITIONAL PERIOD. HOWEVER IN NO EVENT SHALL THIS LETTER OF CREDIT BE EXTENDED BEYOND THE FINAL EXPIRATION DATE OF [THREE MONTHS FROM LEASE EXPIRATION DATE].  UPON SUCH NOTICE TO YOU, YOU MAY DRAW DRAFTS ON US AT SIGHT FOR AN AMOUNT NOT TO EXCEED THE BALANCE REMAINING IN THIS LETTER OF CREDIT WITHIN THE  THEN APPLICABLE  EXPIRATION DATE.

THIS LETTER OF CREDIT IS TRANSFERABLE ONE OR MORE TIMES IN ITS ENTIRETY (BUT NOT IN PART) AND [NAME OF BANK] ONLY IS AUTHORIZED TO ACT AS THE TRANSFERRING BANK.

WE SHALL NOT RECOGNIZE ANY TRANSFER OF THIS LETTER OF CREDIT UNTIL THIS ORIGINAL LETTER OF CREDIT TOGETHER WITH ANY AMENDMENTS AND A SIGNED AND COMPLETED TRANSFER FORM SATISFACTORY TO US IS RECEIVED BY US.  TRANSFER FORMS ARE ATTACHED.

TRANSFER CHARGES ARE FOR THE ACCOUNT OF THE APPLICANT.

THE CORRECTNESS OF THE SIGNATURE AND TITLE OF THE PERSON SIGNING THE TRANSFER FORMS MUST BE VERIFIED BY YOUR BANK.

IN CASE OF ANY TRANSFER UNDER THIS LETTER OF CREDIT, THE DRAFT AND ANY REQUIRED STATEMENT MUST BE EXECUTED BY THE TRANSFEREE.

THIS LETTER OF CREDIT MAY NOT BE TRANSFERRED TO ANY PERSON WITH WHICH U.S. PERSONS ARE PROHIBITED FROM DOING BUSINESS UNDER U.S. FOREIGN ASSETS CONTROL REGULATIONS OR OTHER APPLICABLE U.S. LAWS AND REGULATIONS.

ALL DRAFTS MUST INDICATE "DRAWN UNDER [NAME OF BANK] LETTER OF CREDIT NO. _____ DATED _____."

THE ORIGINAL LETTER OF CREDIT AND SIGHT DRAFT MUST BE PRESENTED FOR DRAWING.  DRAWINGS BY FAX ARE PERMITTED, TO BE PRESENTED BY FAX TO _____.

ALL CORRESPONDENCE AND ANY DRAWINGS HEREUNDER ARE TO BE DIRECTED TO OUR OFFICE AT_____, ATTENTION: STANDBY LETTER OF CREDIT DEPARTMENT.  CUSTOMER INQUIRY NUMBERS ARE _____ AND_____.

WE HEREBY AGREE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT WILL BE DULY HONORED UPON PRESENTATION WITHOUT INQUIRING AS TO WHETHER BENEFICIARY HAS THE RIGHT TO DRAW UNDER THIS LETTER OF CREDIT AND WITHOUT RECOGNIZING ANY OBJECTION OR CLAIM OF THE APPLICANT OR ANY OTHER PARTY OF WHATSOEVER NATURE OR KIND EXCEPT FOR ANY ORDER FROM A COURT OF COMPETENT JURISDICTION .

PARTIAL AND MULTIPLE DRAWINGS PERMITTED.

THIS CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION) INTERNATIONAL CHAMBER OF COMMERCE, FOR PUBLICATION NO. 600 AND AS TO MATTERS NOT COVERED THEREIN AND NOT INCONSISTENT THEREWITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, THE UNIFORM COMMERCIAL CODE AS FROM TIME TO TIME IN EFFECT IN SUCH JURISDICTION.

IN THE EVENT THAT OUR OFFICES ARE NOT OPEN TO RECEIVE A PRESENTATION BY BENEFICIARY UNDER THIS LETTER OF CREDIT ON THE EXPIRATION DATE HEREOF AND SUCH CLOSURE IS A RESULT OF AN INTERRUPTION IN OUR BUSINESS DUE TO A FORCE MAJEURE EVENT, THEN THE EXPIRATION DATE HEREOF SHALL BE DEEMED EXTENDED FOR THIRTY DAYS FROM OUR REOPENING OF BUSINESS.

THE NUMBER AND THE DATE OF OUR CREDIT AND THE NAME OF OUR BANK MUST BE QUOTED ON ALL DRAFTS REQUIRED.

_____
AUTHORIZED SIGNATURE

DATE:_____

TO:

_____
_____
_____
_____

RE:    LETTER            OF            CREDIT            NO.            _____
          ISSUED BY: _____ BANK

GENTLEMEN:

FOR VALUE RECEIVED, THE UNDERSIGNED BENEFICIARY HEREBY IRREVOCABLY TRANSFERS TO:

_____
NAME OF TRANSFEREE

_____
ADDRESS

ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY TO DRAW UNDER THE ABOVE LETTER OF CREDIT IN ITS ENTIRETY.

BY THIS TRANSFER, ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY IN SUCH LETTER OF CREDIT ARE TRANSFERRED TO THE TRANSFEREE AND THE TRANSFEREE SHALL HAVE THE SOLE RIGHTS AS BENEFICIARY THEREOF, INCLUDING SOLE RIGHTS RELATING TO ANY AMENDMENTS WHETHER INCREASES OR EXTENSIONS OR OTHER AMENDMENTS AND WHETHER NOW EXISTING OR HEREAFTER MADE. ALL AMENDMENTS ARE TO BE ADVISED DIRECT TO THE TRANSFEREE WITHOUT NECESSITY OF ANY CONSENT OF OR NOTICE TO THE UNDERSIGNED BENEFICIARY.

THE ORIGINAL OF SUCH LETTER OF CREDIT IS RETURNED HEREWITH, AND WE ASK YOU TO ENDORSE THE TRANSFER ON THE REVERSE HEREOF, AND FORWARD IT DIRECT TO THE TRANSFEREE WITH YOUR CUSTOMARY NOTICE OF TRANSFER.

SINCERELY,

_____
NAME OF BENEFICIARY

_____
AUTHORIZED NAME & TITLE

_____

_____
AUTHORIZED SIGNATURE

_____
TELEPHONE NUMBER

THE ABOVE SIGNATURE, WITH TITLE AS STATED, CONFORMS WITH THAT ON FILE
WITH US AND IS AUTHORIZED FOR EXECUTION OF SUCH INSTRUMENTS.

_____
NAME & ADDRESS OF BANK

_____
AUTHORIZED NAME & TITLE

_____
AUTHORIZED SIGNATURE

_____
TELEPHONE NUMBER

_____

THIS FORM MUST BE EXECUTED IN DUPLICATE.

**EXHIBIT 3**

**Form of Guaranty**

**[NTD:  SEE SEPARATE GUARANTY DOCUMENT]**