**BLANK ROME LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel:    212-885-5000
Fax:    212-885-5001
Ira L. Herman
Evan J. Zucker
Mara B. Levin

**KAUFMAN FRIEDMAN  PLOTNICKI & GRUN, LLP**
Howard Grun, Esq.
300 East 42nd Street- 10th Floor
New York, New York 10017
Phone: (212) 973-3330
hgrun@kfpgllp.com

*Co-Counsel for 92 Third Street, LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>COWORKRS 3RD STREET LLC d/b/a BOND GOWANUS,<br><br><div align="right">Debtor.</div> | Chapter 11<br><br>Case No. 23-44306 (ESS)<br><br>Adv. Pro. No.: 23-01113-ESS |
| COWORKRS 3RD STREET LLC d/b/a BOND GOWANUS,<br><br><div align="right">Plaintiff,</div><br>-against-<br><br>92 THIRD STREET LLC, OREN RICHLAND, DEARBORN CAPITAL GROUP LLC, INNOVO WORKS 92 THIRD STREET LLC, and INNOVO WORKS LLC,<br><br><div align="right">Defendants.</div> | Hearing Date:<br>December 5, 2023<br>2:00 p.m. |

I, David Kershner, make this declaration under 28 U.S.C. § 1746 (the "Declaration"):

## I.    INTRODUCTION

1.    I am the Management Committee Designee of Goldstein Advisors LLC, the Manager of New 45 West 45th Street, LLC, which is the sole member of 92 Third Street, LLC ("Owner"), the owner of the building located at 68-80 Third Street, Brooklyn, New York 11231 ("Building"). I am also the President & CEO of Samson Management LLC, Owner's property manager and agent with respect to the operation of the Building. I am fully familiar with the facts and circumstances set forth below. I respectfully submit this Declaration in opposition to the application made by debtor Coworkrs 3rd Street LLC d/b/a Bond Collective ("Bond") for an order granting it a temporary restraining order, a permanent injunction, and related relief in conjunction with an adversary proceeding it has commenced in this Bankruptcy Proceeding.

2.    Bond's request for relief allegedly arises from what it characterizes as an illegal eviction to which it has been subjected with respect to commercial premises it once leased from Owner in the Building ("Premises"). As will be demonstrated below, the Bond papers before this Court are wrong on the facts and wrong on the law for the simple reasons that:

> (i)    Bond has not had a lease with Owner since March 2022, when the lease ("Lease," Exhibit A to Bond's moving papers) was terminated resulting from Bond's default in paying Owner over $4 million in rent and additional rent the due, and failing to cure its default after notice was provided as required by Bond's lease;
>
> (ii)   As Owner's attorneys have explained to me, the terminated Lease could not be revived, once terminated, as a matter of law, leaving Bond with no leasehold or tenancy interest which could become part of the Bankruptcy estate so as to trigger any application of the automatic stay provisions of the Bankruptcy Code;

(iii)    Bond was only in possession of the Premises after termination of its lease as a holdover occupant pursuant to a stipulation of settlement ("Stipulation," Exhibit D to Bond's moving papers) and judgment ("Judgment," Exhibit E to Bond's moving papers) arising from a State Supreme Court ejectment action ("Supreme Court Action") which provided for a stay of Bond's eviction through Owner's use of self-help *if* Bond made timely payments of use and occupancy during its holdover occupancy in accordance with a schedule of payments set forth in the Stipulation; and

(iv)    Bond was legally evicted from the Premises six days prior to the filing of its Bankruptcy Petition pursuant to the State Supreme Court Judgment and Stipulation after defaulting on its Stipulation obligations and failing to cure its default after receiving notice as required by the Stipulation.

3.    In that regard, notwithstanding all of the allegations made by Bond and its counsel, the simple fact is that the Supreme Court Action in ejectment arose due to Bond's significant and substantial default in making payments to Owner in excess of $4,000,000.00 under its Lease with Owner which was in place at the time. The issuance of the Judgment was agreed to by Bond pursuant to the Stipulation, which was so ordered by the Kings County Supreme Court. As will be detailed below, the Judgment provided for Bond's eviction either by a sheriff or marshal, or by Owner's use of self-help with the same effect as if effectuated by a sheriff or marshal, upon issuance of a five day vacate notice to Bond by Owner. The Judgment also provided for a stay of that eviction should Bond make timely payments of use and occupancy to Owner during the period of its holdover occupancy as provided by the Stipulation.

4.    Unfortunately, Bond defaulted in making payments required by the Stipulation so that by November 2023 Bond owed in excess of $1.4 million to Owner under the terms of the Stipulation. That default resulted in the service upon Bond by

Owner of (i) a notice of default under the Stipulation and, (ii) after Bond failed to cure its default, a notice to vacate as required by the Stipulation and the Judgment. When Bond failed to vacate the Premises as required by the vacate notice, Owner executed upon its rights under the Judgment and utilized self-help to peaceably evict Bond from the Premises. That eviction took place on November 21, 2023 at 2:45 a.m., six days prior to Bond's filing of its Bankruptcy Petition, as detailed in the accompanying Declaration of Gregory Haye, Owner's agent.

5.      As has been explained to me by Owner's counsel, self-help is absolutely recognizable under New York Law as a legitimate remedy for Owner to have exercised in obtaining possession of the Premises, and Owner properly executed upon its rights in this regard consistent with the Judgment and Stipulation. Thus, there is no basis upon which Bond can claim that an illegal eviction took place. Moreover, as has been explained to me by Owner's counsel, inasmuch as this eviction occurred before the filing by Bond of its Bankruptcy Petition, any interest Bond claims it had in the Premises and the Lease, despite the termination of its Lease and the issuance of the Judgment and Bond's execution of the Stipulation, evaporated upon its eviction, leaving no leasehold or tenancy interest in Bond's Bankruptcy estate.

6.      That being the case, it is respectfully submitted that there is no basis upon which Bond can succeed on the merits in its Adversary Proceeding so as assert a viable claim for a TRO or any injunctive or related relief arising from its eviction, as the eviction was legal, and Bond had no legal interest in the Premises when it filed its Bankruptcy Petition.

## II.    BACKGROUND FACTS

7.      Bond was the tenant of the Premises pursuing to the Lease with Owner's

predecessor which was modified by a First Lease Modification Agreement dated as of

July 9, 2015 and assigned by Owner's predecessor to Owner by Assignment and

Assumption of Leases dated July 8, 2015. Copies of the First Lease Modification and

Assignment and Assumption of leases, which are not attached to Bond's moving papers,

are collectively annexed hereto as Exhibit A. The Lease term began June 1, 2015 and was

scheduled to expire on May 31, 2025.

8.      Paragraph 17(2) of the Lease provides in pertinent part that upon a default

by Bond in the payment of rent or additional rent, then, after service of notices as

required by the Lease as a result of such default, "Owner may, without notice, re-enter the

demise premises either by force or otherwise, and dispossess Tenant by summary

proceedings or otherwise, and the legal representative of Tenant or other occupant of the

demised premises, and remove their effects and hold the demised premises as if the lease

had not been made . . ."

9.      By notices dated February 8, 2022 and March 3, 2022 (collectively, "Lease

Default Notices," Exhibit B hereto), Owner advised Bond that it was in default of its

obligations under the Lease to make payments to Owner of over $4 million in monetary

obligations pursuant to the Lease, as follows:

### February 8, 2022 Notice

"Tenant has defaulted in the payment of the following Minimum Rent
and Additional Rent as required by the Lease, at least twice

consecutively during a twelve-month period, in the aggregate sum of
**$3,095,425.18** ("Arrears"):

| | | |
|---|---|---|
| Real Estate Tax Adjustment, January 2017 | $ | 112,542.62 |
| Real Estate Tax Escalation, August 2017 | $ | 120,788.64 |
| Real Estate Tax Escalation - | | |
| Credit Adjustment December 2017 | $ | ( 1,023.11) |
| Real Estate Tax Escalation, January 2018 | $ | 60,890.71 |
| Real Estate Tax Escalation - | | |
| Credit Adjustment February 2018 | $ | ( 60,890.71) |
| Real Estate Tax Escalation, July 2018 | $ | 166,913.49 |
| Real Estate Tax Escalation, December 2018 | $ | 166,913.49 |
| Real Estate Tax Escalation - | | |
| Credit Adjustment January 2019 | $ | (166,913.49) |
| Minimum Rent, June 2019  (balance due) | $ | 100,000.00 |
| Minimum Rent, July 2019  (balance due) | $ | 60,383.58 |
| Real Estate Tax Escalation, July 2019 | $ | 166,913.49 |
| Real Estate Tax Escalation, August 2019 | $ | 70,253.94 |
| Real Estate Tax Escalation, January 2020 | $ | 111,519.51 |
| | | |
| Real Estate Tax Escalation - | | |
| Credit Adjustment January 2020 | $ | (481,527.41) |
| Real Estate Tax Adjustment, January 2020 | $ | (111,519.51) |
| Minimum Rent, February 2020 (balance due) | $ | 130,383.58 |
| Minimum Rent, March 2020 (balance due) | $ | 30,000.00 |
| Minimum Rent, May 2020 | $ | 160,383.58 |
| Minimum Rent, June 2020 | $ | 175,995.91 |
| Minimum Rent, July 2020 | $ | 175,995.91 |
| Real Estate Tax Escalation, July 2020 | $ | 166,913.49 |
| Minimum Rent, August 2020 (balance due) | $ | 145,995.91 |
| Minimum Rent, September 2020 | $ | 175,995.91 |
| Minimum Rent, October 2020 | $ | 175,995.91 |

Amount of security deposit
maintained by Tenant as security
for the faithful performance by Tenant of all
of the terms, conditions, covenants and
agreements of the Lease, including,
but not limited to, the payment of Minimum
Rent and Additional Rent, as applied by
Landlord in partial payment of the Minimum
Rent and Additional Rent due
from Tenant through November 1, 2020          $          (982,353.48)

| | | |
|---|---|---|
| Minimum Rent, November 2020 | $ | 175,995.91 |
| Minimum Rent, December 2020 (balance due) | $ | 150,995.91 |
| Minimum Rent, January 2021 | $ | 175,995.91 |
| Minimum Rent, February 2021 | $ | 175,995.91 |
| Minimum Rent, March 2021 | $ | 175,995.91 |
| Real Estate Tax Escalation - | | |
| Credit Adjustment March 2021 | $ | (77,027.32) |
| Minimum Rent, April 2021 | $ | 175,995.91 |
| Minimum Rent, May 2021 | $ | 175,995.91 |
| Minimum Rent, June 2021 | $ | 176,047.16 |
| Minimum Rent, July 2021 | $ | 176,047.16 |
| Real Estate Tax Escalation July 2021 | $ | 166,913.49 |
| Minimum Rent, August 2021 | $ | 176,047.16 |
| Minimum Rent, September 2021 (balance due) | $ | 101,047.16 |
| Minimum Rent, October 2021 | $ | 176,047.16 |
| Minimum Rent, November 2021 (balance due) | $ | 101,047.16 |
| Minimum Rent, December 2021 (balance due) | $ | 101,047.16 |
| Real Estate Tax Escalation - | | |
| Credit Adjustment December 2021 | $ | (56,408.76) |
| Minimum Rent, January 2022 | $ | 101,047.16 |
| Minimum Rent, February 2022 | $ | 76,047.16 |
| **Total Due** | **$** | **3,095,425.18** |

Tenant has failed to deliver to Landlord payment in the aggregate amount of **$982,353.48** so as to replenish the **$982,353.48** of Tenant's security deposit applied by Landlord in partial payment of Minimum Rent and Additional Rent due from Tenant, as set forth above, despite written demand therefor by Landlord pursuant to notice dated February 1, 2022."

## March 3, 2022 Notice

"Having been served with a Notice to Cure Default dated February 8, 2022 ("Default Notice") which detailed the manner in which Tenant has failed to make timely payments of Minimum Rent and Additional Rent to Landlord pursuant to the Lease between January 2017 and February 2022 at least twice consecutively, or three times nonconsecutively, within a 12-month period, a copy of which is annexed hereto as Exhibit B, the terms of which are incorporated by reference herein, Tenant failed to make timely payment of the Minimum Rent due for the month of March 2022 in the sum of $176,047.16. Should Tenant's failure to pay such Minimum Rent due under the Lease for the month of March 2022 continue for more than fifteen (15) days from the date of service hereof, to wit, beyond March 20, 2022, Tenant's

defaults in the payment of Minimum Rent and Additional Rent to Landlord as set forth in the Default Notice and herein shall be rendered deliberate, and the Lease shall terminate and be cancelled upon the expiration of ten (10) days following the service by Landlord of a notice of termination and cancellation of Lease.   If Tenant remains in possession of the Premises following such termination and cancellation of Lease, Landlord will commence summary proceedings or other legal action to remove Tenant and all occupants from the Premises and to obtain such other relief to which Landlord is entitled by law."

10.     As a result of service of the Lease Default Notices, Owner and Bond commenced discussions as to how best to resolve Bond's default and arrive at an arrangement by which Bond could remain in the Premises in an effort to save what appeared to be a failing business while at the same time making payments to Owner as best as it could. These extensive discussions revolved around Bond agreeing to the termination of its Lease, and to signing the Stipulation in the Supreme Court Action providing for the termination of its tenancy and the Owner's right to evict it pursuant to the Judgment to be issued by the State Supreme Court, with Bond's maintaining the right to stave off eviction by making agreed upon payments for the duration of what would have been the Lease term were the Least not terminated.

11.     Unfortunately, despite the fact that negotiations were ongoing, by March 22, 2022 Bond was dragging its feet and had not yet formally agreed to the terms discussed, resulting in service upon Bond by Owner of a notice of termination of tenancy dated March 22, 2022 ("Lease Termination Notice," Exhibit C hereto) terminating Bond's Lease and tenancy effective April 3, 2022. After service of the Termination Notice, Bond finally agreed to the arrangements as discussed, and Bond agreed that its counsel would accept service of a Summons and Complaint (Exhibit D hereto) which would be followed

by the filing of the Stipulation (terminating the Lease as of March 24, 2022), and the

Judgment which would be so ordered and signed, respectively, by the State Supreme

Court. The Summons and Complaint were filed with the State Supreme Court, and

Bond's attorney executed a Notice of Appearance dated March 28, 2022 (Exhibit E

hereto) in which he appeared for Bond in the State Supreme Court action and

acknowledged service of the Summons and Complaint on behalf of Bond. Thereafter,

the Stipulation was so ordered by the State Supreme Court, and the Judgment was

issued on April 29, 2022.

    12.    The Stipulation provides at paragraph 3 as follows:

"Based upon the termination of Coworkrs' lease and Coworkrs' continuing occupancy and possession of the Premises despite such termination, and subject to the remaining provisions of this Stipulation, Coworkrs is obligated to peacefully vacate and surrender possession of the Premises, and all keys thereto in its possession, within five (5) days after service by Plaintiff or its undersigned counsel upon Coworkrs by email to edeitsch@bondcollective.com and shlomo@bondcollective.com and upon its undersigned counsel by email to tovia@jclawllp.com of a notice to vacate ("Vacate Notice"). In that regard, Defendant hereby consents to the issuance of a judgment by the Court ("Judgment"), in the form annexed hereto as Exhibit B (subject to the Court's modifications, if any, thereto), (i) empowering and authorizing the New York City Marshal or the New York City Sheriff, and their deputies or other representatives, as the case may be, upon Plaintiff's tender to the New York City Marshal or the New York City Sheriff, as the case may be, of a certified copy of the Judgment, to use such force as is necessary to remove and evict Coworkrs and all occupants from the Premises, to wit, a Portion of Cellar, a Portion of First Floor and a Portion of Second Floor in the Building located at 68-80 Third Street, Brooklyn, New York 11231, as set forth in Exhibit A hereto, and to place Plaintiff into possession of the Premises, to wit, a Portion of Cellar, a Portion of First Floor and a Portion of Second Floor in the Building located at 68-80 Third Street, Brooklyn, New York 11231, as set forth in Exhibit A hereto, should Coworkrs not timely vacate and surrender possession of the Premises after service by Plaintiff of the Vacate Notice, and (ii) in the alternative, empowering and authorizing Plaintiff to utilize self-help, change the locks to the Premises, and thereby obtain possession of the Premises should Coworkrs not

timely vacate and surrender possession of the Premises after service by Plaintiff of the Vacate Notice, with the utilization of such self-help remedy having the same force and effect as if the New York City Marshal or the New York City Sherriff had placed Plaintiff into possession of the Premises."

13.     After providing for a stay of Bond's eviction on condition that it make timely payments of use and occupancy to Owner for a specific period of time ("Holdover Period"), the Stipulation provides at paragraph 11, in pertinent part, as follows:

"Should Coworkrs default in complying with any of its obligations hereunder, whether monetary, as set forth above, or nonmonetary as provided by the terms of the Lease and applicable during the Stay Period, as set forth above, and should Coworkrs fail to cure (i) any such monetary default within ten (10) days of written notice of such default delivered to Coworkrs by email to edeitsch@bondcollective.com and shlomo@bondcollective.com, and upon its undersigned counsel by email to tovia@jclawllp.com, or (ii) any nonmonetary default within thirty (30) days of written notice of such default delivered to Coworkrs by email to edeitsch@bondcollective.com and shlomo@bondcollective.com, and upon its undersigned counsel by email to tovia@jclawllp.com, unless such nonmonetary default is incapable of being cured during such thirty (30) day period, in which case Coworkrs must diligently begin the process of curing such nonmonetary default during such thirty (30) day period, and then continue to diligently pursue the cure of such default after the expiration of such thirty (30) day period, failing which (a) Plaintiff shall have the right to serve the Vacate Notice and thereafter immediately execute upon the Judgment as set forth above, (b) in the event the Judgment is not issued by the Court, Plaintiff shall nonetheless have the absolute right to serve the Vacate Notice and, should Coworkrs not timely vacate and surrender possession of the Premises after service by Plaintiff of the Vacate Notice, utilize self-help, change the locks to the Premises, and thereby obtain possession of the Premises, with the utilization of such self-help remedy having the same force and effect as if the New York City Marshal or the New York City Sheriff had placed Plaintiff into possession of the Premises, (c) Plaintiff's waiver of the Arrears Balance shall be deemed null and void, (d) the base real estate tax amount to be used for purposes of calculating the real estate tax escalation charges shall be $127,555.56, (e) all payment obligations under (x) this Stipulation and (y) the Lease to the extent they differ from Coworkrs' payment obligations as provided by this Stipulation, shall be deemed accelerated to the date of default, and Defendant

shall be liable for the immediate payment to Plaintiff of all such sums, and (f) notwithstanding any other remedy to which Plaintiff is entitled under the Lease and this Stipulation, Plaintiff shall have the right to the immediate entry of a money judgment against Coworkrs in the sum of $4,027,778.66 representing the Arrears and $50,000.00 in legal fees incurred by Plaintiff resulting from Coworkrs' default under the Lease, with interest thereon from March 1, 2022, upon the filing of an affidavit by Plaintiff with the Clerk of the Court pursuant to CPLR 3215(i) as to Coworkrs' failure to comply with the terms of this Stipulation, together with a copy of the complaint or a concise statement of the facts on which the claim was based."

14.     Paragraph 12 of the Stipulation provides as follows:

"Upon Coworkrs' peaceful surrender of possession of the Premises, or its eviction therefrom by any means as provided herein, any and all personal belongings, property, furnishings or installations remaining in the Premises after such surrender or eviction shall be deemed abandoned by Coworkrs, and may be discarded by Plaintiff at Coworkrs' expense and without liability to Coworkrs."

15.     Bond began making payments pursuant to the terms of the Stipulation, but by April 2023 its payments had become erratic, and as was the case when Owner had served Bond with the Lease Default Notices, Bond once again began falling behind in the payments which it was required to make pursuant to the Stipulation. This was extremely troubling and grossly unfair, as Bond was operating its business in the Premises at full tilt and collecting rent from the hundreds of occupants renting space from Bond but withholding significant payments due to Owner.

16.     Owner emailed Bond's principals on April 24, 2023 advising Bond that its payment due under the Stipulation had not been received. In response, it received an e-mail from Bond dated April 27, 2023 (Exhibit F hereto) advising it that Bond had been in talks and negotiations with a possible investor/restructuring partner. It went on to state

that it was pleased to introduce Oren Richland of Dearborn Capital Group ("Dearborn")

who would be its new capital partner and restructuring officer. Bond attached a letter

dated April 27, 2023 (Exhibit G hereto) providing Mr. Richland's contact details, and it

requested that Owner schedule a meeting with Mr. Richland to begin discussing the plans

for the future with respect to the Premises given the capital infusion expected from the

Dearborn.

17.    In response, Owner emailed Bond's principal on April 28, 2023 (Exhibit H

hereto) to confirm that it was authorized to deal with Mr. Richland and Dearborn on all

matters present and future regarding the Stipulation, the Premises, and Bond's occupancy

in the Premises. Bond's principal confirmed such authority by reply email.

18.    Thereafter, Owner embarked upon lengthy discussions with Mr. Richland

and Dearborn concerning Dearborn's acquisition of Bond, and the execution of a new

lease with a Dearborn entity with respect to the Premises. Negotiations concerned

forgiving the entire debt of Bond under the Judgment, releasing its principles from the

guarantees they had executed with respect to the Lease, and providing for a 10-year lease

term for a Dearborn created entity. At various junctures throughout negotiations, it was

Owner's understanding that the parties were near completion of a deal in this regard.

Indeed, Owner engaged counsel to prepare lease documents, as well as a release

agreement between and among Owner, Bond and its guarantors, and Dearborn which

would encompass all of these terms.

19.    Nevertheless, while Owner was advised by Mr. Richland that Dearborn was

prepared to move forward to sign the proposed new lease and the release agreement

prepared, it was also advised by Dearborn that it was not getting cooperation from Bond or its principals, who apparently were making more demands from Dearborn in order for the deal to move forward. By October 2023, it had been six months since these negotiations and discussions began, and with the history of Bond's incessant defaults, significant arrears, and broken promises, Owner had reached its limit in terms of waiting for Bond to do what it promised to do in April, which was to utilize Dearborn to right the ship and use the infusion of cash to make Owner whole.

20.     Accordingly, the attorney who represented Owner in the State Supreme Court action wrote to the attorney who represented Bond in the State Supreme Court action by e-mail dated October 31, 2023 (Exhibit I hereto) advising him that Owner would not wait much longer for Bond to finalize its deal with Dearborn. The e-mail made clear that Owner intended to pursue all of its rights under the terms of the Stipulation and the Judgment should a deal not be consummated with Dearborn and Bond by 5:00 p.m. on November 2, 2023.

21.     Needless to say, no deal with Bond and Dearborn was consummated by the November 2nd deadline set forth in Owner's attorney's October 31st e-mail. Accordingly, a Notice of Default dated November 2, 2023 ("Stipulation Default Notice," Exhibit J hereto), as required by the Stipulation, was served on Bond advising it that it was in default in making payment to Owner of $1,435,362.34 required by the Stipulation, and that if such default was not cured within 10 days, Owner intended to serve it with a vacate notice as provided by the Stipulation requiring that Bond vacate the premises within five days. In response, Owner did not receive any indication from Bond that it was

prepared to cure its default as set forth in the Stipulation Default Notice. Nor did Bond

seek any relief from the Kings County Supreme Court seeking to stay Owner from

exercising its rights under the Stipulation and Judgment.

22.     When no cure of its default was effectuated by Bond, a vacate notice dated

November 14, 2023 ("Vacate Notice," Exhibit K hereto), as provided by the Stipulation

and the Judgment, was served upon Bond requiring it that it vacate the Premises in 5 days,

failing which it would be evicted from the Premises in accordance with the terms of the

Stipulation and the Judgment. Again, Bond did not communicate with Owner, and did

seek any relief from the Kings County Supreme Court seeking a stay of its eviction.

23.     Bond did not vacate the Premises in accordance with the terms of the

Vacate Notice, and as reflected in the accompanying Declaration of Gregory Haye, the

individual property manager employed by Samson with respect to the Building, Mr. Haye

arrived at the Building at approximately 2:45 a.m. on November 21, 2023 and, utilizing a

locksmith/alarm company, had the locks to the Premises and Building changed, and had

control over the alarm system in place at the Premises transferred to Owner. Neither Mr.

Richland nor Dearborn nor any other entity accompanied Mr. Haye at this time or

participated in Owner's execution upon its self-help right to evict Bond from the

Premises.

24.     In the meantime, as it was becoming ever more apparent that Bond was

unlikely to cure its default by making payment of the over $1.4 million that was owed to

Owner under the terms of the Stipulation after Owner served the Stipulation Default

Notice, Dearborn made it clear that it was prepared to enter into a lease of its own accord

with Owner should Owner obtain possession of the Premises. With a new lease having already been prepared for a Dearborn entity in anticipation of an agreement being reached between and among Owner, Dearborn and Bond as discussed above, the new lease was substantially in a form ready to be adapted for Dearborn's tenancy, but could certainly not become effective until Owner had possession of the Premises.

      25.     Thus, after the cure period set forth in the Stipulation Default Notice had expired with no cure having been effectuated by Bond, and after the Vacate Notice was served, a lease was signed as of November 16, 2023 with a Dearborn entity known as Innovo Works 92 Third Street LLC ("Innovo") for the Premises. The lease with Innovo ("Innovo Lease") specifically provided that it was subject to possession of the Premises being obtained by Owner, and the Innovo Lease was held in escrow by Owner's counsel pending Owner obtaining possession of the Premises under its rights pursuant to the Stipulation and Judgment.

      26.     Therefore, on the morning of November 21st, after Owner obtained possession of the Premises as detailed in the accompanying Declaration of Gregory Haye, and as set forth above, Mr. Haye met Mr. Richland at the Building at approximately 7:00 a.m., at which point possession of the Premises was turned over by Owner to Mr. Richland on behalf of Innovo as the new tenant of the Premises. A letter from Owner was also provided to Innovo setting forth the Owner's rights under the Stipulation and Judgment, as well as Owner's execution upon its available self-help remedy to acquire legal possession of the Premises.

27.     Although Bond and its principals remained silent for weeks despite

receiving several notices from Owner regarding its default and Owner's intent to exercise

its rights under the Stipulation and Judgment and evict Bond from the Premises, Bond

awoke from its slumber, and one of its employees appeared at the Premises later in the

morning of November 21st. Bond threatened to call the police, and contributed to

confusion among Bond's members as to Innovo's legitimacy as a tenant of the Premises.

The police were not called, and the Bond employee left, but the damage was done. As I

understand it, the occupants of the Premises began receiving written communications

from Bond maintaining that it was still the tenant of the Premises, and that rent should

continue to be paid to it pursuant to whatever membership agreements were in place

between Bond and the occupants. As the occupants of the Premises were naturally

receiving different information from different sources, they grew confused, and remain

unsure to date as to whom rent should be paid.

28.     Owner provided Innovo with a letter dated November 28, 2023 (Exhibit L

hereto) addressed to the occupants of the Premises which simply summarized for them

the information available publicly concerning the Stipulation and the Judgment, as well

as Owner's exercise of its rights pursuant to those documents to evict Bond from the

Premises. The letter did not instruct any of these occupants as to whom rent should be

paid, and it made clear that because of the confusion, as well as the filing by Bond of its

Bankruptcy Petition on November 27th, Owner intended to seek clarification from the

Bankruptcy Court regarding these issues.

## III.    THE INSTANT APPLICATION

29.    At the moment, because of this confusion, Owner is now in a position where it has not yet released from escrow the Innovo Lease, and has not been paid by Innovo the monies which is due under the Innovo Lease at this time. No doubt, this is precisely the impact Bond wished to have by filing its Bankruptcy Petition even though it had been evicted from the Premises prior to its Bankruptcy filing in accordance with the Stipulation and Judgment to which it had agreed. Indeed, Owner's rights under the Innovo Lease are now threatened because it may not be able to provide Innovo with possession of the Premises by the January 31, 2024 possession date set forth in the Lease due to Bond's legal maneuvers in filing a Bankruptcy Petition and adversary proceeding which assert rights to the Premises and the Lease which Bond long ago abandoned and forfeited.

30.    If any party is being irreparably harmed by the circumstances described herein, it is Owner, which has done nothing but exercise the rights afforded to it by law, by the Stipulation and by the Judgment, only to find itself having to fend off claims of its alleged wrongdoing which are bereft of factual or legal basis. Bond's filing can only be intended to muddy the waters so as to perhaps put pressure to bear on Owner and Innovo to settle with Bond to its monetary advantage. Such a strategy cannot be countenanced by this Court.

31.    For all of the foregoing reasons and the reasons set forth in the accompanying memorandum of law prepared by Owner's attorneys, it is respectfully requested that this Court deny Bond's application in its entirety.

32.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 4th day of December, 2023.

David Kershner